PD-0445-15
COURT OF CRIMINAL APPEALS
AUSTIN, TEXAS
Transmitted 4/21/2015 11:12:35 AM
Accepted 4/21/2015 3:06:59 PM
ABEL ACOSTA
CLERK

No. PD-_____

_____

IN THE COURT OF CRIMINAL APPEALS
OF TEXAS

_____

FILED IN
COURT OF CRIMINAL APPEALS

April 21, 2015

ABEL ACOSTA, CLERK

DAVID FREDERICK CARY,

Appellant/Respondent,

v.

THE STATE OF TEXAS,

Appellee/Petitioner.

_____

From the Court of Appeals, Fifth District of Texas at Dallas
Court of Appeals No. 05-13-01010-CR

_____

**STATE'S PETITION FOR DISCRETIONARY REVIEW**

_____

KEN PAXTON
Attorney General of Texas

CHARLES E. ROY
First Assistant Attorney General

ADRIENNE McFARLAND
Deputy Attorney General
for Criminal Justice

EDWARD L. MARSHALL
Chief, Criminal Appeals Division

**\*JOSEPH P. CORCORAN**
Assistant Attorney General
Supervising Attorney
for Non-Capital Appeals
Criminal Appeals Division
State Bar No. 00793549
Joseph.Corcoran@TexasAttorneyGeneral.gov

P. O. Box 12548, Capitol Station
Austin, Texas 78711
Telephone: (512) 936-1400
Facsimile: (512) 936-1280

**\*Lead Appellate Counsel**

_____
ATTORNEYS FOR THE STATE

## IDENTITY OF PARTIES AND COUNSEL

To assist this Honorable Court in determining disqualification and recusal, the State certifies the following is a complete list of the parties and their attorneys in accordance with Texas Rule of Appellate Procedure 68.4(a).

1. **Counsel for the State**
   JOSEPH P. CORCORAN (This proceeding)
   Assistant Attorney General
   Texas Bar Number 00793549

   CARA HANNA (Dallas Court of Appeals)
   Assistant Attorney General
   Texas Bar Number 24055622

   GRETCHEN MERENDA (Dallas Court of Appeals)
   Assistant Attorney General
   Texas Bar Number 24010233

   ELIZABETH GOETTERT (Dallas Court of Appeals)
   Assistant Attorney General
   Texas Bar Number 24036646

   CATHY E. CHOPIN (Trial court)
   Assistant Attorney General
   Texas Bar Number 24055307

HARRY WHITE (Trial court)
(former) Assistant Attorney General
Texas Bar Number 24013740

P. O. Box 12548, Capitol Station
Austin, Texas  78711

2.    **Appellant**
DAVID CARY

3.    **Counsel for Appellant on appeal**
JOHN M. HELMS
Texas Bar Number 09401001
Law Offices of John M. Helms
2600 State Street
Dallas, TX 75204

4.    **Counsel for Appellant at trial**
KERRY LAWSON PEDIGO
Texas Bar Number 15716500
8401 North Central Expressway
Suite 630
Dallas, Texas, 75225

5.    **Trial Court Judge**
THE HONORABLE JOHN R. NELMS

# TABLE OF CONTENTS

                                         **Page**

IDENTITY OF PARTIES AND COUNSEL .............................................ii

TABLE OF CONTENTS ....................................................................iv

INDEX OF AUTHORITIES ...............................................................vii

STATEMENT REGARDING ORAL ARGUMENT .................................1

STATEMENT OF THE CASE ..............................................................1

STATEMENT OF PROCEDURAL HISTORY ........................................2

STATEMENT OF FACTS ....................................................................2

I.     Background .............................................................................2

II.    Legal Rational of the Court of Appeals ..........................................4

GROUND FOR REVIEW ....................................................................6

Does an appellate court give proper deference to a jury's finding that the State proved—beyond a reasonable doubt—that the predicate bribery payments were not intended to be "political contributions," when that court focuses on only the evidence tending to *negate* the finding, and fails to consider the totality of the evidence in *support* of the finding, including the rational inferences therefrom?

ARGUMENT ......................................................................................6

I.     The Court Of Appeals' Decision Conflicts With Another Panel Decision From The Same Court, On The Same Legal Issue ...........6

TABLE OF CONTENTS, Continued

II.   The Court of Appeals Resolved an Important Question of Constitutional Law In a Way That Appears to Conflict With the Applicable Decisions of Both This Court and the Supreme Court of the United States .......................................................... 7

III.  Fairness and Justice Support this PDR .......................................... 14

PRAYER FOR RELIEF ....................................................................... 15

CERTIFICATE OF SERVICE ............................................................ 16

CERTIFICATE OF COMPLIANCE WITH TEXAS RULE OF APPELLATE PROCEDURE 9.4 .......................................................... 17

# INDEX OF AUTHORITIES

## Cases

*Brooks v. State*, 323 S.W.3d 893 (Tex. Crim. App. 2010) ..................... 8, 9

*Cary v. State*, No. 05-12-01421-CR, 2014 WL 4261233 (Tex. App.—Dallas
Aug. 28, 2014) .................................................................... passim

*Cary v. State*, No. 05-13-01010-CR, 2015 WL 1346126 (Tex. App.—Dallas
Mar. 25, 2015) ................................................................... passim

*Clayton v. State*, 235 S.W.3d 772 (Tex. Crim. App. 2007) ...................... 8

*Clewis v. State*, 922 S.W.2d 126 (Tex. Crim. App. 1996) ........................ 9

*Delay v. State*, 443 S.W.3d 909 (Tex. Crim. App. 2014) .......................... 9

*Gear v. State*, 340 S.W.3d 743 (Tex. Crim. App. 2011) .......................... 8

*Isassi v. State*, 330 S.W.3d 633 (Tex. Crim. App. 2010) .......................... 8

*Jackson v. Virginia*, 443 U.S. 307 (1979) .......................................... 2, 8

*Martinez v. State*, 696 S.W.2d 930 (Tex. App.—Austin 1985) ............... 13

*McCallum v. State*, 686 S.W.2d 132 (Tex. Crim. App. 1985) ................. 13

*Mustard v. State*, 711 S.W.2d 71 (Tex. App.—Dallas 1986) ............ 10, 13

*Williams v. State*, 235 S.W.3d 742 (Tex. Crim. App. 2007) .................. 8, 9

## Statutes

Tex. Penal Code § 2.02(b) ..........................................................................4

Texas Penal Code § 36.02(d) ......................................................................4

## Other Authorities

Model Penal Code § 240.1 .........................................................................12

## STATEMENT REGARDING ORAL ARGUMENT

The State respectfully submits that the primary legal questions raised in this appeal are sufficiently complicated that oral argument would benefit the Court. Moreover, the Court recently granted a petition for discretionary review (PDR)—and oral argument—in an appeal involving Appellant's spouse, who was effectively Appellant's co-conspirator, which is substantively identical to the present appeal. *See Stacy Stine Cary v. State*, PD-1341-14.

## STATEMENT OF THE CASE

This appeal arises from a criminal conviction in the 366th Judicial District Court of Collin County, Texas. Following a jury trial, Appellant, David Cary, was convicted of one count of engaging in organized criminal activity under section 71.02(a) of the Penal Code, six counts of bribery under section 36.02 of the Penal Code, and one count of money laundering under section 34.02 of the Penal Code. 2 CR 654–58, 681–96.[1] Appellant

---

[1] "CR" refer to the Clerk's Record of papers filed in the trial court, preceded by the volume number and followed by the page number(s). "RR" refers to the Reporter's Record of the transcribed trial proceedings which occurred April 16, 2013 through April 26, 2013, preceded by the volume number and followed by the page number(s).

1

was sentenced by the jury in each count to fourteen years' imprisonment, all sentences to run concurrently. 10 RR 113–16; 1 CR 666–76.

## STATEMENT OF PROCEDURAL HISTORY

On March 25, 2015, after finding the evidence to be legally insufficient under the familiar standard set out in *Jackson v. Virginia*,[2] the court of appeals reversed the trial court's judgment of conviction and sentence for all counts, and entered a judgment of acquittal. *Cary v. State*, No. 05-13-01010-CR, 2015 WL 1346126 (Tex. App.—Dallas Mar. 25, 2015) ("*David Cary*"). The State did not seek rehearing.

## STATEMENT OF FACTS

### I.    Background

The reporter's record in this appeal is lengthy, and includes the testimony of numerous witnesses at trial, as well as voluminous documents admitted in evidence. The ultimate resolution of this appeal—a challenge to the legal sufficiency of the evidence to support Appellant's conviction—will necessarily involve a discussion of the testimony and key exhibits admitted at trial. Such a discussion is, however, far beyond the

---

[2] 443 U.S. 307 (1979).

limited scope and purpose of a PDR. Moreover, as the State will establish below, the decision to grant PDR can be made without an in depth review of the trial record.

In sum,[3] the evidence establishes that Appellant had ongoing litigation before Judge Sandoval of the 380th District Court in Collin County, and was dissatisfied by several adverse rulings in that litigation. Appellant developed a scheme to identify and to bribe a judicial candidate—Suzanne Wooten—who would then issue favorable rulings to Appellant in the pending litigation. To do this, Appellant caused approximately $150,000 to be paid to an intermediary—James Spencer— to offer, confer, or agree to confer a benefit to Suzanne Wooten, as consideration for Wooten's act of proceeding or continuing to run for office as a state district judge, or for presiding over and issuing favorable rulings to Appellant in cases before her as judge. To disguise these

---

[3] Unlike the *Stacy Cary* opinion, which devoted approximately twenty-six pages to describe the record evidence when performing its *Jackson* review, the opinion below devotes approximately two pages to describe the evidence at trial. Hence, the State is unable to properly describe the trial evidence with reference to the lower court's opinion, at least within the scope of this PDR. For an in depth discussion of the record evidence, the State directs the Court to pages 2–48 of its brief filed in the Dallas Court of Appeals, attached as Appendix C to this PDR.

3

payments, Appellant's spouse, Stacy Cary, created a fictitious consulting agreement with Spencer. *E.g., Cary v. State*, No. 05-12-01421-CR, 2014 WL 4261233, at *31 (Tex. App.—Dallas Aug. 28, 2014)[4] ("*Stacy Cary*") ("From the evidence relating to Spencer's consulting agreement with Stacy, the jury could have reasonably inferred the agreement was a subterfuge, fabricated several years after the purported effective date to provide a false explanation for the transfers of money from Stacy to Spencer that were used to finance Wooten's campaign").

The jury was charged that Appellant could be found guilty as either a principal or party to the bribery offenses, acting in concert with his spouse Stacy Cary (Stacy). For purposes of this appeal, Appellant's bribery convictions constituted a legal predicate for the remaining counts, and hence, a finding of legal insufficiency as to the bribery counts led the lower court to reverse and acquit all the remaining counts. *David Cary*, 2015 WL 1346126, at *6–8.

---

[4] The State has attached a copy of the panel opinion in the *Stacy* appeal as Appendix B.

## II.    Legal Rationale of the Court of Appeals

The court of appeals held that the evidence at trial was legally insufficient to sustain the conviction for all of the counts because, it reasoned, the State's proof at trial established that the only benefits to the target of Appellant's bribe, Wooten, were certain money transfers from Stacy, Appellant's wife, to Spencer, which the State argued at trial were used to fund Wooten's campaign. *David Cary*, 2015 WL 1346126, at *6. As a result, the lower court reasoned that "the State did not meet its burden to prove bribery beyond a reasonable doubt by something other than a political contribution." *Id.* In other words, the lower court concluded that the State failed to prove the "exception" contained in Texas Penal Code § 36.02(d)—that the payments were not a political contribution as defined by Title 15 of the Election Code—beyond a reasonable doubt, because the State's evidence showed that most of the bribery payments were eventually used in Wooten's campaign for political office. *Id.*; *see* Tex. Penal Code § 2.02(b) ("The prosecuting attorney must negate the existence of an exception in the accusation charging commission of the offense and prove beyond a reasonable doubt

5

that the defendant or defendant's conduct does not fall within the exception").

And again, because bribery was the primary legal predicate for the remaining counts, the court of appeals determined that the evidence was legally insufficient to sustain Appellant's conviction for those counts too.

## GROUND FOR REVIEW

Does an appellate court give proper deference to a jury's finding that the State proved—beyond a reasonable doubt—that the predicate bribery payments were not intended to be "political contributions," when that court focuses on only the evidence tending to *negate* the finding, and fails to consider the totality of the evidence in *support* of the finding, including the rational inferences therefrom?

## ARGUMENT

I. **The Court Of Appeals' Decision Conflicts With Another Panel Decision From The Same Court, On The Same Legal Issue**.

The opinion below is inconsistent with the distinct, although substantively identical,[5] panel decision in *Stacy Cary*. Although the *Stacy Cary* opinion is unpublished, two justices on the *Stacy Cary* panel resolved an identical question of legal sufficiency under *Jackson* against

---

[5] Without adopting the lower court's analysis on this point, the State directs the Court to the lower court's description of the nominal differences between the two prosecutions. *See David Cary*, 2015 WL 1346126, at *1, n.1.

6

Stacy, and *affirmed* her conviction—on a materially identical record. *See Stacy Cary*, 2014 WL 4261233A, at *33–34. In other words two justices on the *Stacy Cary* panel determined that a rational juror could have found the State disproved the political contribution element beyond a reasonable doubt, on substantially the same evidence. While the panel in this proceeding was not technically bound by the *Stacy Cary* opinion (because the *Stacy Cary* opinion is unpublished), the moral and logical tension between the two outcomes is problematic, *e.g.*, how can Stacy be guilty while Appellant, her spouse, is acquitted of the same crimes, on essentially the same evidence? Moreover, the "fact" that the *Stacy Cary* panel found legally sufficient evidence to support the convictions in that appeal is, by definition, considerable support for the State's argument that the panel in this appeal resolved the question incorrectly—at least if the justices on the *Stacy Cary* panel are themselves rational.

II. **The Court of Appeals Resolved an Important Question of Constitutional Law In a Way That Appears to Conflict With the Applicable Decisions of Both This Court and the Supreme Court of the United States**.

The court of appeals appears to have misapplied the *Jackson* standard for legal sufficiency. As a result, it failed to give proper

7

deference to the jury's historic determination that Appellant did not intend his predicate bribery payments to constitute political contributions. This Court has mandated that the legal sufficiency standard established in *Jackson* is the only standard to be used in a criminal case. *Brooks v. State*, 323 S.W.3d 893, 895 (Tex. Crim. App. 2010) (plurality op.). On review, all evidence—and any reasonable inferences from that evidence—are framed and measured in the light most favorable to the verdict; after which it is determined whether any rational trier of fact could have found the elements of the offense beyond a reasonable doubt. *Jackson*, 443 U.S. at 319; *Gear v. State*, 340 S.W.3d 743, 746 (Tex. Crim. App. 2011). The jury is the exclusive judge of witness credibility and the weight of the evidence. *Isassi v. State*, 330 S.W.3d 633, 638 (Tex. Crim. App. 2010). An appellate court presumes that the factfinder resolved any conflicting inferences in favor of the verdict and defers to that resolution. *See Jackson*, 443 U.S. at 326; *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). An appellate court also defers to the factfinder's evaluation of the credibility of the evidence and weight to give the evidence. *See Williams v. State*, 235 S.W.3d 742, 750

(Tex. Crim. App. 2007). The appellate court may not sit as a thirteenth juror and substitute its judgment for that of the fact finder by reevaluating the weight and credibility of the evidence. *Id.*

Here, the court of appeals cited the *Jackson* standard obliquely, with reference to *Delay v. State*, 443 S.W.3d 909, 912 (Tex. Crim. App. 2014). *David Cary*, 2015 WL 1346126, at *2. And while the lower court correctly noted that, "sometimes appellate review of legal sufficiency involves simply construing the reach of the applicable penal provision in order to decide whether the evidence, even when viewed in the light most favorable to conviction, actually establishes a violation of the law," in doing so the court failed to properly frame the evidence at trial in *favor* of the verdict. *Id.* at *4–6. Instead, the appellate court focused on only evidence tending to *negate* the jury's determination that the payments were not intended to be a "political contribution." *See id.* In essence, the lower court appears to have applied the civil standard for such review,

*i.e.*, whether the jury's resolution was against the great weight of competing evidence.[6] This was error.

The relevant legal question when properly framed, is whether—at the moment Appellant directed the transfer of money to Spencer—Appellant's intent was that each payment constitute a political contribution. *E.g., Mustard v. State*, 711 S.W.2d 71, 75 (Tex. App.—Dallas 1986, pet. ref'd) ("The offense of bribery focuses on the mental state of the actor, and is complete if a private citizen, by offering, conferring, or agreeing to confer intends an agreement"). The question then becomes whether the State proved that it was *not* Appellant's intent to make a political contribution at the instant each payment was made, beyond a reasonable doubt. The court of appeals arguably recognized this as the correct standard. *See David Cary*, 2015 WL 1346126, at *5 ("[I]f Stacy Cary transferred money to Spencer with the intent that it be used in connection with Wooten's campaign, then, by definition, the money is a political contribution").

---

[6] So, too, the lower court's rationale is much like the standard for *factual* sufficiency defined in *Clewis v. State*, 922 S.W.2d 126 (Tex. Crim. App. 1996), a standard ultimately jettisoned by this Court in *Brooks. See Brooks*, 323 S.W.3d at 895.

When the legal question is properly framed with reference to only the evidence *supporting* the jury's verdict, however, it becomes apparent that the *Stacy Cary* panel correctly resolved this question. *See Stacy Cary*, 2014 WL 4261233A, at \*33–34. A rational jury could have found that Appellant did not intend for the predicate transfers to Spencer to be used in connection with Wooten's campaign, and instead intended that the payments to Spencer be used to obtain, by any means necessary, (1) a person who would challenge the incumbent judge of the 380th Judicial District Court, despite the odds stacked against succeeding in such a challenge, and/or (2) a judge who would rule favorably in Appellant's custody and visitation proceedings, and/or rule in favor of his spouse Stacy. In other words, when the evidence supporting the jury verdict is properly framed, a rational juror could have determined that Appellant had no specific intent that his payments made by his spouse be used specifically in connection with the campaign. Such a juror finding, if rational, constitutes legally sufficient evidence of bribery.

In rejecting these arguments the lower court discarded the jury's inference in favor of the jury's *actual* decision, supplanting it instead with

11

evidence and argument *against* that decision. *E.g.*, *David Cary*, 2015 WL 1346126, at \*5 (the jury could not have relied on Appellant's deceptive conduct in preventing the payments from being traced back to him because "the State charged appellant with bribing Wooten, the State's theory was that the Carys funded Wooten's campaign, and the jury was asked whether the payments were made to Wooten as consideration for various actions on her part, including issuing rulings favorable to the Carys").

There are at least two problems with this approach. First, the State's "theory" of the case is not outcome determinative to the question of legal sufficiency, which considers *evidence* and valid inferences in relation to a jury charge—as they relate to the outcome the jury *actually* achieved. Second, the lower court gave too much weight to the consideration provided Wooten, and how those payments were *ultimately* used in her campaign. *See David Cary*, 2015 WL 1346126, at \*6 (showing that the lower court focused almost exclusively on the manner in which the "benefit" to Wooten was eventually used, and not on the evidence

supporting the jury's inference that Appellant did not specifically intend that benefit).

While the State did charge Appellant with "bribing Wooten," it alleged that Appellant offered, *or* conferred, *or* agreed to confer on another that payment, and the jury was properly instructed that proof of any one of the three alleged acts would warrant conviction, no proof of a bilateral agreement is needed. *E.g., Martinez v. State*, 696 S.W.2d 930, 933 (Tex. App.—Austin 1985, pet. ref'd) (distinguishing from *McCallum v. State*, 686 S.W.2d 132 (Tex. Crim. App. 1985) (proof of a bilateral agreement required where indictment only alleged a single theory of bribery)). Rather, in this instance, the offense of bribery is complete at the moment the offer is made. *Martinez*, 696 S.W.2d at 933 and n.3 (noting the "*McCallum* court's understanding of the 'as consideration for' language found in §36.02 and in Model Penal Code § 240.1 is not that of the model code commentators") (citing Model Penal Code § 240.1, Comment 4(b), (c)); *see Mustard*, 711 S.W.2d at 75. Hence, the lower court's fixation with the manner in which the money was ultimately used in the campaign, while probative, does not foreclose the possibility that

Appellant did not intend the money to be used as a political contribution at the moment he made the payment. This was the only question that mattered, and jury resolved it in *favor* of State.

## III. Fairness and Justice Support this PDR

As discussed, above, this Court granted a PDR in the *Stacy Cary* appeal to resolve the legal issue that the lower court resolved *against* the State in *this* appeal. The Court should grant PDR in this appeal for the same reason. Perhaps more important, PDR is necessary here to ensure both fairness to all parties, and the even-handed administration of justice. Finally, this appeal will assist the Court in providing guidance to the lower courts regarding the application of the *Jackson* standard for legal sufficiency under the bribery statute, and specifically the manner in which to analyze the exception in Texas Penal Code § 36.02(d), beyond a reasonable doubt.

## PRAYER FOR RELIEF

For the foregoing reasons, the State respectfully requests that this Court grant PDR, reverse the lower court, and affirm Appellant's convictions on all counts.

Respectfully submitted,

KEN PAXTON
Attorney General of Texas

CHARLES E. ROY
First Assistant Attorney General

ADRIENNE McFARLAND
Deputy Attorney General
for Criminal Justice

EDWARD L. MARSHALL
Chief, Criminal Appeals Division

/s/ Joseph P. Corcoran
JOSEPH P. CORCORAN*
\*Lead Counsel                     Supervising Attorney
   for Non-Capital Appeals
Criminal Appeals Division
State Bar No. 00793549
Joseph.Corcoran@TexasAttorneyGeneral.gov

P. O. Box 12548, Capitol Station
Austin, Texas  78711
Tel.: (512) 936-1400
Fax: (512) 936-1280

ATTORNEYS FOR THE STATE

15

## CERTIFICATE OF SERVICE

Pursuant to Rule 9.5(b)(1) of the Texas Rules of Appellate Procedure, I do hereby certify that if the email address of attorneys designated below is on file with the electronic filing manager, a true and correct copy of the foregoing notice was served electronically by that electronic filing manager, on the following attorneys via electronic mail:

John Michael Helms Jr.
Attorney for Appellant

Moreover, I do hereby certify that if the email addresses for the designated attorneys are not on file with the electronic filing manager, a true and correct copy of the foregoing pleading was served by email, addressed to:

John Michael Helms Jr.
john@johnhelmslaw.com

Lisa McMinn
State Prosecuting Attorney
lisa.mcminn@spa.texas.gov

/s/ Joseph P. Corcoran
JOSEPH P. CORCORAN
Assistant Attorney General

16

**CERTIFICATE OF COMPLIANCE WITH
TEXAS RULE OF APPELLATE PROCEDURE 9.4**

This brief complies with Tex. R. App. Proc. 9.4(i)(D) in that it contains 3,636 words, as calculated pursuant to Tex. R. App. Proc. 9.1(i), in Microsoft Word 2013, Century, 14 points.

/s/ Joseph P. Corcoran
JOSEPH P. CORCORAN
Assistant Attorney General

IN THE COURT OF CRIMINAL APPEALS
OF TEXAS

DAVID FREDERICK CARY,
Appellant/Respondent,

v.

THE STATE OF TEXAS,
Appellee/Petitioner.

From the Court of Appeals, Fifth District of Texas at Dallas
Court of Appeals No. 05-13-01010-CR

## APPENDIX A
## STATE'S PETITION FOR DISCRETIONARY REVIEW

2015 WL 1346126
Only the Westlaw citation is currently available.

NOTICE: THIS OPINION HAS NOT BEEN
RELEASED FOR PUBLICATION IN THE
PERMANENT LAW REPORTS. UNTIL RELEASED,
IT IS SUBJECT TO REVISION OR WITHDRAWAL.

OPINION
Court of Appeals of Texas,
Dallas.

David Cary, Appellant
v.
The State of Texas, Appellee

No. 05–13–01010–CR | Opinion Filed March 25,
2015

On Appeal from the 366th Judicial District Court,
Collin County, Texas, Trial Court Cause No.
366–81636–2011

**Attorneys and Law Firms**

John M. Helms, for David Cary.

Cara Blossom Hanna, Elizabeth A. Goettert, Gretchen B.
Merenda, Harry Eugene White, for the State of Texas.
Before Justices Bridges, Lang–Miers, and Myers

**OPINION**

Opinion by Justice Lang–Miers

**\*1** Appellant David Cary was charged with eight
felonies—six counts of bribery, one count of money
laundering, and one count of engaging in organized
criminal activity. After finding appellant guilty as
charged, the jury assessed concurrent sentences of
fourteen years in prison for each offense. On appeal
appellant argues that (1) the evidence is legally
insufficient to support his convictions, (2) he received
ineffective assistance of counsel, and (3) the bribery
statute is unconstitutional. We conclude that the State's
evidence is legally insufficient to support appellant's
convictions. We reverse the trial court's judgments and
render judgments of acquittal.

**BACKGROUND**

Appellant's convictions arise from the same evidence
presented by the State in the previous trial of his wife,
Stacy Stine Cary. We described all of the evidence at
great length in our opinion in Stacy Cary's appeal.
*See* *Cary v. State,* No. 05–12–01421–CR, 2014 WL
4261233 (Tex.App.–Dallas Aug. 28, 2014, pet. granted)
(not designated for publication). Because the parties agree
that the records in both cases are nearly identical,[1] we do
not re-describe all of the evidence again here. Instead, we
discuss pertinent evidence below as it pertains to the
issues we must decide in this appeal.

**ISSUES ON APPEAL**

Appellant raises six issues on appeal (several of which are
different from the issues raised in Stacy Cary's appeal). In
his first issue, appellant argues that the evidence is legally
insufficient to support his bribery convictions because (1)
the State's evidence proved an exception to the bribery
statute, (2) there was no evidence of consideration, and
(3) there was no evidence of intent. In his second issue,
appellant argues that the evidence is legally insufficient to
support his conviction for engaging in organized criminal
activity because there was insufficient evidence of the
alternative predicate offenses of bribery, money
laundering, and tampering with a governmental record. In
his third issue, appellant argues that the evidence is
legally insufficient to support his conviction for money
laundering because there was insufficient evidence of the
sole predicate offense of bribery. In his fourth issue,
appellant argues that he received ineffective assistance of
counsel because his counsel admittedly failed to timely
amend appellant's sentencing election so that punishment
could be assessed by the trial court, which caused
appellant to receive a longer sentence. In his fifth issue,
appellant argues that the bribery statute is unconstitutional
as applied because it impermissibly burdened his First
Amendment right to exercise political speech. In his sixth
issue, appellant argues that the bribery statute is facially
unconstitutional because it is vague and overbroad. We
only address appellant's first three issues because our
resolution of those issues is dispositive of this appeal.

## STANDARD OF REVIEW

**\*2** In evaluating the legal sufficiency of the evidence to support a criminal conviction, "reviewing courts are obliged to view all of the evidence in the light most favorable to the jury's verdict, in deference to the jury's institutional prerogative to resolve all contested issues of fact and credibility." *Delay v. State,* 443 S.W.3d 909, 912 (Tex.Crim.App.2014). But sometimes, as in this case, "appellate review of legal sufficiency involves simply construing the reach of the applicable penal provision in order to decide whether the evidence, even when viewed in the light most favorable to conviction, actually establishes a violation of the law." *Id.*

## BRIBERY

**Applicable Law**
The bribery statute at issue in this case provides as follows:

(a) A person commits an offense if he intentionally or knowingly offers, confers, or agrees to confer on another, or solicits, accepts, or agrees to accept from another:

(1) any benefit as consideration for the recipient's decision, opinion, recommendation, vote, or other exercise of discretion as a public servant, party official, or voter;

(2) any benefit as consideration for the recipient's decision, vote, recommendation, or other exercise of official discretion in a judicial or administrative proceeding;

(3) any benefit as consideration for a violation of a duty imposed by law on a public servant or party official; or

(4) any benefit that is a political contribution as defined by Title 15, Election Code, or that is an expenditure made and reported in accordance with Chapter 305, Government Code, if the benefit was offered, conferred, solicited, accepted, or agreed to pursuant to an express agreement to take or withhold a specific exercise of official discretion if such exercise of official discretion would not have been taken or withheld but for the benefit; notwithstanding any rule of evidence or jury instruction allowing factual inferences in the absence of certain evidence, direct evidence of the express

agreement shall be required in any prosecution under this subdivision.

(b) It is no defense to prosecution under this section that a person whom the actor sought to influence was not qualified to act in the desired way whether because he had not yet assumed office or he lacked jurisdiction or for any other reason.

(c) It is no defense to prosecution under this section that the benefit is not offered or conferred or that the benefit is not solicited or accepted until after:

(1) the decision, opinion, recommendation, vote, or other exercise of discretion has occurred; or

(2) the public servant ceases to be a public servant.

(d) It is an exception to the application of Subdivisions (1), (2), and (3) of Subsection (a) that the benefit is a political contribution as defined by Title 15, Election Code, or an expenditure made and reported in accordance with Chapter 305, Government Code.

(e) An offense under this section is a felony of the second degree.

TEX. PENAL CODE ANN. § 36.02 (West 2011) (internal footnote omitted).

**The Indictment**
The indictment charged appellant with bribery in counts two through seven in connection with six separate payments from Stacy Cary to James Stephen Spencer, Suzanne Wooten's campaign manager. For example, count two alleged that appellant,

> on or about January 4, 2008, ... did then and there intentionally and knowingly offer, confer, and agree to confer a benefit, other than a political contribution as defined by Title 15, Election Code, or an expenditure made and reported in accordance with Chapter 305 of the Government Code, to-wit: $50,000 to Suzanne H. Wooten, a public servant, to-wit: a candidate for the office of Judge of the 380th Judicial District Court and presiding Judge of the 380th Judicial District Court, as consideration for Suzanne H.

Wooten's decision, opinion, recommendation, vote, or other exercise of discretion as a public servant, and as consideration for Suzanne H. Wooten's decision, vote, recommendation, and other exercise of official discretion in a judicial proceeding, to wit: filing paperwork to run for Judge, proceeding and continuing with a campaign to unseat the incumbent elected Judge of the 380th Judicial District Court, and as Judge of the 380th Judicial District Court presiding over and issuing favorable rulings in cases in which [appellant] and Stacy Stine Cary are parties[.]

**\*3** The allegations in the other five bribery counts differed only with respect to the date and amount of the transfer. The payments totaled $150,000 and occurred between January 4 and March 14, 2008. The jury charge tracked the indictment and instructed the jury that appellant could be found guilty as a principal or as a party to the offenses of bribery.

**Analysis**

Appellant was charged with bribery under penal code sections 36.02(a)(1) and 36.02(a)(2). As a result, the exception for political contributions found in section 36.02(d) applies, and under section 2.02(b) of the penal code,[2] it was the State's burden to prove beyond a reasonable doubt that the benefits to Wooten, in this case the payments to Spencer, were something other than political contributions. In his first issue, appellant argues that the evidence is legally insufficient to support his bribery convictions because the State failed to satisfy that burden. We agree.

We begin by looking to the relevant definitions in Title 15 of the Texas Election Code. Shown in context, the relevant provisions of the election code provide:

(2) "**Contribution**" means a direct or **indirect transfer of money**, goods, services, or any other thing of value and includes an agreement made or other obligation incurred, whether legally enforceable or not, to make a transfer. The term includes a loan or extension of credit, other than those expressly excluded by this subdivision, and a guarantee of a loan or extension of credit, including a loan described by this subdivision. The term does not include:

(A) a loan made in the due course of business by a corporation that is legally engaged in the business of lending money and that has conducted the business continuously for more than one year before the loan is made; or

(B) an expenditure required to be reported under Section 305.006(b), Government Code.

(3) "**Campaign contribution**" means a **contribution to a candidate** or political committee that is **offered or given with the intent that it be used in connection with a campaign for elective office** or on a measure. Whether a contribution is made before, during, or after an election does not affect its status as a campaign contribution.

(4) "Officeholder contribution" means a contribution to an officeholder or political committee that is offered or given with the intent that it be used to defray expenses that:

(A) are incurred by the officeholder in performing a duty or engaging in an activity in connection with the office; and

(B) are not reimbursable with public money.

(5) "**Political contribution**" means **a campaign contribution** or an officeholder contribution.

(6) "Expenditure" means a payment of money or any other thing of value and includes an agreement made or other obligation incurred, whether legally enforceable or not, to make a payment.

(7) "Campaign expenditure" means an expenditure made by any person in connection with a campaign for an elective office or on a measure. Whether an expenditure is made before, during, or after an election does not affect its status as a campaign expenditure.

**\*4** TEX. ELEC. CODE ANN. § 251.001(2)–(7) (West 2010) (emphasis added).

Boiled down, the State's theory in this case was that the Carys secretly funded Wooten's campaign for elective office. And the only evidence of a benefit to Wooten in this case was that Stacy Cary gave money to Spencer and Spencer used it in connection with Wooten's campaign. During opening statements, for example, the State told the jury,

> Without Stacy Cary's money that was given to Stephen Spencer, Suzanne Wooten does not win.

Suzanne Wooten spends money on signs. She spends money on radio ads. She spends money on print ads. She spends money on direct mailers. She hires a consultant. None of these things are possible without the money being given to her.

During its case in chief, the State proved its theory through testimony and documentary evidence. During Spencer's direct examination by the State, for example, he repeatedly acknowledged that he used the money he received from Stacy Cary to pay for Wooten's campaign expenditures. Spencer's testimony was consistent with State's Exhibit 94, a compendium exhibit created by the State's fraud examiner, Kyle Swihart. Exhibit 94 shows the timing of the payments from Stacy Cary to Spencer, and which campaign expenses were paid using the money. Swihart testified at length about the evidence summarized in State's Exhibit 94. For example, with respect to the transfer of $50,000 from Stacy Cary to Spencer on January 4, Swihart explained that it was immediately used to pay Wooten's campaign consultant, Hank Clements:

Q. All right. We've got these two payments to Hank Clements totaling $15,000, which happen to be just a few days after this $50,000 comes in. Absent this money from Stacy Cary, does Stephen Spencer have the money to pay for Hank Clements?

A. No.

Q. And absent this money from Stacy Cary, does Suzanne Wooten's campaign have the money to pay for Hank Clements?

A. No.

With respect to the transfer of $25,000 from Stacy Cary to Spencer on February 4, Swihart testified that it was used to pay for additional campaign expenditures:

Q. Okay. And then there's another—appears to be another transfer from Stacy Cary?

A. Yes, of $25,000 that posted to his account on February 4th of 2008.

Q. All right. Now, after that post[ed] to his account, does he cut several more cashier's checks?

A. Yes, he does.

Q. Can you tell us what those cashier's checks are?

A. It would be the Plano Profile cashier's check on February 5th.

Q. Okay.

A. The Cartwright Signs check on February 5th. Actually both of those together there for $3877 and $4036. And then the last Cartwright expenditure on February 8th of 2008.

Q. All right. So, absent this $25,000 from Stacy Cary, does Stephen Spencer have the funds to get these cashier's checks?

A. No, he does not.

Likewise, with respect to the transfer of $25,000 from Stacy Cary to Spencer on February 15, Swihart testified that it was used to pay campaign expenditures:

Q. Okay. Now, the next thing I'd like to ask you about is this next transfer from Stacy Cary.

**\*5** A. The one on February 15th?

Q. Yes, sir. Can you tell me about that?

A. That is another transfer that occurred. I believe that one may have been via check. And that occurred on February 15th.

Q. Okay. And so his balance after that transfer of $25,000 is how much?

A. It's $25,000.92.

Q. And so that occurs on the 15th. And on the 20th, does he draw two checks?

A. Yes, he does.

Q. Okay. And what are those checks for?

A. Those are for radio ads for KVIL and KRLD.

Q. And absent this $25,000 that he receives from Stacy Cary, does he have the funds to pay for these advertisements?

A. No, he does not.

Q. Okay. And absent this $25,000 from Stacy Cary, does the Suzanne Wooten Campaign account have the funds to pay for these advertisements?

A. No.

Finally, during closing argument, the State told the jury that Stacy Cary's money was not a political contribution because it "never goes into [Wooten's] account. It's never reported."

The State argues on appeal that the payments to Spencer for Wooten's benefit should not be considered political contributions because the evidence demonstrates that appellant "deliberately engaged in several deceptive practices to prevent the funds from being traced to him." We must confine our analysis, however, to the definitions found in the election code. And under the definition of "political contribution" in the election code, no exception is made for covert indirect transfers of money.

Additionally, under the applicable definitions in the election code, the money did not need to be transferred directly to Wooten's campaign account, nor did it need to be properly reported in Wooten's campaign filings, in order for it to constitute a political contribution. Instead, if Stacy Cary transferred money to Spencer with the intent that it be used in connection with Wooten's campaign, then, by definition, the money is a political contribution.

The State also argues that a conclusion that the benefits to Wooten were political contributions would lead to an absurd result because it would mean that anyone could covertly and indirectly fund a judge's campaign in exchange for the candidate's agreement to rule in his favor, as long as there is no evidence of an express agreement. We disagree. We are not sanctioning the conduct in this case, nor are we concluding that it was lawful. Instead, we conclude that the State did not satisfy its burden under the specific language in section 36.02 of the penal code and Title 15 of the election code. SeeTEX. PENAL CODE ANN. § 36.02; TEX. ELEC. CODE ANN. § 251.001(2)–(7).

The State also argues that a rational jury could have found that appellant did not intend for the transfers to Spencer to be used in connection with Wooten's campaign, and instead intended that the payments to Spencer "be used to obtain, by any means necessary, (1) a person who would challenge the incumbent judge of the 380th Judicial District Court, despite the odds stacked against succeeding in such a challenge, and/or (2) a judge who would rule favorably in Appellant's custody and visitation proceedings, and/or rule in favor of his wife Stacy." The State contends that because of a difference between the amount Spencer spent on Wooten's campaign and the amount she reimbursed him, the jury could have inferred "that Appellant had no specific intent that every payment made by his wife be used specifically in connection with the campaign." But the State charged appellant with

bribing Wooten, the State's theory was that the Carys funded Wooten's campaign, and the jury was asked whether the payments were made to Wooten as consideration for various actions on her part, including issuing rulings favorable to the Carys.

**\*6** We recognize that the majority did not reach this conclusion in *Cary. See*2014 WL 4261233, at \*33–34. In that appeal, however, Stacy Cary did not raise the same issues as those presented here. For example, Stacy Cary did not raise the issue of whether the State failed to prove that the transfers from her to Spencer were not political contributions. Instead, Stacy Cary affirmatively argued in her appeal that the transfers to Spencer were compensation for services rendered under a consulting agreement. And the majority's discussion of unassigned error raised by the dissent was obiter dictum and not material to the majority's resolution of Stacy Cary's appeal.

We conclude that the State's evidence proved that the only benefits to Wooten were the transfers from Stacy Cary to Spencer, which the State argued were payments made to fund her campaign. As a result, the State did not meet its burden to prove bribery beyond a reasonable doubt by something other than a political contribution.[3] We resolve appellant's first issue in his favor, reverse the convictions for bribery, and render judgments of acquittal.

### MONEY LAUNDERING

A person commits the offense of money laundering if he "knowingly finances or invests or intends to finance or invest funds that the person believes are intended to further the commission of criminal activity." TEX. PENAL CODE ANN. § 34.02(a)(4) (West 2011). In this case the State alleged that appellant,

> on or about and between January 4, 2008 and March 14, 2008, ... did then and there, pursuant to one scheme and continuing course of conduct, knowingly finance, invest, and intend to finance and invest funds that [appellant] believed were intended to further the commission of criminal activity, to-wit: Bribery, and the aggregate value of said proceeds was $100,000 or more but less than $200,000[.]

In his third issue, appellant argues that the evidence is

legally insufficient to support his conviction for money laundering because there is "insufficient evidence of the only predicate offense—bribery." The State was not required to prove bribery in order to convict appellant of money laundering. Instead, the State was only required to prove that appellant believed he was furthering the commission of bribery. But in this case, the State's only evidence was that appellant believed Stacy Cary was making what constitutes political contributions under the election code. And the political contributions Stacy Cary made are subject to the exception under the bribery statute. As a result, there is no evidence that appellant believed he was furthering the commission of bribery. We resolve appellant's third issue in his favor, reverse the conviction for money laundering, and render a judgment of acquittal.

## ENGAGING IN ORGANIZED CRIMINAL ACTIVITY

A person commits the offense of engaging in organized criminal activity "if, with the intent to establish, maintain, or participate in a combination or in the profits of a combination, ... the person commits or conspires to commit one or more [enumerated offenses]." *See*TEX. PENAL CODE ANN. § 71.02(a) (West Supp.2014). In this case the State alleged that appellant engaged in organized criminal activity by committing or conspiring to commit three predicate offenses: bribery, money laundering, and tampering with a governmental record. *See id.* §§ (9) (bribery), (10) (money laundering), (13) (tampering with a governmental record).

**\*7** We have concluded that the evidence is insufficient to support the convictions for bribery and money laundering; consequently, those predicate offenses will not support the conviction for engaging in organized criminal activity. The sole remaining alleged predicate offense is tampering with a governmental record.

**The Indictment**
In the indictment the State alleged that appellant engaged in organized criminal activity by tampering with a governmental record as follows:

> on or about and between September 19, 2007 and October 20, 2009, ... with intent to establish, maintain, and participate in a combination and in the profits of a combination of three or more persons, namely, [appellant], Suzanne H. Wooten, Stacy Stine Cary, and

James Stephen Spencer, did commit and conspire to commit the following offenses:

> ...

**Tampering with a Government Record**, in that Suzanne H. Wooten did then and there, with the intent to defraud and harm another, namely, the State of Texas, the Texas Ethics Commission, and the citizens of Texas, intentionally and knowingly make, present, and use a governmental record with knowledge of its falsity, to-wit: prepared, swore, and affirmed a Personal Financial Statement that was submitted to the Texas Ethics Commission and did not list and report all gifts and loans, as required by Texas Government Code Sec. 572.023, omitting [appellant], Stacy Stine Cary, and James Stephen Spencer under the heading "Gifts," and the heading "Personal Notes and Lease Agreements," when in truth and fact [Wooten] had received gifts and loans from [appellant], Stacy Stine Cary, and James Stephen Spencer during the calendar year 2008;

> and in furtherance of the conspiracy to commit said offenses [appellant] performed one or more overt acts, to-wit: communicated with other members of the combination, and organized, planned, and supervised the other members of the combination....

*See id.*§§ 37.10(a)(5), 71.02(a)(13).

The governmental record at issue here is Wooten's Personal Financial Statement for calendar year 2008 that she filed with the Texas Ethics Commission as part of her judicial campaign. The State argued that appellant, Wooten, and at least one other person committed and conspired to commit tampering with a governmental record, specifically, falsifying Wooten's Personal Financial Statement by omitting loans and gifts she received from appellant, Stacy Cary, and Spencer.

**Applicable Law**
The government code requires a candidate or officeholder to file a Personal Financial Statement and, in that report, to disclose personal loans over $1,000 and personal gifts over $250 made or given to the reporting individual, the reporting individual's spouse, or the reporting individual's dependent child. TEX. GOV'T CODE ANN. § 572.023(a)(5), (7) (West 2012). As charged in this case, a person commits the offense of tampering with a governmental record if the person makes, presents, or uses a Personal Financial Statement with knowledge of its falsity and with intent to defraud or harm another. *See*TEX. PENAL CODE ANN. § 37.10(a)(5); *State v.*

*Vasilas,* 198 S.W.3d 480, 484 (Tex.App.–Dallas 2006), *aff'd,* 253 S.W.3d 268 (Tex.Crim.App.2008).

"Gift," "personal loan," and "personal note" are not defined in the statute. The ordinary meaning of "gift" is a voluntary transfer of property to another made gratuitously and without consideration. *Magness v. Magness,* 241 S.W.3d 910, 912 (Tex.App.–Dallas 2007, pet. denied). The elements of a gift are (1) the intent to make a gift; (2) delivery of the property; and (3) acceptance of the property. *Id.* The ordinary meaning of "loan" is "money lent at interest." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1326 (1981). And "note" means "a written or printed paper acknowledging a debt and promising payment." *Id.* at 1544. The State's campaign finance expert, Ian Steusloff, testified that he understood "personal note" to include a "document that states that you agree to pay a specific amount to another person[.]"

**Analysis**

**\*8** In his second issue, appellant argues that there is no evidence of unreported loans or gifts to Wooten individually; there is no evidence Wooten's Personal Financial Statement was false; and there is no evidence appellant knew about the existence or contents of Wooten's Personal Financial Statement. We agree.

All of the State's evidence, indeed its entire theory, was that the money Stacy Cary transferred to Spencer was used to benefit Wooten's judicial campaign. But the State's ethics expert testified that the Personal Financial Statement applied only to loans and gifts to the candidate, not to the campaign. And the State did not present any evidence that appellant, Stacy Cary, or Spencer directly or indirectly gave money to Wooten individually. In fact, Swihart, the State's fraud expert who investigated this case for four years, agreed that "there's not a single payment that went from either Dave or Stacy Cary to Suzanne Wooten" and "there's not even a situation where there's been a payment from either [of] the Carys to a third party who then turned around and forwarded that money to Judge Wooten[.]" Steusloff testified that he was sitting in the courtroom for a majority of the witnesses' testimony and he had "not heard of any gifts." And he agreed that if there was no evidence Wooten received a gift, then checking "Not Applicable" under "Gifts" on the Personal Financial Statement would be correct.

Having reviewed the entire record, we conclude that the State did not offer any evidence that appellant, Stacy Cary, or Spencer intended to make a gift of money to Wooten individually, that appellant, Stacy Cary, or Spencer delivered a gift of money to Wooten, or that Wooten accepted a gift of money from appellant, Stacy Cary, or Spencer.

We also conclude that the State did not offer any evidence that appellant, Stacy Cary, or Spencer loaned Wooten money. Wooten's Personal Financial Statement disclosed a loan to Wooten individually from Bank of America, and Swihart testified that "[a]s far as [he knew]" that was the only loan for Wooten's campaign. The State offered no evidence that Wooten signed a personal note in favor of appellant, Stacy Cary, or Spencer. And Steusloff testified that he believed to constitute a personal note "as a minimum, there would need to be a document that said 'I, Suzanne Wooten, promise to pay.'" The State offered no such document. We conclude that the State offered no evidence of a personal note or personal loan to Wooten individually.

Additionally, the State did not offer any evidence that appellant knew about the Personal Financial Statement, knew Wooten had to file such a statement, knew what the statement was required to include, or knew what Wooten disclosed when she filed it. The State concedes that there is "no direct evidence of [a]ppellant's knowledge of Wooten's campaign records or record filing requirements," but it argues that the jury could have inferred based on appellant's "blatant disregard for complying with any [reporting] restrictions [that] [a]ppellant must have intended for Wooten to omit him, his wife, and/or Spencer from her Personal Financial Statement as the bulk of her campaign resources." Based on this record, any such inference amounts to mere surmise or suspicion.

We conclude that the State offered no evidence that Wooten's Personal Financial Statement omitted alleged loans and gifts from appellant, Stacy Cary, or Spencer because there is no evidence of loans or gifts from them to Wooten individually. We further conclude that the State offered no evidence of appellant's knowledge that Wooten allegedly falsified her Personal Financial Statement. Because there is no evidence to support any of the alleged predicate offenses, the conviction for engaging in organized criminal activity cannot stand. We resolve appellant's second issue in his favor, reverse the conviction for engaging in organized criminal activity, and render a judgment of acquittal.

**CONCLUSION**

**\*9** We conclude that the evidence is legally insufficient to

sustain appellant's convictions for bribery, money laundering, and engaging in organized criminal activity. We reverse appellant's convictions and render judgments of acquittal. As a result, we do not need to address appellant's remaining arguments.

Footnotes

1    According to the State, the records are "materially identical." According to appellant, the only difference is that the following additional evidence was presented in appellant's case only:
    • The jury heard evidence that the judge who was appointed to preside over appellant's modification proceeding after Suzanne Wooten recused herself made decisions in favor of appellant, including ordering that the children should live with appellant.
    • James Stephen Spencer explained and put into context the email exchange between him and appellant dated June 9, 2009, concerning the Supreme Court's June 8, 2009 decision in *Caperton v. A.T. Massey Coal Co.,* 556 U.S. 868, 129 S.Ct. 2252, 173 L.Ed.2d 1208 (2009). Spencer testified that the reason he was interested in the *Caperton* decision was because of his ongoing concerns about the Family Law Foundation's potential influence over a judge in Tarrant County.
    • The jury heard evidence that Wooten planned to voluntarily recuse herself in cases in which a party was represented by someone from her former law firm for approximately nine months after she separated from her firm, and the motion to recuse Wooten in Stacy Cary's case against Jennifer Cary was filed around the time her self-imposed decision to recuse was supposed to expire.
    • Rick Robertson testified that while Wooten was on the bench he "found her to be a judge to follow the law," and there was nothing about her rulings that would suggest that she had been bribed.
    • Two witnesses for the State testified that Wooten was ethical and had a strong reputation for ethics.

2    Section 2.02(b) of the penal code states, "The prosecuting attorney must negate the existence of an exception in the accusation charging commission of the offense and prove beyond a reasonable doubt that the defendant or defendant's conduct does not fall within the exception." TEX. PENAL CODE ANN. § 2.02(b) (West 2011).

3    Because we conclude that the exception to the bribery statute was not negated, we do not need to address appellant's alternative arguments that the evidence is legally insufficient to support his bribery convictions because there is no evidence of consideration or intent.

---

**End of Document**    © 2015 Thomson Reuters. No claim to original U.S. Government Works.

_____

IN THE COURT OF CRIMINAL APPEALS
OF TEXAS
_____


DAVID FREDERICK CARY,

                          Appellant/Respondent,

v.

THE STATE OF TEXAS,

                          Appellee/Petitioner.
_____


From the Court of Appeals, Fifth District of Texas at Dallas
Court of Appeals No. 05-13-01010-CR
_____

## APPENDIX B
## STATE'S PETITION FOR DISCRETIONARY REVIEW

2014 WL 4261233
Only the Westlaw citation is currently available.

SEE TX R RAP RULE 47.2 FOR DESIGNATION
AND SIGNING OF OPINIONS.

OPINION
**Do Not Publish Tex.R.App. P. 4**
Court of Appeals of Texas,
Dallas.

Stacy Stine CARY, Appellant
v.
The STATE of Texas, Appellee.

No. 05–12–01421–CR. | Aug. 28, 2014. |
Discretionary Review Refused March 25, 2015

On Appeal from the 366th Judicial District Court, Collin
County, Texas, Trial Court Cause No. 366–81637–2011.
James Fallon, Judge.

**Attorneys and Law Firms**

John M. Helms, Robert R. Smith, Dallas, TX, for
appellants.

Cara Blossom Hanna, David Glickler, Harry Eugene
White, Greg Abbott, Austin, TX, for appellees.

Before Justices FITZGERALD, LANG, and FILLMORE.

OPINION

Opinion by Justice FILLMORE.

**\*1** A jury found appellant Stacy Stine Cary (Stacy) guilty
of one count of engaging in organized criminal activity,
six counts of bribery, and one count of money laundering.
The trial court assessed punishment of ten years'
confinement and a fine of $10,000 for each count, those
sentences to run concurrently. The trial court suspended
imposition of the sentences, and placed Stacy on
community supervision for a period of ten years. The trial
court required her to serve thirty days in county jail as a
condition of her community supervision.[1]

In four issues, Stacy contends the evidence is insufficient

to support the bribery, engaging in organized criminal
activity, and money laundering convictions, and the trial
court erred by excluding evidence that Stacy's husband
did not need to bribe a judge to obtain favorable rulings in
his child custody case. We affirm the trial court's
judgments.

**Background**

*Indictment*

With regard to six transfers of money ($50,000 on
January 4, 2008, $25,000 on January 30, 2008, $25,000
on February 14, 2008, $25,000 on February 26, 2008,
$10,000 on March 7, 2008, and $15,000 on March 14,
2008), Stacy was charged with six counts of bribery for
intentionally and knowingly offering, conferring, and
agreeing to confer a benefit, other than a political
contribution as defined by Title 15 of the election code, or
an expenditure made and reported in accordance with
Chapter 305 of the government code, to Suzanne H.
Wooten as a public servant:

> to-wit: a candidate for the office of
> Judge of the 380th Judicial District
> Court and presiding Judge of the
> 380th Judicial District Court, as
> consideration for Suzanne H.
> Wooten's decision, opinion,
> recommendation, vote, or other
> exercise of discretion as a public
> servant or as consideration for
> Suzanne H. Wooten's decision,
> vote, recommendation, or other
> exercise of official discretion in a
> judicial proceeding, to-wit: filing
> paperwork to run for Judge,
> proceeding or continuing with a
> campaign to unseat the incumbent
> elected judge of the 380th Judicial
> District Court, and as Judge of the
> 380th Judicial District Court
> presiding over and issuing
> favorable rulings in cases in which
> [Stacy] and David Cary are
> parties[.]

Stacy was charged with money laundering as follows:

[Stacy] on or about and between January 4, 2008 and March 14, 2008, ... did then and there, pursuant to one scheme and continuing course of conduct, knowingly finance, invest, and intend to finance and invest funds that [Stacy] believed were intended to further the commission of criminal activity, to-wit: Bribery, and the aggregate value of said proceeds was $100,000 or more but less than $200,000[.]

Stacy was also charged with engaging in organized criminal activity as follows:

[O]n or about and between September 19, 2007 and

| Date of Transfer | Date of Deposit | Amount |
| --- | --- | --- |
| January 4, 2008 | January 4, 2008 | $50,000 |
| January 30, 2008 | February 4, 2008 | $25,000 |
| February 14, 2008 | February 15, 2008 | $25,000 |
| February 26, 2008 | February 26, 2008 | $25,000 |
| March 7, 2008 | March 7, 2008 | $10,000 |
| March 14, 2008 | March 14, 2008 | $15,000 |

to Suzanne H. Wooten, a public servant, to-wit: a candidate for the office of Judge of the 380th Judicial District Court and presiding Judge of the 380th Judicial District Court, as consideration for Suzanne H. Wooten's decision, opinion, recommendation, vote, or other exercise of discretion as a public servant or as consideration for Suzanne H. Wooten's decision, vote, recommendation, or other exercise of official discretion

October 20, 2009, ... with intent to establish, maintain, and participate in a combination and in the profits of a combination of three or more persons, namely, [Stacy], Suzanne H. Wooten, David Cary, and James Stephen Spencer, did commit and conspire to commit the following offenses:

**\*2 Bribery,** in that [Stacy] did then and there intentionally and knowingly offer, confer, and agree to confer a benefit, other than a political contribution as defined by Title 15, Election Code, or an expenditure made and reported in accordance with Chapter 305 of the Government Code, to-wit: one or more of the following transactions:

in a judicial proceeding, to-wit: filing paperwork to run for Judge, proceeding and continuing with a campaign to unseat the incumbent elected Judge of the 380th Judicial District Court, or as Judge of the 380th Judicial District Court presiding over and issuing favorable rulings in cases in which [Stacy] or David Cary are parties; OR

**Money Laundering,** in that [Stacy] did then and

there, pursuant to one scheme and continuing course of conduct, knowingly finance, invest, intend to finance and invest funds that [Stacy] believed were intended to further the commission of criminal activity, to-wit: Bribery, and the aggregate value of said proceeds was $100,000 or more but less than $200,000; OR

**Tampering with a Government Record,** in that Suzanne H. Wooten did then and there, with intent to defraud and harm another, namely, the State of Texas, the Texas Ethics Commission, or the citizens of the State of Texas, intentionally and knowingly make, present, and use a governmental record with knowledge of its falsity, to-wit: prepared, swore, or affirmed a Personal Financial Statement that was submitted to the Texas Ethics Commission and did not list and report all gifts and loans, as required by [Texas Government Code Sec. 572.023](), omitting [Stacy], David Cary, and James Stephen Spencer under the heading "Gifts," and the heading "Personal Note and Lease Agreements," when in truth and fact said Suzanne H. Wooten had received gifts and loans from [Stacy], David Cary, and James Stephen Spencer during the calendar year 2008;

and in furtherance of the conspiracy to commit said offenses [Stacy] performed one or more overt acts, to-wit: initiated, authorized, and executed six monetary transactions composed of wire transfers and checks totaling $150,000 to James Stephen Spencer[.]

### Evidence at Trial

**\*3** The reporter's record in this appeal includes the testimony of the numerous witnesses at trial, as well as voluminous documents admitted in evidence. Because this appeal involves a challenge to the sufficiency of the evidence to support Stacy's convictions, a rather lengthy discussion of the testimony and key exhibits admitted at trial is necessary.

### Rick Robertson

David Cary (David) filed for divorce from Jennifer Cary (Jennifer) in December 2003. The divorce petition was filed in the 380th Judicial District Court of Collin County, Texas. Judge Charles Sandoval (Sandoval) was the presiding judge of that court. Rick Robertson, a board certified family law attorney practicing in Collin County,

represented Jennifer throughout the divorce proceeding. Robertson testified at trial regarding the divorce and a subsequent suit affecting the parent-child relationship (SAPCR). David was represented by four different lawyers during the divorce proceeding, and in the divorce proceeding and subsequent SAPCR many depositions were taken and hearings conducted.

In the divorce proceeding, David and Jennifer reached an agreement regarding the terms of possession of their twin daughters, the amount of child support, and a fund to be established by David for the children's education expenses. Sandoval signed the final divorce decree on October 5, 2004.[2] In April 2005, Jennifer filed a SAPCR in the 380th Judicial District Court. The parties mediated Jennifer's SAPCR, and a partial mediated settlement agreement was signed in June 2005 and filed in Sandoval's court in July 2005.

In the summer or fall of 2005, a hearing in the SAPCR proceeding was conducted on Jennifer's motion for temporary orders. David filed a motion to transfer the proceeding to Dallas County, Texas, which Jennifer opposed. Sandoval denied David's motion to transfer the case.[3] In April 2006, David filed a motion to recuse Sandoval. On May 8, 2006, the judge appointed to hear the motion to recuse denied that motion. In October 2006, a trial was conducted before Sandoval concerning a number of issues in the SAPCR. Among Sandoval's rulings following the trial was an order that David pay Jennifer's attorney's fees in the amount of $416,543.16.[4] A final order of modification was signed by Sandoval on December 1, 2006. Robertson testified that David appealed almost every order signed by Sandoval, and Robertson found it unusual that neither David nor Jennifer appealed Sandoval's final order of modification. In January 2007, David filed a motion to modify the prior order in the SAPCR. Robertson testified that in moving to modify a SAPCR order, one typically must allege some change in circumstances occurring since the last order. Robertson was surprised by David's motion to modify, because it was filed the month after Sandoval's December 2006 final order of modification. In his motion to modify, David asserted he had secured full-time employment at a higher salary than attributed to him at the entry of prior modification orders, he had married Stacy on December 3, 2006 resulting in a decrease in his monthly expenses, and he had a court-ordered duty to support a teenage daughter from a marriage prior to his marriage to Jennifer. David also moved again for transfer of the proceeding to Dallas County.[5] Jennifer answered the January 2007 motion to modify and sought an order that David pay her attorney's fees and sanctions for filing frivolous pleadings. Sandoval denied David's motion to modify the

December 1, 2006 order. On June 25, 2007, Sandoval signed an order sanctioning David in the amount of $50,000.

Sandoval was opposed by Suzanne Wooten (Wooten) in the 2008 Republican primary for judge of the 380th Judicial District Court. There was no candidate in the 2008 Democrat primary for judge of the 380th Judicial District Court, so the winner of the Republican primary would be elected judge of that court in the 2008 general election. Sandoval was defeated by Wooten in the 2008 Republican primary, and his last day in office was December 31, 2008. Wooten became the judge of the 380th Judicial District Court in January 2009.

**\*4** Robertson testified that in January 2009, David filed another motion to modify in the SAPCR. Robertson understood Jennifer retained attorney Kyle Basinger to represent her in David's motion to modify. Before Wooten announced her candidacy for judge of the 380th Judicial District Court, she was affiliated with Basinger's law firm and practiced in the Collin County office of that firm.

### *Israel Suster*

Jennifer retained attorney Israel Suster to assist her in the collection of $416,543.16 in attorney fees and the $50,000 sanction Sandoval had previously ordered David to pay. Suster testified that to facilitate collection of these sums, he filed a Motion for Turnover Order in Sandoval's court. In the application, Jennifer sought to require the turnover to a previously appointed receiver of funds held by David's legal counsel that allegedly constituted an unused retainer paid by David, and funds held by Tolleson Private Bank that allegedly were owned by or for the benefit of David and which he had the authority to withdraw. In support of Jennifer's Motion for Turnover Order, Suster filed his affidavit and supporting exhibits which, among other things, stated that documents produced by David's legal counsel in response to a subpoena duces tecum indicate the counsel was in possession of $12,798.50 being held on behalf of David for the purpose of payment of future legal services, and that upon Suster's information and belief, David was the owner and/or beneficiary of funds held at Tolleson Private Bank. Attached as Exhibit 2 to Suster's affidavit is a copy of a $30,000 cashier's check issued by Tolleson Private Bank, representing payment by David to Jennifer of educational funds for their children that had been ordered by Sandoval. Suster therefore assumed the educational fund payment originated from an account held by or on

behalf of David at Tolleson Private Bank.

Suster filed a motion to hold David in contempt for failure to pay the $50,000 sanction and for failure to provide information and documents as ordered by Sandoval on January 31, 2007. Shortly after Sandoval signed the requested turnover order, Stacy filed a petition in intervention and motion to dissolve the turnover order, and objections to subpoenas seeking information from third parties pursuant to the turnover order. Stacy sought sanctions against Suster. David filed a motion to set aside the turnover order and the orders imposing sanctions and awarding attorney's fees. At the January 3, 2008 hearing of David's motions, Stacy testified she intervened in the lawsuit because Suster and Jennifer were trying to seize Stacy's funds, claiming the funds were owned by David. At the hearing, Stacy testified she purchased the cashier's check from Tolleson Private Bank used by David to establish the educational fund ordered by Sandoval in order to keep David from being held in contempt for failure to make the payment. Stacy also testified at the hearing regarding payments she made to attorneys who represented David. Sandoval quashed the prior turnover order and denied Stacy's motion for sanctions against Suster.

On January 3, 2008, Suster was served with a December 2007 lawsuit filed by Stacy against him in County Court at Law No. 4, Collin County, Texas. Stacy alleged Suster had committed fraud by filing a lien in the 380th Judicial District Court in conjunction with the application for a turnover order. On May 28, 2008, Judge Wheless signed an order transferring Stacy's lawsuit against Suster from County Court at Law No. 4 to the 380th Judicial District Court to be consolidated with the SAPCR involving David and Jennifer over which Sandoval was presiding. Stacy objected to Wheless transferring her lawsuit against Suster to the 380th Judicial District Court and filed a motion to reconsider the transfer. After Stacy's lawsuit against Suster was transferred to the 380th Judicial District Court, Stacy did not press for the discovery she had sought while the case was pending in the County Court at Law. However, after Wooten became judge of the 380th Judicial District Court in January 2009, Stacy pursued her motions for additional discovery and depositions. When Wooten allowed only a limited amount of the discovery Stacy requested, Stacy dismissed her lawsuit against Suster.

### *Michael Puhl*

**\*5** Michael Puhl is a board certified family law attorney

practicing in Collin County, Texas. In 2006, the judge of the 366th Judicial District Court in Collin County was not seeking reelection, and Puhl ran as a candidate for election to that bench. Puhl's campaign expenses totaled $20,000 to $25,000, and $5,000 to $8,000 of that amount was funded from Puhl's personal resources. Puhl testified that his opponent spent over $100,000 on the campaign. Puhl was not successful in that election.

In the fall of 2007, Puhl received a telephone call from James Spencer. Puhl had not previously met Spencer. Spencer told Puhl that he was interested in speaking to Puhl about the possibility of Puhl running for election against Sandoval as the sitting judge of the 380th Judicial District Court. Puhl's best recollection was that he met with Spencer in mid or late summer of 2007. Spencer's phone records show a phone call with Puhl on December 5, 2007, but Puhl testified his initial phone conversation with Spencer took place much earlier than that date. Either in the phone conversation or in the subsequent meeting, Spencer told Puhl that he was involved with the Texas Home School Coalition (THSC), and there were several people he knew who were dissatisfied with decisions rendered by Sandoval and were seeking an opponent for Sandoval in the 2008 Republican primary. Spencer indicated to Puhl that he could provide financial support for Puhl's campaign as well as volunteer support for walking neighborhoods to distribute campaign materials. With regard to financial support, Spencer's representations to Puhl were very general in nature; Puhl's impression was that Spencer could marshal supporters who would provide financial assistance to the campaign. Puhl also testified that most attorneys are not inclined to contribute to a campaign against an incumbent judge, because contributions are listed on the candidate's State campaign finance disclosure forms. Puhl testified that the maximum campaign contribution that could be made to a candidate for a Collin County bench in 2006 was $2,500 per household. Puhl declined to run as a candidate in the election.

### *Daniel Dodd*

**\*6** Daniel Dodd, chair of the Democratic Party in Collin County in 2007, testified that in early November 2007, he learned Wooten wanted to run for election as a Collin County judge. At a meeting with Dodd, Wooten indicated she was considering running for judge of the 380th Judicial District Court against Sandoval, but Wooten had not decided whether to run as a Democrat or a Republican. Dodd informed Wooten that if she ran as a Democrat, he could not give her money for signs because

of a lack of funds. Dodd advised Wooten that if she had signs, the Democratic Party would make sure they were distributed.

After Dodd met with Wooten, he received a telephone call from an individual in Austin, Texas. Dodd could not remember the name of the caller, but the man told Dodd that "a bunch of lawyers ... did not like" Sandoval and they would "like to get him out." The man told Dodd that Wooten looked like a good candidate to defeat Sandoval, and "they" wanted to help her. The man told Dodd that he thought it would probably cost about $100,000 to run a successful campaign, and he could get the money. The man was requesting permission to contact Wooten. Dodd told the man that Wooten was considering whether she would run as a Democrat or a Republican. Dodd testified that an individual had better odds of being elected in Collin County running as a Republican. Dodd gave the man Wooten's contact information. Sometime after that, Dodd contacted Wooten and inquired whether she was going to run for election as a Democrat or a Republican. Wooten informed Dodd she was going to run for election as a Republican.

### *James Stephen Spencer*

Spencer testified that he was charged with the same offenses as Stacy: engaging in organized criminal activity, bribery, and money laundering. He confirmed that he was being compelled to testify under a grant of testimonial immunity.

Spencer had an employment background in health care administration, but for the past fifteen years has done independent consulting work in areas ranging from marketing to finance, with some work involving political, regulatory, and legislative matters. Spencer had some limited experience in the area of oil and gas, principally involving oil field services and removal of salt water from oil wells. He has no engineering background or college degrees. He lives in Dripping Springs, Texas, which is a four and one-half hour drive from Collin County, Texas.

Beginning in 1997 or 1998, Spencer became engaged in a contentious legal fight with his wife's parents over rights of visitation with his child and stepchild. Spencer "went to the legislature" beginning in 2005 to try to amend laws regarding parental rights that he believes are unconstitutional. Spencer is not a registered lobbyist in Texas; his legislative advocacy was in advancement of his personal interests. According to Spencer, he had a conversation in 2007 with Tim Lambert of the THSC, and

Lambert thought "we're going to have to unseat some judges to get their attention around the state, especially on this issue of parental rights."Spencer indicated the THSC has between 50,000 and 70,000 dues-paying members and he thought he could possibly raise money from THSC members if he ran a candidate against a "bad judge." The THSC was the only organization that "got involved" in Wooten's campaign for election to the 380th Judicial District Court.

In 2007, Spencer met Hank Clements, a registered lobbyist, who also had political campaign experience. Clements was very knowledgeable about political advertising, including purchasing radio broadcasting time and preparation of mail, flier, and sign advertising. Spencer talked to Clements about working together on political campaigns, however Spencer knew Clements would not work as a political campaign consultant without compensation. Spencer thought working with Clements would be an opportunity to learn from Clements, develop relationships with Clements's connections, and "make some money," although Spencer testified he did not make a lot of money working on the Wooten campaign. Clements's original quote to Spencer for working on a district court judicial campaign was $50,000. Spencer told Clements that there were only sixty-three days until the primary election and there was "no way" compensation of that magnitude "was going to happen." Wooten eventually spoke to Clements in the latter half of December 2007. Ultimately, Clements worked on the Wooten campaign and was paid $25,000 for his services.

**\*7** Royce Poinsett, general counsel for the Speaker of the Texas House of Representatives, put Spencer in touch with David and Stacy in September 2007.[6] On September 19, 2007, Spencer emailed David and Stacy. The first time Spencer met David and Stacy was at their home in Dallas, Texas on October 2, 2007. That meeting lasted approximately two to two and one-half hours. Spencer learned that Stacy had an interest in a family-owned oil and gas company and also had some independent investments in the oil and gas industry. There was to be some liquidation of an investment Stacy or her family had, and she was going to have "significant proceeds from that sale" that she would either have to reinvest or incur some "pretty hefty capital gains taxes." In short, Stacy "had a significant gain that she had to turn around and put to work."David was an executive in the software industry, and Spencer told David he had clients involved in internet technology, including cyber security. Spencer felt that he and David "had some common ground on that area of business."

During the meeting, David and Stacy shared with Spencer their experience in meeting with legislators and advocating for change in laws relating to parental rights. Spencer testified that the "greatest substance" of their conversation was about the issue of parental rights, and Spencer wanted to do research on David and Stacy's legislative agenda, which involved shared-custody concepts. At the meeting, David and Stacy told Spencer they had been through a significant, lengthy, and expensive family law battle that was continuing. Spencer also testified that during the meeting, he discussed "in general terms" with Stacy his interest in providing her consulting services in the following areas:

1. Assessment of possible investment in new pumping technology;

2. Analysis of the U.S. electric marketplace, and potential investment in SmartGrid-related ventures;

3. Assistance in assessing and securing counsel in anticipation of and for contemplated litigation; and

**\*8** 4. Assessment and proposal for family-centered advocacy, with an emphasis on parental rights.

According to Spencer, this discussion culminated in an Acknowledgment of Engagement letter dated October 1, 2007 (the consulting agreement) between Spencer and Stacy, which was admitted in evidence. Stacy agreed to pay Spencer $250,000 based on the "overall project," and $150 per hour pursuant to a fee schedule. The term of the agreement was October 1, 2007 to December 31, 2009. Spencer testified the consulting agreement was drafted sometime in the first half of October 2007 and back-dated to October 1, 2007. He testified he hand-delivered the consulting agreement to Stacy in October or early November 2007.

As a result of their meeting, in October or November 2007, Spencer reviewed David's divorce and SAPCR case file in the 380th Judicial District Court. It was Spencer's "determination" after reviewing the case file that Sandoval was not applying the law correctly, and it was Spencer's impression that the SAPCR was being "handled poorly." One of Sandoval's rulings that Spencer found "problematic" was a ruling in which Sandoval sanctioned David's attorney $50,000 to be paid to David's ex-wife, Jennifer.

Spencer testified that in the first half of November 2007, he decided he wanted to find a candidate to unseat Sandoval as judge of the 380th Judicial District Court, and he acknowledged that David's divorce and SAPCR were factors in that decision. There were other factors as

well: an informal internet poll regarding Sandoval's performance, comments of THSC members in Collin County, Sandoval's clearance rate for cases on his docket, and Sandoval's "appellate record." It appeared to Spencer that Sandoval was a "good target" for a challenger. Spencer believed Collin County was a "high profile place to make a stand on the issue of parental rights," and a competitive judicial race in Collin County seemed a good way to make a statement that would "resonate throughout the judiciary." Spencer learned that in the history of Collin County, there had never been a challenger to a sitting district judge, so Spencer believed he and THSC could send a powerful message by unseating a judge they perceived to be unfriendly concerning parental rights issues.

With regard to identifying potential candidates to run against Sandoval, Spencer believed he telephoned several people for recommendations, including Stacy. Spencer testified that he contacted attorney Puhl regarding running against Sandoval. Spencer told Puhl he could provide operational support, grassroots support, and organizational support, and Spencer may have generally mentioned the THSC. Spencer told Puhl that he would help him raise money for the race if he committed to run. Spencer told Puhl he thought it would require between $100,000 and $150,000 to run a "serious challenge." Spencer acknowledged that very few lawyers would want to contribute to a campaign in opposition to Sandoval. Spencer knew that anyone running against Sandoval would not raise much money from attorneys before election day and that most contributions to judicial campaigns are made by lawyers. Spencer thought "other people," like grassroots activists, might contribute money to a campaign against Sandoval, although Spencer did not know any "grassroots activists" in Collin County that he could rely on for campaign contributions. Puhl declined to run against Sandoval, and he did not think Sandoval could be defeated.

Spencer called Puhl's former law partner, Brian Loughmiller, about running against Sandoval. Spencer told Loughmiller that he would help Loughmiller raise money for the campaign, and Spencer thought he talked to Loughmiller about the amount of money required to win the race. Loughmiller declined to run against Sandoval, and he did not think Sandoval was going to be defeated in the next election cycle.

**\*9** Spencer testified that Wooten's name, as a potential candidate to run against Sandoval, came from a "couple of directions." Loughmiller may have mentioned Wooten. In mid-November or mid-December 2007, Spencer contacted Dodd. Spencer told Dodd he was looking for a

candidate to run in the Republican primary against Sandoval, and he thought Sandoval was a good target for a challenger. Spencer had heard the Democratic Party was recruiting Wooten to run for office and, as a courtesy, Spencer wanted to inform Dodd that he was going to try to recruit Wooten to run as a Republican. Spencer learned Wooten had declined to run as a Democrat.

Spencer testified he telephoned Wooten in mid-December 2007, in advance of the January 2, 2008 deadline to file as a candidate for the March 4, 2008 Republican primary. Spencer told Wooten that he had a "contact" in the area who could get her name out, but Spencer did not mention Clements at that point. Spencer told Wooten the campaign would cost $100,000 to $150,000, and Wooten thought that was a reasonable estimate. Spencer told Wooten about the support he thought her campaign could garner, such as endorsements, grassroots support, and volunteers walking in neighborhoods and handing out campaign materials. Spencer does not recall if he mentioned the THSC. Spencer told Wooten he would do everything he could to be supportive of her campaign. Spencer testified that most of the estimated $100,000 to $150,000 campaign expense would have to come from Wooten.

On January 2, 2008, Wooten filed as a candidate for the 380th Judicial District Court and appointed attorney Alma Benavides as her campaign treasurer. Sometime prior to January 2, 2008, Wooten called Spencer and asked him to serve as her campaign manager. At the time Wooten hired Spencer as her campaign manager, she had not met him in person. Spencer hired an assistant to help him with campaign management "after we had a candidate and had a campaign up and running."

Spencer acknowledged that at the time he was recruiting Wooten as a candidate for the 380th Judicial District Court, and when she agreed to run for election, Spencer was receiving money from Stacy. He also acknowledged there were probably times when he placed telephone calls to Stacy and Wooten in close proximity. According to Spencer, when he contacted David and Stacy, he did not reveal details about his relationship with Wooten. Spencer testified he did not provide information to David and Stacy about Wooten's campaign, and he did not discuss his "business" with David and Stacy. He did mention to David and Stacy that he was involved in a judicial campaign in Collin County and that they would not be involved in it. He also testified Stacy knew he was working on a campaign, but he did not know if he identified it as the Wooten campaign. He told Stacy it was a contested judicial primary in Collin County, but he testified that it would not be difficult to figure out which campaign because there were not many contested races.

David knew Wooten was running for judge. David asked Spencer about the campaign, but Spencer told David that he could not discuss it with him because David had a case pending in the 380th Judicial District Court. When David inquired further about why he could not be involved in Wooten's campaign, Spencer told him it was because Spencer was working with Stacy, Spencer and David were friends, and Wooten was Spencer's client. David picked up Wooten campaign signs and placed them in his yard, and Spencer went to David's office at some point during Wooten's campaign and saw a Wooten campaign sign there.

Spencer testified that the only thing he spoke to Wooten about that would be closely related to his business with David and Stacy was the issue of parental rights. When asked whether Wooten knew anything about David and Stacy, Spencer testified that he did not believe so. While Spencer indicated he spoke with Wooten at length about campaign strategy, he testified he did not talk to her about the money he was receiving from Stacy because one had nothing to do with the other. Spencer did not think he was placing Wooten in a difficult position; he thought he was protecting her by "partitioning off" his business relationship with David and Stacy from Wooten's political campaign. Spencer denied stating that he "owned" Wooten or that Wooten was going to "fix" David's divorce.

**\*10** Between January 1, 2008 and March 15, 2008, Stacy paid Spencer $150,000 in the form of checks and wire transfers.[7]Spencer testified this compensation related to his consulting agreement with Stacy, however he indicated the compensation was for services that were not yet performed but were "in progress." According to Spencer, he received these payments for his services at the same time he was serving as campaign manager for Wooten.

Spencer testified that his "champagne" budget for a successful Wooten election campaign was $149,200. Spencer acknowledged at trial that without Stacy's money, he probably would not have been able to pay for all of Wooten's campaign expenses. According to Spencer, Stacy's $150,000 was "put to work to run" Wooten's campaign; however, at that point, he was spending "his money" on Wooten's campaign. Spencer testified he believed Wooten would pay him back and she did. Spencer testified that Wooten told him she had opened a line of credit to "back" all of her campaign expenses. Spencer wanted to avoid using that line of credit because, when reports of campaign expenditures are filed with the Texas Ethics Commission (Ethics Commission), it apprises the opponent of how funds

available to the campaign are being used. In a February 5, 2008 email from Spencer to Wooten and Clements, Spencer stated that Sandoval "raised some money, but I don't think he's in a position to match our resources."Spencer testified that in that email, he was speaking not only of Wooten's campaign account, but also Wooten's line of credit. However, Spencer testified that without Stacy's transfers of money to him before February 5, 2008, Spencer might not have been able to pay Clements or the other expenses of Wooten's campaign incurred by that date or "we might have had a line of credit early."

The first transfer of money from Stacy to Spencer occurred on January 4, 2008, in the amount of $50,000. The payment, which was made without Spencer providing Stacy an invoice for consulting services, occurred with only two months remaining until the Republican primary. Before receipt of that wire transfer, Spencer had $2.39 in his bank account. Spencer paid Clements $7,500 on January 7, 2008 and $7,500 on January 8, 2008. Spencer testified that without the wire transfer from Stacy, he would not have had the money to pay Clements's $15,000 fee, and Wooten would have had to pay Clements's fee directly.

The second transfer of money from Stacy to Spencer occurred on January 30, 2008, in the amount of $25,000. The third transfer of money from Stacy to Spencer occurred on February 14, 2008, in the amount of $25,000. The fourth transfer of money from Stacy to Spencer occurred on February 26, 2008, in the amount of $25,000.

**\*11** After the March 4, 2008 Republican primary, Spencer and Clements were in contact on March 7, 2008 regarding Clements's $10,000 bonus payable as a result of Wooten's success in the primary election. On March 7, 2008, the fifth transfer of money from Stacy to Spencer occurred in the amount of $10,000. On March 6, 2008, Spencer's bank balance was $2,407.69. After the transfer of $10,000, Spencer's bank balance was $11,707. Within an hour of Stacy's March 7, 2008 wire transfer of $10,000 to Spencer's account, Spencer's wife purchased a cashier's check for payment of Clements's $10,000 victory bonus. Spencer testified he did not recall if he was in contact with David regarding the March 7, 2008 wire transfer. The sixth transfer of money from Stacy to Spencer occurred on March 14, 2008, in the amount of $15,000.

When Wooten announced her candidacy, Spencer and Clements advised her that it would cost a minimum of $100,000 to be competitive in the race. Spencer testified that he billed Wooten about $111,000 for campaign

expenses. Copies of Spencer's invoices and his "working copy" of bills to Wooten's campaign were admitted in evidence. Spencer testified that at the time Wooten was raising money after her successful political campaign, she still owed Spencer $80,000. Spencer invoiced Wooten's campaign $4,536.75 on February 20, 2008, $2,409.25 on March 4, 2008, $10,009.25 on March 23, 2008, $12,000 on April 16, 2008, $15,000 on April 25, 2008, and $5,000 on May 26, 2008. On May 29, 2008, Spencer invoiced Wooten's campaign $84,368.75, with credits and adjustments of $51,929.82 for payments between February 13, 2008 and April 28, 2008, leaving a balance due of $37,438.93. Spencer invoiced Wooten's campaign $9,241.50 on June 3, 2008. By invoice dated July 1, 2008, Spencer's cumulative bill to Wooten showed she still owed Spencer $33,369.91.

In the cover letter forwarding Spencer's May 29, 2008 invoice to Wooten, he advised that "we recognize your July filing deadline with the Ethics Commission, and will render a supplemental Invoice to your office in June."Spencer testified he knew Wooten needed information regarding amounts spent or incurred for the benefit of her campaign in order to report these items properly on her campaign finance report filed with the Ethics Commission. Spencer believed a candidate is required to report not only campaign contributions and expenses on campaign finance reports, but also must list funds the candidate holds in a campaign account on a given date. Spencer testified he did not prepare Wooten's campaign finance reports, but when asked, he provided the information she needed to prepare the reports.

Wooten did not have to draw down on her line of credit until sometime after the March 4, 2008 Republican primary. While Spencer testified he did not know whether Wooten drew on her line of credit for the first time on August 19, 2008 when she paid Spencer $33,369, documents admitted in evidence indicate Wooten's line of credit was opened on August 13, 2008.

**\*12** Spencer's consulting agreement with Stacy, dated October 1, 2007, was admitted in evidence. Also admitted in evidence was Spencer's October 15, 2009 "Engagement Letter for Outsourced Marketing Services" relating to consulting services to be provided by Spencer to TDI, David's employer. Spencer testified regarding certain aspects of those two documents. The consulting agreement was not signed by Stacy and was dated prior to the date Spencer testified he first met Stacy on October 2, 2007. The TDI Engagement Letter for Outsourced Marketing Services was signed by William Johnson, Chief Executive Officer of TDI, on October 14, 2009, however the date of Johnson's signature was the day

before the date of the engagement letter. Spencer's consulting agreement with Stacy and the TDI engagement letter each indicate the term of the agreement ended on December 31, 2009. Spencer believed Stacy paid him no money in connection with the consulting agreement after March 15, 2008.

Spencer testified that he made mistakes in preparing Stacy's consulting agreement. The consulting agreement dated October 1, 2007, and the TDI Engagement Letter for Outsourced Marketing Services dated October 15, 2009, both contain an identical phrase relating only to TDI: "[a]ny additional time spent on TDI's behalf is part and parcel to, and inclusive of this engagement."Spencer initially testified that in October 2007, he did not know the TDI company name, but he later changed his testimony and indicated that David gave him a business card at their October 2, 2007 meeting. Spencer denied that the reason Stacy's consulting agreement and the TDI engagement letter contain the same language concerning "additional time spent on TDI's behalf" was that when he received a subpoena and produced documents to the State in November 2009, he fabricated Stacy's consulting agreement to "paper" the $150,000 Spencer received from Stacy. Spencer denied that some of the work the consulting agreement indicates he was to perform for Stacy was actually work he was to perform pursuant to his Engagement Letter for Outsourced Marketing Services with TDI; he testified that he thought Stacy was interested in the same subject matter because she and David had an equity interest in TDI.

Spencer also testified that he made mistakes in the paperwork supporting invoices to Stacy. For example, Spencer testified that, according to the schedule of payments due under the consulting agreement with Stacy, she was to pay him $25,000 "per project," and Stacy "roughly" paid $100,000 according to the schedule. An August 1, 2008 "summary" invoice from Spencer to Stacy was admitted in evidence. That summary shows that for the "balance" of $100,000, credits were applied for the following transfers of money to Spencer: $25,000 on February 5, 2008; $25,000 on February 14, 2008; $15,000 on March 4, 2008; and $10,000 on March 7, 2008. Spencer did not include the $25,000 transfer on February 26, 2008, however that transfer is handwritten on Stacy's copy of the "summary" invoice. The "summary" invoice did not include the January 4, 2008 wire transfer of $50,000 from Stacy.

One of the "projects" for which Spencer testified he was paid $25,000 or more by Stacy involved possible equity investment by Stacy in Down Hole Injections (DHI). Spencer provided information to Stacy concerning DHI

which included eighteen pages of DHI financial statements contained in a private offering memorandum given to Spencer in mid–2007 by an individual living in Dripping Springs, Texas. By letter dated April 7, 2008, Spencer advised Stacy he did not believe DHI was a good investment for her. Another "project" for which Spencer testified he was paid $25,000 by Stacy involved analysis of the rural electricity marketplace. By letter dated July 10, 2008, Spencer sent Stacy a summary analysis of the "U.S. Electric Co–Op Market and Potential Venture to Acquire Broadband Service Delivery Rights."Spencer acknowledged that the contents of that letter were taken in large part from an article published in the Harvard Journal of Legislation. Spencer testified he also provided information to Stacy in July 2008 concerning new pumping technology, the U.S. electric marketplace, and ventures related to Smart–Grid technology, based upon materials he had previously received.[8]With regard to the "project" concerning parental rights for which Stacy was to pay Spencer $25,000, a power point presentation was introduced in evidence that described creation of a for-profit internet service provider that could "sustain advocacy of parental rights," and, according to the presentation, would gross $46,000,000 in revenue during a one year period, although Spencer testified he did not have experience creating an internet service provider.

**\*13** Spencer testified that in early 2008, he began doing work with TDI, which he then would have known was David's employer. The first time Spencer was paid by TDI was in July or August 2008. He was initially asked to obtain a release of a lien on an account. Later, he was asked to retain a lobbyist on behalf of TDI and to obtain sales contracts. An August 26, 2008 letter from Spencer to TDI regarding "Proposed Legislative/Regulatory Strategic Plan" contains identical language to a July 10, 2008 communication from Spencer to Stacy regarding "Analysis of the U.S. Electric Co–Op Market and Potential Venture to Acquire Broadband Service Delivery Rights."

Spencer testified regarding the events surrounding Wooten's recusal in March 2009 from David's SAPCR. Benavides, Wooten's campaign treasurer and an associate with the law firm with which Wooten practiced before her election, filed an answer on behalf of Jennifer on February 27, 2009 at 9:59 a.m., in advance of a March 2, 2009 hearing before Wooten. According to the phone records admitted in evidence, David phoned Spencer at 1:35 p.m. and 8:30 p.m. on February 26, 2009. On February 27, 2009 at 8:56 a.m., Spencer received a text message from David. At 9:07 a.m., Spencer sent a text message to Benavides. At 9:46 a.m., Spencer and David exchanged text messages. Thereafter, Spencer telephoned

Benavides, and Spencer then called David. At 11:03 a.m., Spencer phoned David. David then called Spencer and spoke to him for several minutes. Benavides returned Spencer's telephone call. Spencer then called David.

Spencer acknowledged at trial that David contacted him to advise him that an answer had been filed for Jennifer in the SAPCR by Benavides. Spencer testified that he "may have known" that for a period of time, Wooten would not preside over cases in which Benavides was counsel. Spencer stated that he contacted Benavides regarding her appearance on behalf of Jennifer. Spencer indicated that he cautioned Benavides about involvement in the SAPCR; specifically, he warned her "not to go in" the case. Spencer said he was giving Benavides "a read on the case [he] thought she was getting into" and that he thought the case was a "real mess."[9]Benavides asked Spencer if she could call him back with the law firm's managing partner, Basinger, on the line. Benavides and Basinger called Spencer, and Spencer told them they did not want to be on this case.

**\*14** Spencer and David spoke on the phone on February 28, 2009. Spencer testified he did not speak with Wooten on February 26, 27, 28, or March 1, 2009. A hearing was scheduled in the SAPCR before Wooten on March 2, 2009. There were a number of text messages between Spencer and David on March 2, 2009. A transcript of the March 2, 2009 hearing was admitted in evidence. As she began the hearing, Wooten stated:

> I had a chat with Judge Oldner, our administrative judge, about whether or not it was appropriate for me to hear this, especially in light of Ms. Benavides appearing on the case. Not to blame Ms. Benavides, but I was with her firm up until right about the end of last year. So, for various reasons, I have to recuse myself off this case.

Wooten signed a recusal in the SAPCR on March 4, 2009.

Spencer testified he did contact Wooten in early March 2009 prior to her recusal. He told Wooten he was going to be in the area on a trip and wanted to take her to lunch. Records introduced in evidence established Spencer also called the office of Judge Oldner during this period of time, and Spencer testified he did not dispute calling Oldner's office. He testified that at some point he tried to recruit Oldner to run for an appellate bench, although he did not know whether that was the subject of this particular phone call. Spencer testified that he did not

think it was accurate that Oldner would have control over "where David's case [was] going" after Wooten's recusal. After Wooten recused herself in the SAPCR, Spencer understood there was a case involving Stacy and Suster that remained pending in Wooten's court, and Spencer acknowledged that he discussed that case with David.

A June 9, 2009 email exchange between David and Spencer was admitted in evidence regarding a June 8, 2009 decision of the United States Supreme Court in *Caperton v. A.T. Massey Coal Co., 556 U.S. 868, 129 S.Ct. 2252, 173 L.Ed.2d 1208 (2009),* a case involving judge recusal. Spencer's email to David included the following text from an article about the decision:

> Today's decision by the U.S. Supreme Court that judges who receive campaign contributions large enough to create the appearance of bias should recuse themselves.... In *Caperton v. Massey,* the nation's high court ruled 5–4 that because a West Virginia Supreme Court justice received $3 million in campaign contributions from an energy company executive, the judge should not have taken part in a decision affecting the executive's company.

Spencer emailed David that "I think you'll understand why I'm interested in this subject matter." David then emailed "the entire story" to Spencer. Spencer denied that the reason he and David were interested in the news article was because Stacy's money was used to finance Wooten's campaign.

### Deanna Kedzie

**\*15** Deanna Kedzie, a certified public accountant, testified that her practice focuses upon tax accounting and Stacy was her client. Kedzie testified about a 2008 income and expense report dated March 16, 2009 that was prepared by Stacy. According to Kedzie, the report indicates legal fees of $226,602.96 were incurred in 2008 relating to divorce and child custody issues. Kedzie testified that Stacy wanted to deduct from 2008 taxable income a total of $226,773 for legal and professional fees. Kedzie also testified about a March 31, 2008 email to her from Stacy, relating to Stacy's 2007 tax return, in which Stacy wrote that her legal expenses were high "THANKS

TO MY STEP CHILDREN'S LITIGIOUS/ABUSIVE/NARCISSIsTC[sic]/GOLD DIGGING MOTHER" and inquired why legal fees "defending my home and family" could not be deducted from taxable income on her 2007 income tax return. Kedzie testified that none of Stacy's legal fees relating to divorce and child custody issues were actually deducted from taxable income on her income tax returns.

Kedzie testified she was unaware that Stacy had hired Spencer to perform consulting services. None of the backup documentation for calendar years 2007 and 2008 income and expense that Stacy provided to Kedzie for purposes of income tax return preparation contained any indication Stacy paid Spencer for consulting work during that period. According to Kedzie, if Stacy was unsure about how to address the tax aspects of an expenditure or deduction, Stacy would typically contact Kedzie for advice; and if Stacy had needed any advice on how to address the tax aspects of a $150,000 consulting agreement, Stacy would most likely have contacted Kedzie because Kedzie prepared Stacy's personal and business tax returns. Stacy did not seek advice from Kedzie concerning the consulting agreement with Spencer.

### Kyle Basinger

Attorney Kyle Basinger testified that Wooten previously had operated a Collin County office for Basinger's law firm. Basinger's law firm formalized separation from Wooten's Collin County office on September 1, 2008, after Wooten won the Republican primary for judge of the 380th Judicial District Court.

Before the 2008 election, Basinger spoke with Wooten several times about her interest in running for judge in Collin County. Initially Wooten talked to Basinger about running as an Independent. Basinger told her he saw very little chance of her winning a Collin County judicial election as an Independent. Basinger learned of Wooten's decision to run for judicial office just before the filing deadline in January 2008. Basinger was concerned that it seemed a last minute decision by Wooten. Basinger talked to Wooten about the difficulty of raising campaign funds to oppose an incumbent judge in Collin County, and told her that it was extremely difficult to defeat an incumbent judge in Collin County.

Benavides, an associate in Basinger's law firm, served as Wooten's campaign treasurer. After her election, Wooten requested that members of Basinger's law firm not appear

in her court for a period of nine months in order to avoid the appearance of impropriety. With respect to a Basinger firm case pending in Sandoval's court at the time Wooten assumed office, Basinger testified that his office would contact Wooten's court coordinator to advise her of the pending case, and the case would be ministerially transferred to another Collin County judge.

**\*16** Basinger represented Jennifer with regard to a motion to modify filed in the SAPCR involving David and Jennifer that was pending in Wooten's court. On February 27, 2009, at 9:59 a.m., Basinger's law firm filed pleadings on behalf of Jennifer concerning the motion to modify. Basinger received a telephone call from Spencer at approximately 10:30 a.m. on February 27, 2009. Basinger was aware Spencer had served as Wooten's campaign manager. Basinger testified this was the only time he had received a telephone call from Spencer, and he was surprised Spencer was calling him and that Spencer had his telephone number. Basinger had only met Spencer one time prior to this telephone call. Spencer asked that Basinger consider withdrawing from the SAPCR involving David and Jennifer. Spencer's position was that Basinger needed "to get off this case." Basinger told Spencer he could not "just tell me I need to get off the case."Spencer told Basinger that he did not want to be a part of this case and that Basinger had "to trust [him] on that." Basinger told Spencer that he had to give Basinger "more than that." Spencer said there was an ongoing investigation of Sandoval in Austin, but Basinger told Spencer that Sandoval was not hearing the SAPCR. Basinger told Spencer that he had given Basinger no reason to get off the case, and that was "pretty much the way we left it."Basinger continued to represent Jennifer after the phone call from Spencer.

On March 3, 2009, Basinger's law firm filed a motion to recuse Wooten in connection with the pending motion to modify the SAPCR. Basinger's and Benavides's names were listed as counsel on that motion. On March 4, 2009, Wooten granted the motion to recuse.

Jennifer approached Basinger regarding his firm representing her in two additional civil litigation matters, one pending in Collin County and the other pending in Dallas County. The civil litigation in Collin County was related to the SAPCR between David and Jennifer; the case was filed by Stacy against Jennifer and Suster, who was attempting to collect attorney's fees Sandoval had ordered David to pay Jennifer in the SAPCR. That lawsuit was originally filed in the County Court at Law No. 4 of Collin County. Because it was related to the SAPCR involving David and Jennifer, the case was transferred to Wooten's court in which the SAPCR case was pending.

Basinger and Benavides are listed as counsel on an April 23, 2009 pleading filed on behalf of Jennifer in the lawsuit filed by Stacy against Jennifer and Suster that was pending before Wooten. Basinger filed a motion for protection regarding Stacy's attempt to depose Jennifer. Wooten denied Jennifer's motion for protection. On May 8, 2009, Basinger filed a motion to recuse Wooten in Stacy's lawsuit against Jennifer and Suster. Basinger anticipated the motion to recuse would be granted because Wooten had recused herself previously with regard to the motion to modify filed in the SAPCR involving David and Jennifer, and there were overlapping facts in Stacy's lawsuit against Jennifer and Suster.

Unlike the prior motion to recuse, however, Wooten did not voluntarily recuse herself from Stacy's lawsuit against Jennifer and Suster. Judge G. Calhoun, Jr. was appointed to hear the motion to recuse Wooten in that matter. On June 29, 2009, Basinger forwarded correspondence to Wooten withdrawing Jennifer's motion to recuse. Basinger testified that his law partner had met with Jennifer, and the decision had been made to withdraw the motion to recuse Wooten. Basinger testified that he wanted Wooten to continue as the judge presiding over this case, and he thought she would be a "great judge" on the case. However, Basinger testified that, at that time, he had no idea of any allegation that Spencer helped finance Wooten's campaign, and had he known of and believed such an allegation, it would have affected his view of Wooten. Basinger testified that after the motion to recuse Wooten was filed in Stacy's lawsuit against Jennifer and Suster, Stacy nonsuited her case.

### *Hank Clements*

**\*17** Hank Clements, an attorney and registered lobbyist in Texas, testified that his firm provides political and legislative consulting services, including lobbying. Clements also provides services to candidates for public office, including campaign management, direct mail advertisement, media strategies, and speech preparation. Prior to 2008, Clements had worked on approximately six judicial campaigns.

In the spring of 2007, Clements met Spencer in the office of a legislator. Clements believes Spencer was there with regard to a family law issue. Spencer told Clements he was interested in managing political campaigns, advocating for parental rights legislation, and getting "bad judges" off the bench. It was Clements's understanding from speaking with Spencer in the fall of 2007 that

Spencer wanted to field a candidate in a judicial race. Spencer specifically asked if Clements had ever managed a campaign in Collin County, and Clements advised Spencer that he had. Spencer told Clements there were a number of judges that had been targeted by a group he belonged to because the judges were opposed to the family law agenda the group was trying to advocate at the legislature. Clements recalled specifically that Spencer wanted to "go after" and defeat Sandoval. Clements understood Spencer had been unable to find a candidate to run against Sandoval, but Spencer identified Wooten as a potential candidate who was considering entering the race. Spencer wanted Clements to talk to Wooten regarding the magnitude of such a campaign. Clements spoke on the telephone with Wooten toward the end of 2007, and he met with her on a Saturday in December 2007. Clements gave Wooten an idea of the time commitment and cost required for an effective political campaign. Clements also told Wooten it would require a substantial commitment on Wooten's part to defeat an incumbent judge, and that the campaign would cost $60,000 to $70,000 or more.

By late December 2007 or early January 2008, Clements knew Wooten was going to run against Sandoval in the Republican primary for judge of the 380th Judicial District Court. The primary election was scheduled for early March 2008, and Clements testified that was a short time in which to execute the campaign. Although Spencer had never managed a political campaign, Clements testified Spencer wanted to run Wooten's campaign and Wooten hired Spencer as her campaign manager. Spencer hired Clements as a subcontractor to handle media, prepare a campaign plan, develop overall strategies, and design a direct mail plan. Clements was to be paid $15,000 for the scope of work and a $10,000 victory bonus if Wooten won the race. Clements received cashier's checks for payment of his fees as follows: $7,500 on January 7, 2008, $7,500 on January 8, 2008, and $10,000 on March 7, 2008 after Wooten defeated Sandoval in the March 4, 2008 Republican primary.

Clements did not send his bills directly to Wooten. Clements did not discuss individual campaign expenditures with Wooten; that would have been done by Spencer and the campaign treasurer. Clements testified that it is important for a campaign manager to obtain the candidate's "buy off" on individual campaign expenditures because the expenditures must be reported to the Ethics Commission. According to Clements, management of a campaign is characterized as "turnkey" when the candidate pays a fee to a campaign manager or political consultant, and the manager or consultant is then responsible for paying vendors and service providers.

Clements indicated that Spencer provided turnkey management of Wooten's election campaign.

**\*18** In other campaigns, Clements assisted the candidate in preparing campaign finance reports to be filed with the Ethics Commission. He was not asked to review Wooten's campaign finance reports. According to Clements, campaign finance reports generally itemize the amount of campaign contributions and expenditures. Campaign finance reports filed with the Ethics Commission are public records, and the public can view the reports to see how candidates raised and spent their campaign funds.

The bank records for the "Suzanne H. Wooten for Judge Campaign" were admitted in evidence. Those records indicate that on February 4, 2008, the balance in the campaign account was $2,366, and on February 5, 2008, the balance in the account was $1,933. Clements recollects he received a telephone call from Spencer regarding how much money Sandoval had raised in his campaign and that Spencer was "not impressed" with the amount. Sandoval's Campaign Finance Report filed with the Ethics Commission on February 4, 2008 was admitted in evidence. That report reflected Sandoval had raised $12,575 in campaign contributions, had expended $8,997.08, and on February 4, 2008, his campaign account had a balance of $4,231.37. Spencer sent an email to Wooten and Clements regarding Sandoval's February 4, 2008 Campaign Finance Report. In that email, Spencer said Sandoval had "raised some money," but Spencer did not think Sandoval was "in a position to match our resources." Clements did not know what Spencer meant by his reference to "resources" in that email. Spencer did not tell Clements that there were contributors Spencer could go to for money, but that was Clements's interpretation of the email. It sounded to Clements like there were some contributors who could be "tapped" in order to raise more campaign funds than Sandoval. Clements testified he had no role in raising money for Wooten's campaign or in managing the finances of the campaign.

Records regarding paid political advertisements for the Wooten campaign on local radio stations were admitted in evidence. For example, a $6,000 cashier's check from Spencer for payment for radio advertisements airing on a radio station from February 25 through February 28, and on March 3, 2008, was admitted in evidence. The invoice for the radio advertisements was dated March 10, 2008. A $4,000 cashier's check from Spencer for payment for radio advertisements airing on another radio station from February 25 through February 28, and on March 3, 2008 was also admitted in evidence. The contract confirmation for that radio advertising was dated February 22, 2008,

and the invoice for that radio advertising was dated March 10, 2008. An invoice from Spencer to Wooten's campaign for the $6,000 and $4,000 radio advertisement expenses was dated March 23, 2008. A cashier's check dated February 26, 2008 from Spencer in the amount of $14,454.25 was presented as payment for radio advertisements for Wooten's campaign that aired on three other radio stations from February 24 through March 3, 2008, pursuant to contracts entered into at the end of February 2008. A February 4, 2008 cashier's check from Spencer to Cartwright Signs and T–Shirt Printing in the amount of $4,036.75 was admitted in evidence. Documents on which Wooten gave approval for campaign expenditures and edited or approved campaign advertisements and media materials were admitted in evidence. Clements testified with regard to this evidence that there is nothing improper with Spencer paying a campaign expense and billing the candidate later for that expense. Although not holding himself out as an expert on campaign finance reports, Clements testified that a campaign manager could bill the candidate later for an invoice paid by the campaign manager, but he believed the law required that the expense incurred be posted on the candidate's campaign finance report. Clements further testified that even if a consultant decided not to send a candidate a bill, the candidate nevertheless would be required to itemize campaign expenses on the campaign finance report covering the time period the expenses were incurred.

### *Ian Steusloff*

**\*19** Ian Steusloff, an assistant general counsel for the Ethics Commission, testified that the Ethics Commission is an agency that, among other things, administers laws relating to campaign finance, ethics disclosure, and regulation of lobbyists. It also serves as an enforcement agency.

Steusloff testified regarding filings with the Ethics Commission that candidates and officeholders are required to make. Candidates for election to a judicial office are required to file campaign finance reports. Those reports show campaign contributions, campaign expenditures made from a campaign account, campaign expenditures made from personal funds, and loans to a campaign. Typically candidates must file campaign finance reports on January 15th and July 15th. If opposed in an election, candidates must also file campaign finance reports thirty days and eight days before the election.[10] Candidates are required to swear the information provided in a campaign finance report is true and correct. The

campaign finance reports filed by a judicial candidate are public records, and the Ethics Commission posts those reports on its internet website.

Steusloff testified that contributions to a judicial campaign must be individually itemized on the campaign finance report if the contribution, whether money or in-kind, exceeds $50. A candidate must also disclose on the campaign finance report outstanding loans to a judicial campaign. Steusloff explained that campaign expenditures of over $50 must be itemized on the campaign finance report. For disclosure purposes, an expenditure is deemed made when the amount of the expenditure is readily determinable. Steusloff testified that, in 2008, when an individual or entity made an expenditure of more than $100 that benefitted, but was independent from, a campaign, such as paying for advertising that benefitted a candidate, the individual or entity was required to file a report with the Ethics Commission disclosing the expenditure and send a report of the expenditure to the candidate. According to Steusloff, if an employee of a candidate makes an expenditure for the campaign, the expenditure would be itemized on the campaign finance report as if the expenditure had been made by the candidate. If, however, the candidate hired an independent consultant and delegated authority to the consultant to make decisions concerning campaign expenditures without the candidate's approval, Steusloff testified the candidate would disclose on the campaign finance report payments made to the consultant for consulting services but not itemize the individual expenditures made by the consultant to specific vendors.

Steusloff testified that in judicial races, there are limits on campaign contributions. The limit depends on the population of the judicial district. If the population in the judicial district is between 250,000 and one million, as in Collin County in 2008, the contribution limit is $2,500. According to Steusloff, if an individual lends money to a candidate specifically to support the candidate's campaign, the loan counts against the campaign contribution limit for that individual; however, that is not the case when the candidate obtains a campaign loan from a bank. Additionally, there are limits on a candidate's campaign expenditures, which apply whether the candidate is using campaign contributions or personal funds. When a candidate pays campaign expenditures from personal funds, there is a limit on reimbursement of those expenditures from campaign contributions; the limit is five times the maximum permissible campaign contribution. Therefore, where the campaign contribution limit for a judicial race is $2,500, the total amount of reimbursement from campaign contributions of a

candidate's out-of-pocket campaign expenditures is $12,500.

Wooten's campaign finance reports were admitted in evidence. Wooten's Campaign Finance Report for the period January 25, 2008 through February 23, 2008 indicated she had received a total of $10,425 in campaign contributions, with total political expenditures of $11,734.41. Wooten's Campaign Finance Report for the period February 24, 2008 through June 30, 2008 indicates she received $59,755. 19 in campaign contributions and expended $65,515.91. Wooten's January 11, 2009 Campaign Finance Report filed for the period July 1, 2008 to December 31, 2008 indicates she received campaign contributions of $5,150 and expended $42,419.91.

**\*20** Wooten's January 11, 2009 Campaign Finance Report indicates payments to Spencer in the amounts of $1,500 and $7,550 for "turnkey mgmt svcs fees and costs-per invoice[s]." Earlier campaign finance reports and amended campaign finance reports filed by Wooten in 2009 disclose the following payments to Spencer: an August 28, 2008 payment in the amount of $33,369, 91 for "turnkey mgmt svcs fees and costs—per invoice"; a February 13, 2008 payment in the amount of $4,002.32 for signs and fees; a February 22, 2008 payment in the amount of $4,527.50 for campaign material and fees; a March 7, 2008 payment in the amount of $2,400 for a direct mailer; a May 29, 2008 payment in the amount of $5,000 for "turnkey management svcs fee and costs—per invoice[s]"; June 24, 2008 payments of $5,241.50 and $2,700 for "turnkey mgmt svcs fees and costs—per invoice"; a June 30, 2008 payment in the amount of $7,550 for "turnkey management services fees and costs—per invoice"; and a June 30, 2008 payment of $1,500 for "turnkey management services fees and costs—per invoice."The campaign finance reports also include campaign expenditures for "CBS radio buy—per invoice" on March 31, 2008 in the amount of $10,000, "WBAP radio buy fee" on April 17, 2008 in the amount of $12,000, and "radio buy and direct mail—per invoice" on April 28, 2008 in the amount of $14,000. A campaign finance report reflects a "personal loan" from Wooten to the campaign on August 28, 2008 in the amount of $33,369.91, matching the August 28, 2008 payment of $33,369.91 to Spencer for "turnkey mgmt svcs fees and costs—per invoice."

**Kyle Swihart**

Kyle Swihart, a certified fraud examiner and a forensic

auditor employed by the office of the Texas Attorney General, testified that he investigates allegations and complaints of white-collar crime relating to public integrity and money laundering. His investigation of Stacy included review of bank records; phone records; campaign finance reports; credit card statements and documents establishing a credit card account; invoices; payments made by Wooten to Spencer; and records of emails and other forms of communication.

A chart created by Swihart containing a summary of the evidence he relied upon was admitted in evidence. That chart contained a summary of bank records, invoices for services or products provided to Wooten's campaign, transfers of money from Stacy to Spencer, the dates when products or services benefitting the Wooten campaign were purchased or rendered, and the dates Spencer invoiced Wooten's campaign. The summary of the evidence spans the period of January 1, 2008, the day before Wooten filed her candidacy for judge of the 380th Judicial District Court, and August 29, 2008, when Wooten wrote a check in the amount of $33,369.91 from her line of credit to Spencer. The records Swihart reviewed establish Spencer made six deposits to his bank account of funds transferred to him by Stacy in the form of wire transfer or check.

On January 3, 2008, Spencer had $2.39 in his bank account and Wooten had $25 in her campaign account. On January 4, 2008, $50,000 was deposited in Spencer's bank account from Stacy's first transfer of money to him. Without the money transferred by Stacy to Spencer on January 4, 2008, Spencer did not have funds in his bank account, and Wooten did not have funds in her campaign account, for Spencer to make payment by cashier's check to Clements on January 7, 2008 in the amount of $7,500 and on January 8, 2008 in the amount of $7,500. On January 23, 2008, Spencer had a balance of $7,656.31 in his bank account remaining from the January 4, 2008 transfer of money from Stacy, $16,856.37 having been spent by Spencer on Wooten's campaign.

**\*21** On February 4, 2008, a payment from Stacy to Spencer in the amount of $25,000 was posted to Spencer's bank account. Before this deposit, Spencer had an account balance of $5,545.51, and Wooten had a balance of less than $3,000 in her campaign account. After that deposit, the balance in Spencer's bank account was $25,692.30. The records show that on February 5, 2008, Spencer began using the $25,000 for Wooten's campaign, including an expenditure of $2,345 for an advertisement in the Plano Profile magazine, and payments of $4,036.75 and $3,877.32 to Cartwright Signs. Without Stacy's February 4, 2008 payment of

$25,000 to Spencer, these campaign expenses could not have been paid from either Spencer's bank account or Wooten's campaign account.

On February 13, 2008, Spencer had $1,180.97 in his bank account and Wooten had $5,885.06 in her campaign account. On February 15, 2008, another $25,000 check from Stacy was posted to Spencer's bank account. After deposit of that check, Spencer's bank balance was $25,000.92. Spencer used the money in his account after that deposit to purchase cashier's checks on February 20, 2008 totaling $10,000 to pay invoices for radio advertisements. Absent the $25,000 from Stacy, neither Spencer's bank account nor Wooten's campaign account had sufficient funds for payment of the radio stations' advertising invoices.

On February 26, 2008, a $25,000 wire transfer from Stacy posted to Spencer's bank account. Prior to that deposit, Spencer had $5,565.18 in his bank account and Wooten had $5,166.58 in her campaign account. The day Stacy's wire transfer was made, Spencer made additional radio advertisement purchases in the amount of $14,454.25, as well as payments to the THSC Political Action Committee for a mailer and to an assistant. Without the $25,000 payment from Stacy, Spencer did not have sufficient funds in his bank account, and Wooten did not have sufficient funds in her campaign account, to pay those campaign expenses.

On March 7, 2008, after the March 4, 2008 Republican primary, Stacy wire-transferred a fifth payment to Spencer in the amount of $10,000. At the time of that transfer, Spencer had $11,707 in his bank account, and Wooten had $2,710.08 in her campaign account. Approximately one hour after the $10,000 wire transfer, Spencer purchased a cashier's check in the amount of $10,000 made payable to Clements. A sixth payment by wire transfer in the amount of $15,000 was made by Stacy to Spencer on March 13, 2008. On March 14, 2008, that payment was posted to Spencer's bank account.

Swihart reviewed phone and email records of Stacy, David, Clements, Spencer, and Wooten. Swihart testified regarding the dates and times of communications among those individuals and others. The first communication Swihart was able to document between Spencer and David and Stacy was September 21, 2007. Swihart was able to document a telephone call from Wooten to Spencer on December 20, 2007. Swihart testified regarding communications occurring around the dates of payments from Stacy to Spencer. Swihart also testified regarding communications occurring around the dates of events in matters before the 380th Judicial District Court

after Wooten became judge of that court.

**\*22** At 3:40 p.m. on January 2, 2008, Wooten filed as a candidate for the 380th Judicial District Court. Moments before that filing, Wooten spoke to Spencer by telephone. After Wooten filed as a candidate, Spencer communicated with David. Between 6:49 p.m. and 9:45 p.m. that night, Spencer communicated with David on David's cell phone, with Wooten on her cell phone, and with David, Stacy, or both, on the telephone at the Cary home.

At 10:17 a.m. on January 3, 2008, Paladini Financial requested a third-party wire transfer from one of Stacy's accounts to Spencer in the amount of $50,000.[11] There were two attempts by Spencer to reach David and Stacy's home phone during that day, and David spoke to Spencer from 1:13 p.m. to 1:23 p.m. At 4:49 p.m., Stacy was sent new wiring instructions because the earlier wire transfer could not be completed. On January 4, 2008, the date of the first wire transfer to Spencer from Stacy, Spencer had three telephone communications with someone on David and Stacy's home phone. Swihart assumed those conversations were with Stacy as they occurred during the work day; David worked outside the home and Stacy had an office in her home from which she worked. After the wire transfer of $50,000 was posted to Spencer's account at 4:34 p.m., Spencer telephoned Wooten's office. Thereafter, there was a brief telephone call to Spencer from David.

On January 29, 2008, the night before the second payment by Stacy to Spencer, Spencer telephoned David's cell phone. Immediately thereafter, either David or Stacy telephoned Spencer from David and Stacy's home phone. Spencer then telephoned Wooten. After the telephone call to Wooten, Spencer telephoned David and Stacy's home. Stacy made a second payment to Spencer on January 30, 2008, and Spencer deposited that payment on February 1, 2008. That payment posted to Spencer's bank account on February 4, 2008. On February 5, 2008, Spencer sent an email to Wooten that Sandoval "cannot match our resources," even though Wooten had raised only $3,620 from campaign contributions at that time.

On February 14, 2008, Stacy made her third payment to Spencer. On that day, Spencer exchanged text messages by phone with David between 5:12 p.m. and 5:23 p.m. Between 5:34 p.m. and 5:46 p.m., Spencer then communicated in succession with Wooten, Clements, and David. Stacy's third payment to Spencer posted to his account on February 15, 2008.

On February 26, 2008, Stacy made her fourth payment to Spencer. At 4:41 a.m., Spencer's assistant confirmed to

Spencer by email that radio advertising time had been purchased for Wooten's campaign. At 5:24 a.m. and 6:59 a.m., David received text messages from Spencer. At 9:17 a.m., Stacy sent instructions to Tolleson Private Bank to wire $25,000 to Spencer. At 2:14 p.m., the wire transfer was posted to Spencer's account. At 2:37 p.m. and 2:53 p.m., Spencer's wife, Kipling Spencer, purchased cashier's checks for payment of Wooten campaign expenses from the funds wired to Spencer's account by Stacy.

**\*23** Swihart testified regarding telephone calls from TDI, David's place of employment, to Wooten's law office prior to her election as judge. There were a total of four telephone calls, with the longest being two minutes and fifty-four seconds. The first telephone call occurred on January 21, 2008 and the last call occurred on February 25, 2008. Swihart testified there were also telephone calls between David's cell phone and Wooten's law office, totaling twelve to fifteen minutes.

On March 4, 2008, Wooten won the Republican primary. On March 7, 2008, Stacy made the fifth payment to Spencer. On March 7, 2008, between 7:07 a.m. and 8:29 a.m., Spencer text-messaged four times with David. Clements text-messaged Spencer at 8:17 a.m. David and Stacy had three phone conversations between 8:45 a.m. and 9:10 a.m. Between 9:23 a.m. and 10:02 a.m., Spencer and David exchanged thirteen text messages. At 10:47 a.m., Stacy attempted to reach David by telephone. At 10:58 a.m., Stacy sent instructions to Tolleson Private Bank to wire $10,000 to Spencer. At 11:40 a.m., David text-messaged Spencer. At 2:51 p.m., the wire transfer of $10,000 posted to Spencer's bank account. Between 3:21 p.m. and 3:52 p.m., Spencer and David exchanged eleven text messages. At 3:59 p.m., Kipling Spencer purchased a cashier's check made payable to Clements in the amount of $10,000.

Between 6:24 p.m. and 6:31 p.m. on March 13, 2008, the day of the sixth payment from Stacy to Spencer, Spencer text messaged David six times. At 9:41 p.m., Stacy sent instructions by email to Tolleson Private Bank to wire Spencer $15,000. On March 14, 2008, the sixth payment from Stacy to Spencer in the amount of $15,000 was posted to Spencer's bank account.

On January 2, 2009, Wooten was sworn in as judge of the 380th Judicial District Court. At 9:59 a.m. on February 27, 2009, Benavides's pleading regarding her appearance on behalf of Jennifer in the SAPCR case pending in Wooten's court was file-stamped. At 11:03 a.m., there was a one-minute phone call between Spencer and David's cell phone. At 11:04 a.m., there was a

two-minute telephone call from Spencer to Benavides's cell phone. At 11:06 a.m., Spencer attempted to call David. Between 11:08 a.m. and 11:13 a.m., there was a telephone call from David to Spencer. Between 11:14 a.m. and 11:17 a.m., there was a telephone call from Spencer to Benavides. From 11:18 a.m. to 11:21 a.m., there was a telephone call from Spencer to David.

Swihart testified regarding events of March 2, 2009. On that date, Wooten was still presiding over the SAPCR involving David and Jennifer. Wooten and Spencer were communicating by text message. In the midst of their text messages, Spencer telephoned Judge Oldner's office. A transcript of the March 2, 2009 hearing before Wooten in the SAPCR case was admitted in evidence. At the hearing, Wooten stated she learned Benavides was appearing in the family law matter between David and Jennifer on Friday, February 27, 2009. Wooten stated she had spoken with Judge Oldner, the administrative judge, on February 27, 2009, about whether it was appropriate for her to hear the matter, "especially in light of [Alma] Benavides appearing on the case."Wooten indicated she had worked with Benavides through September 2008 and Benavides was her campaign treasurer. Wooten stated that "[F]or various reasons, I have to recuse myself off this case."At that hearing, David's counsel stated that David waived any conflict and asked Wooten to reconsider recusing herself from hearing the SAPCR. Wooten noted that during her election campaign, David "picked up some" of her campaign signs, but she stated she had not met him and would not know what he looked like. On March 2, 2009, Spencer and David exchanged thirty-one text messages. On March 3, 2009, there were eight text messages between Spencer and David. On March 4, 2009, Wooten recused herself from the SAPCR involving David and Jennifer. There was one phone call between Spencer and David that day.

**\*24** Swihart testified regarding Wooten's campaign expenditures and Spencer's invoices to the Wooten campaign for the period January 7, 2008 through August 29, 2008. Swihart compiled a summary of those expenses and invoices from forty-two exhibits and testimony from a previous hearing.[12] Swihart testified that pre-election expenditures on behalf of the Wooten campaign for the period January 1, 2008 through the Republican primary on March 4, 2008 totaled $81,215.26. The total amount of contributions deposited in Wooten's campaign account for that period was $12,370. Swihart testified that Spencer spent about $118,000 on Wooten's campaign, and Wooten actually paid back only about $102,000 of that amount.

Swihart testified David had a motive to bribe Wooten.

Swihart explained there was a connection between the money Stacy paid to Spencer and the money Spencer spent on behalf of the Wooten campaign, and there was a connection among Stacy, David, Spencer, and Wooten. Swihart testified bribery could occur without Stacy or David ever speaking directly to Wooten about the collusive plan. Based on the evidence he reviewed, Swihart testified David used Spencer as a barrier between Wooten and himself and Stacy. Swihart gave the example of the March 7, 2008 wire transfer of $10,000 from Stacy to Spencer. On March 7, 2008, Spencer and David were in communication, followed by David and Stacy communicating with one another. Stacy then provided instructions to her bank to wire money to Spencer's bank account. One hour and eight minutes after the $10,000 wire transfer was posted to Spencer's account, the money was converted into a cashier's check for payment of Clements's $10,000 bonus following Wooten's victory in the Republican primary. Swihart also testified that if David was screening Stacy from contact with Wooten by utilizing Spencer as a barrier, Stacy would have been involved in the collusive enterprise.

### Jay Valentine

**\*25** Jay Valentine testified that in late 2006 or early 2007, David contacted him regarding Valentine becoming a sales vice president at TDI. In early 2007, David spoke to Valentine about being involved in a "nasty divorce" and a series of family law issues. Valentine thought that one of the people "causing [David] some trouble" was a local judge. David indicated to Valentine that he was doing some "advocacy work." Valentine began working at TDI in November 2007. In February or March of 2008, Valentine had further conversations with David about his family law matters. David had Wooten campaign signs in his office, and he told Valentine that he was working to get Wooten elected. David told Valentine there was a judge by the name of Sandoval who had made an adverse ruling against David. According to Valentine, David said Wooten was going to change "the rulings" made in David's family law matter.

David wanted to hire Spencer to work at TDI. David said several times that the reason he wanted to hire Spencer was because he was "able to fix problems." David told Valentine that he had "hired Spencer to get a candidate to run against this judge" and that Spencer was the person who had "fixed his situation with the judge, and was going to get his situation reversed."According to Valentine, David made those statements to Valentine and other employees of the TDI sales department several

times. Valentine testified that Spencer also made comments to him about Spencer's role in the judicial campaign. Spencer told Valentine that he was able to get Wooten elected and that "he owned her." According to Valentine, Spencer said two or three times that he "owned" Wooten and "used that as a reason for why he was able to get things done" and an example of "the kind of stuff I can do."

David was pushing Valentine to hire Spencer as a consultant who would facilitate meetings with executives of various corporations and help sell TDI's product. Valentine objected to hiring Spencer because he did not think it made sense for the company to hire a "lobbyist," and the only people Spencer knew were politicians. Valentine told David, "Look, if I need to bribe a judge, [Spencer's] my guy," but Spencer cannot add value with regard to sales of the company's product. Although other sales and marketing employees also opposed TDI hiring Spencer, David insisted, and Spencer was hired as a TDI consultant.

In March 2009, Valentine complained about Spencer to the TDI Board of Directors and demanded an outside investigation of Spencer by the Board based on an incident Valentine thought was a basis for TDI severing its relationship with Spencer. Valentine's complaints about Spencer related to Spencer's interaction with a female marketing director while on a business trip. In an email and memorandum setting forth his complaints about Spencer, Valentine also included information about the claims David and Spencer had made about getting Wooten elected and what Wooten was going to do in connection with David's family law matters. David came to Spencer's defense, and Valentine testified he knew his complaint about Spencer was not going to be taken seriously. TDI fired Valentine in April 2009. In June 2009, Valentine filed an employment discrimination claim against TDI. In the employment discrimination complaint, Valentine asserted that David and Spencer had told him about their role in getting Wooten elected and bragged about bribing a judge. Valentine testified that the reason he included those claims in his employment discrimination complaint was to show David's conflict of interest with regard to Spencer. Valentine testified that his employment discrimination claim against TDI was arbitrated, resulting in an arbitration award in his favor.

### William Johnson

**\*26** William Johnson testified that he was CEO and owner of sixty-five to seventy percent of TDI. David

worked at TDI, but left the company in March or April 2012. At the suggestion of David, TDI hired Spencer to resolve an issue related to TDI credit card debt, for which he was paid $5,000 by TDI. Later, David suggested to Johnson that Spencer could provide access to legislators and officials at the Texas Department of Information Resources that would facilitate marketing TDI's products to the State. Johnson and David traveled to Austin, Texas to discuss the initiative with Spencer. As a result of this initiative, Spencer was paid $80,000 by TDI for work in obtaining a rider on a State budget that would facilitate acquisition by the State of data security technology. David then proposed that TDI set up a conference with Spencer in Washington, D.C. to speak to Spencer's contacts in the federal sector.

Johnson testified that Jay Valentine was hired as the head of sales and marketing of TDI in 2007. Valentine had been well-recommended by David and two of the members of the TDI Board of Directors. In March 2009, Johnson received an email from Valentine detailing a complaint that Spencer had allegedly sexually harassed a female marketing director.[13] The email further described what Valentine believed was a conflict of interest involving David and Spencer, because TDI's hiring of Spencer could be viewed as payback for Spencer's valuable work for David personally. In a "memorandum" to TDI, Valentine said Spencer and David had been bragging about unseating a judge who had ruled against David. Johnson testified that if Spencer said he saw Wooten campaign signs in David's office, Johnson would not dispute that testimony.

### Verdict

The jury found Stacy guilty of engaging in organized criminal activity, six counts of bribery, and money laundering. The trial court assessed punishment of ten years' confinement and a fine of $10,000 as to each count, those sentences to run concurrently. The trial court suspended imposition of the sentences, and placed Stacy on community supervision for a period of ten years. The trial court required her to serve thirty days in county jail as a condition of her community supervision. Stacy filed this appeal of those convictions.

### Bribery

In her first issue, Stacy asserts there is insufficient

evidence to support her bribery convictions. In connection with each of the six bribery counts, the jury found Stacy offered, conferred, or agreed to confer a benefit to Wooten as consideration for Wooten's filing to run for election, proceeding or continuing with a campaign for election as judge, or presiding over and issuing favorable rulings to Stacy or David in cases before her as judge.

### Standard of Review

We review the sufficiency of the evidence under the standard set out in *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).*Matlock v. State,* 392 S.W.3d 662, 667 (Tex.Crim.App.2013). We examine all the evidence in the light most favorable to the verdict and determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson,* 443 U.S. at 319; *Matlock,* 392 S.W.3d at 667; *see also Hooper v. State,* 214 S.W.3d 9, 12 (Tex.Crim.App.2007) (in assessing legal sufficiency of the evidence, we consider all the evidence in the light most favorable to the verdict and determine whether, "based on that evidence and reasonable inferences therefrom, a rational juror could have found the essential elements of the crime beyond a reasonable doubt"). This standard recognizes "the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts."*Jackson,* 443 U.S. at 319; *see also Adames v. State,* 353 S.W.3d 854, 860 (Tex.Crim.App.2011). The standard is the same for both direct and circumstantial evidence cases; under this standard, circumstantial evidence is as probative as direct evidence and, alone, can be sufficient to establish guilt. *Hooper,* 214 S.W.3d at 13; *Kutzner v. State,* 994 S.W.2d 180, 184 (Tex.Crim.App.1999).

The jury, as the fact finder, is entitled to judge the credibility of the witnesses, and can choose to believe all, some, or none of the testimony presented by the parties. *Chambers v. State,* 805 S.W.2d 459, 461 (Tex.Crim.App.1991). We defer to the jury's determinations of credibility, and may not substitute our judgment for that of the fact finder. *Jackson,* 443 U.S. at 318–19; *Brooks v. State,* 323 S.W.3d 893, 899–900 (Tex.Crim.App.2010) (plurality op.); *King v. State,* 29 S.W.3d 556, 562 (Tex.Crim.App.2000) (in conducting legal sufficiency analysis, appellate court "may not re-weigh the evidence and substitute our judgment for that of the jury"). Evidence is not rendered insufficient simply because conflicting evidence is introduced. *Matchett v. State,* 941 S.W.2d 922, 936 (Tex.Crim.App.1996)."An

appellate court determines whether the necessary inferences are reasonable based upon the combined and cumulative force of all the evidence when viewed in the light most favorable to the verdict." *Ervin v. State,* 331 S.W.3d 49, 55 (Tex.App.-Houston [1st Dist.] 2010, pet. ref'd). "[I]t is not necessary that every fact point directly and independently to the defendant's guilt; it is enough if the conclusion is warranted by the combined and cumulative force of all the incriminating circumstances." *Johnson v. State,* 871 S.W.2d 183, 186 (Tex.Crim.App.1993). Any inconsistencies in the evidence are resolved in favor of the verdict. *Matson v. State,* 819 S.W.2d 839, 843 (Tex.Crim.App.1991).

### *Analysis*

**\*27** Section 36.02 of the penal code provides, in pertinent part, that a person commits bribery if:

he intentionally or knowingly offers, confers, or agrees to confer on another ...:

(1) any benefit as consideration for the recipient's decision, opinion, recommendation, vote, or other exercise of discretion as a public servant, party official, or voter;

(2) any benefit as consideration for the recipient's decision, vote, recommendation, or other exercise of official discretion in a judicial or administrative proceeding....

TEX. PENAL CODE ANN. § 36.02(a)(1) & (2) (West 2011).[14] It is no defense to prosecution that a person whom the actor sought to influence was not qualified to act in the desired way, whether because she had not yet assumed office, she lacked jurisdiction, or for any other reason. *Id.* § 36.02(b). The offense of bribery is complete when the offer or solicitation is made. *Martinez v. State,* 696 S.W.2d 930, 933 (Tex.App.-Austin 1985, pet. ref'd).

A person acts intentionally with respect to the nature of her conduct or to the result of her conduct when it is her conscious objective or desire to engage in the conduct or cause the result. TEX. PENAL CODE ANN. § 6.03(a) (West 2011). A person acts knowingly with respect to the nature of her conduct or to circumstances surrounding her conduct when she is aware of the nature of her conduct or that the circumstances exist. *Id.* § 6.03(b). A person acts knowingly with respect to a result of her conduct when she is aware that her conduct is reasonably certain to cause the result. *Id.* "The offense of bribery focuses on the

mental state of the *actor,* and is complete if a private citizen, by offering, conferring, or agreeing to confer intends an agreement." *Mustard v. State,* 711 S.W.2d 71, 75 (Tex.App.-Dallas 1986, pet. ref'd); *see also Hubbard v. State,* 668 S.W.2d 419, 420–21 (Tex.App.-Dallas 1984) (bribery focuses on the mental state of the actor, and is complete if a private citizen, by offering, conferring, or agreeing to confer, or a public servant or party official, by soliciting, accepting, or agreeing to accept, intends an agreement), *pet. granted and remanded on other grounds,* 739 S.W.2d 341 (Tex.Crim.App.1987). Intent may be inferred from circumstantial evidence such as acts, words, and conduct of the accused. *Guevara v. State,* 152 S.W.3d 45, 50 (Tex.Crim.App.2004); *Hart v. State,* 89 S.W.3d 61, 64 (Tex.Crim.App.2002) (intent may be inferred from accused's acts, words, and conduct); *see also Conner v. State,* 67 S.W.3d 192, 197 (Tex.Crim.App.2001). Whether the person possessed the requisite intent to commit an offense is most often proven through the circumstantial evidence surrounding the crime. *Sholars v. State,* 312 S.W.3d 694, 703 (Tex.App.-Houston [1st Dist.] 2009, pet. ref'd).

In this case, the jury was charged that Stacy could be found guilty as a principal or as a party to the offenses of bribery. Under the law of parties, each party to an offense may be charged with the commission of the offense. TEX. PENAL CODE ANN. § 7.01(b) (West 2011). A person is responsible for the criminal conduct of another person if "acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense." *Id.* § 7.02(a)(2) (West 2011). When a party is not the "primary actor," the State must prove conduct constituting an offense plus an act by the defendant alone with the intent to promote or assist such conduct. *Beier v. State,* 687 S.W.2d 2, 3 (Tex.Crim.App.1985). The jury may consider "events occurring before, during and after the commission of the offense, and may rely on actions of the defendant which show an understanding and common design to do the prohibited act." *Ransom v. State,* 920 S.W.2d 288, 302 (Tex.Crim.App.1996). Circumstantial evidence may suffice to show the defendant is a party to the offense. *Id.; Miller v. State,* 83 S.W.3d 308, 313 (Tex.App.-Austin 2002, pet. ref'd). "Since an agreement between parties to act together in a common design can seldom be proved by words, the State must rely on the actions of the parties, shown by direct or circumstantial evidence, to establish an understanding or common design to commit the offense ." *Miller,* 83 S.W.3d at 314. Because the charge authorized the jury to convict Stacy as a principal or a party, the verdict will be upheld if the evidence was sufficient on either of those theories. *See Sorto v. State,* 173 S.W.3d 469, 472

(Tex.Crim.App.2005).

### Allegation Bribery Statute Does Not Support Conviction

**\*28** Stacy contends the bribery statute does not support a conviction for offering, conferring, or agreeing to confer a benefit to Wooten as consideration for Wooten's decision to become a judicial candidate, because a potential candidate or someone who has yet to become a candidate is not a "public servant" as referenced in the bribery statute. "Public servant" means:

> a person elected, selected, appointed, employed, or otherwise designated as one of the following, even if he has not yet qualified for office or assumed his duties: (A) an officer, employee, or agent of government; ... (C) an arbitrator, referee, or other person who is authorized by law or private written agreement to hear or determine a cause or controversy; ... (E) a candidate for nomination or election to public office....

TEX. PENAL CODE ANN. § 1.07(41) (West Supp.2013). Assuming, without deciding, that Stacy could not be guilty of bribery for offering, conferring, or agreeing to confer a benefit on Wooten as consideration for Wooten's decision to become a judicial candidate, the assumption would not be dispositive with respect to the legal sufficiency of the evidence to support the bribery convictions if the jury could have found Stacy guilty of bribery for offering, conferring, or agreeing to confer a benefit to Wooten as consideration for Wooten proceeding or continuing with a campaign for election as judge or for favorable rulings in cases involving Stacy or David. "[W]hen the trial court's charge authorizes the jury to convict on more than one theory, as it did in this case, the verdict of guilty will be upheld if the evidence is sufficient on any one of the theories." *See Guevara,* 152 S.W.3d at 49; *see also* TEX. ELEC.CODE ANN. § 251.001(1) (West 2010) ("candidate" means a "person who knowingly and willingly takes affirmative action for purpose of gaining nomination or election to public office or for the purpose of satisfying financial obligations incurred by the person in connection with the campaign for nomination or election").

### Allegation Evidence is Insufficient to Support Conviction

**\*29** Stacy argues that while she was charged under the bribery statute with offering, conferring, or agreeing to confer a benefit to Wooten in consideration for Wooten proceeding or continuing with a campaign for judge, the evidence does not support that charge because the evidence does not show Stacy had the requisite intent or that Wooten "even considered, at any time, getting out of the race after she made the decision" to become a candidate.[15] Additionally, Stacy argues that while she was charged under the bribery statute with offering, conferring, or agreeing to confer a benefit to Wooten in consideration for Wooten's favorable rulings in cases involving Stacy or David, the evidence does not support that charge because the evidence does not show Stacy had the requisite intent or that Stacy knew that any benefit to Wooten was supposed to constitute a bilateral agreement for favorable rulings.[16] We are unpersuaded by these arguments.

Stacy acknowledged in her appellate briefing that there "was certainly evidence that David believed that Judge Sandoval was a bad judge and was unfairly biased against him" and there "was also evidence that [David] wanted Judge Sandoval to be defeated."From this evidence, a rational jury could have reasonably concluded that David wanted Sandoval unseated in the March 2008 Republican primary.

The evidence showed Spencer traveled from his home near Austin, Texas to meet with David and Stacy on October 1, 2007. Shortly after that meeting, Spencer reviewed the court file in David's divorce case and SAPCR and began contacting individuals in Collin County to find a candidate to run against Sandoval for the office of judge of the 380th Judicial District Court. The deadline for filing as a candidate in that race was January 2, 2008. Therefore, there was a limited amount of time to locate a candidate. Because there was no Democrat candidate in that judicial race, the winner of the Republican primary would be the elected judge following the general election in the fall of 2008.

In his discussions with Wooten, Spencer expressed his belief that a successful campaign to unseat Sandoval would require $100,000 to $150,000, and Wooten believed that was a reasonable estimate. The primary election was to be held only two months after Wooten declared her candidacy, and the evidence indicated it was not likely Wooten could solicit significant campaign contributions in that limited period of time, particularly since the majority of campaign contributions in judicial races are made by lawyers and lawyers are not readily

inclined to make contributions to a candidate seeking to unseat an incumbent judge. Despite this fundraising challenge, Wooten agreed to run for election, and she appointed Spencer, who had never before managed a political campaign, to serve as her campaign manager.

In her appellate briefing, Stacy acknowledged that "the evidence shows that [Stacy] made payments to [Spencer] and that [Spencer] used a large portion of those payments to make campaign expenditures for the Wooten campaign at times when the campaign had not raised enough money to cover them."[17] For example, the day following Wooten's January 2, 2008 declaration of her candidacy, Stacy attempted to wire transfer $50,000 to Spencer. When that wire transfer was unsuccessful, Stacy wire transferred $50,000 the following day, January 4, 2008. Before that wire transfer, Spencer had $2.39 in his bank account. The evidence establishes Spencer immediately began utilizing money transferred by Stacy to pay campaign consultant Clements and other campaign expenses. Spencer testified that without the money wire transferred by Stacy, he would not have been able to pay Clements $7,500 on January 7, 2008, and $7,500 on January 8, 2008.

Sandoval's February 4, 2008 Campaign Finance Report indicated Sandoval had raised $12,575 in campaign contributions, had expended $8,997.08, and had a balance of $4,231.37 in his campaign account. The bank records for Wooten's campaign account show that on February 4, 2008, the account had a balance of $2,366, and on February 5, 2008, the account had a balance of $1,933. Despite the fact Sandoval had received significantly greater campaign contributions than Wooten, Spencer told Clements he was not impressed with the amount Sandoval had raised. Spencer also communicated to Wooten and Clements that Sandoval was not "in a position to match our resources." Clements interpreted Spencer's email to mean that there were people Spencer could go to for money.

**\*30** The evidence showed numerous communications between Spencer, David, and Stacy at or about the time of transfers of funds from Stacy to Spencer. For example, on January 29, 2008, the night before the second payment by Stacy to Spencer, Spencer telephoned David's cell phone. Immediately thereafter, either David or Stacy telephoned Spencer from David and Stacy's home phone. Spencer then telephoned Wooten. After the telephone call to Wooten, Spencer telephoned David and Stacy's home. Stacy made the second payment to Spencer on January 30, 2008, and Spencer deposited that payment to his account on February 1, 2008. That payment posted to Spencer's bank account on February 4, 2008. On

February 5, 2008, Spencer sent an email to Wooten indicating that Sandoval "cannot match our resources," even though Wooten had raised only $3,620 for her campaign at that time. On February 14, 2008, Stacy made her third payment to Spencer. On that day, Spencer exchanged text messages by phone with David between 5:12 p.m. and 5:23 p.m. Between 5:34 p.m. and 5:46 p.m., Spencer then communicated in succession with Wooten, Clements, and David. Stacy's third payment to Spencer posted to his account on February 15, 2008. On February 26, 2008, Stacy made her fourth payment to Spencer. At 4:41 a.m. on that day, Spencer's assistant confirmed to Spencer by email that radio advertising time had been purchased for Wooten's campaign. At 5:24 a.m. and 6:59 a.m ., David received text messages from Spencer. At 9:17 a.m., Stacy sent instructions to Tolleson Private Bank to wire $25,000 to Spencer. At 2:14 p.m., the wire transfer was posted to Spencer's account. Swihart testified those funds from Stacy were immediately used for payment of Wooten campaign expenses. At 2:37 p.m. and 2:53 p.m., Spencer's wife purchased cashier's checks for payment of Wooten campaign expenses from the funds wired to Spencer's account by Stacy.

On March 4, 2008, Wooten won the Republican primary. On March 7, 2008, Stacy made the fifth payment to Spencer. Between 7:07 a.m. and 8:29 a.m. on that day, Spencer text-messaged four times with David. Clements text-messaged Spencer at 8:17 a.m. David and Stacy had three phone conversations between 8:45 a.m. and 9:10 a.m. Between 9:23 a.m. and 10:02 a.m., Spencer and David exchanged thirteen text messages. At 10:47 a.m., Stacy attempted to reach David by telephone. At 10:58 a.m., Stacy sent instructions to Tolleson Private Bank to wire $10,000 to Spencer. At 11:40 a.m., David text-messaged Spencer. At 2:51 p.m., the wire transfer of $10,000 posted to Spencer's bank account. Between 3:21 p.m. and 3:52 p.m., Spencer and David exchanged eleven text messages. At 3:59 p.m., Spencer's wife purchased a cashier's check made payable to Clements in the amount of $10,000. Between 6:24 p.m. and 6:31 p.m. on March 13, 2008, the day of the sixth payment from Stacy to Spencer, Spencer text messaged David six times. At 9:41 p.m., Stacy sent instructions by email to Tolleson Private Bank to wire Spencer $15,000. On March 14, 2008, the sixth payment from Stacy to Spencer in the amount of $15,000 was posted to Spencer's bank account.

Spencer testified he kept Stacy removed from his work on Wooten's campaign. However, evidence of the consulting agreement between Spencer and Stacy and a summary of invoices purportedly related to the agreement were introduced in evidence. The consulting agreement is dated prior to Spencer's meeting with David and Stacy where

his consulting services were first purportedly discussed. The consulting agreement, dated October 1, 2007, was strikingly similar to Spencer's October 15, 2009 engagement letter with TDI. Both agreements include an identical phrase relating solely to TDI: "[a]ny additional time spent on TDI's behalf is part and parcel to, and inclusive of this engagement."Spencer admitted when testifying at trial that when he left the October 2, 2007 meeting with David and Stacy, he did not know the name of David's employer.[18]The August 1, 2008 "summary" invoice for purported consulting services rendered by Spencer did not apply a credit for the $50,000 wire transfer from Stacy to Spencer on January 4, 2008, and the $25,000 transfer on February 26, 2008 from Stacy to Spencer did not appear as a credit on the invoice, but was handwritten on Stacy's copy of the invoice. The work product purportedly produced by Spencer pursuant to the consulting agreement was insubstantial, especially in light of the generous compensation of $25,000 for each of the four "projects" outlined in the consulting agreement. Further, the evidence indicated that Stacy purportedly paid Spencer for "projects" at times when she had not been invoiced for the work and Spencer had not provided any work product. Stacy transferred $150,000 to Spencer between January 4, 2008 and March 14, 2008, although Spencer testified he was to be paid $25,000 for each of four "projects," which would total only $100,000 under the consulting agreement.

**\*31** From the evidence relating to Spencer's consulting agreement with Stacy, the jury could have reasonably inferred the agreement was a subterfuge, fabricated several years after the purported effective date to provide a false explanation for the transfers of money from Stacy to Spencer that were used to finance Wooten's campaign. On this record, including the evidence concerning the six transfers of funds from Stacy to Spencer and the communications among Spencer, David, and Stacy at or about the time of the transfers, a rational jury could have reasonably inferred that Stacy intentionally or knowingly, either as the primary actor or a party, offered, conferred, or agreed to confer a benefit, as to each of her transfers of funds to Spencer, as consideration for Wooten's decision to proceed or continue with a campaign to unseat Sandoval through the Republican primary.

Although Spencer denied stating that he "owned" Wooten or that Wooten was going to "fix" David's divorce, Valentine testified Spencer said two or three times that he "owned" Wooten, and "used that as a reason for why he was able to get things done" and an example of "the kind of stuff [he could] do."Valentine testified David told him that he had "hired Spencer to get a candidate to run against this judge" and that Spencer had "fixed [David's]

situation with the judge, and was going to get his situation reversed."The jury heard Johnson's testimony regarding Valentine's "memorandum" in which he said Spencer and David had been bragging about unseating a judge who had ruled against David and Valentine's email to Johnson in which he expressed his concern that TDI's hiring Spencer could be seen as a conflict of interest, that is, as payback for Spencer's role in unseating the judge presiding over David's divorce and SAPCR.

The jury also heard evidence concerning a June 2009 email exchange between Spencer and David regarding an opinion of the United States Supreme Court concerning judge recusal. *See Caperton, 556 U.S. 868, 129 S.Ct. 2252, 173 L.Ed.2d 1208*. The email included a statement from an article discussing *Caperton,* stating that "judges who receive campaign contributions large enough to create the appearance of bias should recuse themselves...." In the email, Spencer stated to David that he thought David would understand why he was interested in the subject matter of that case, although Spencer denied that he and David were interested in *Caperton* because Stacy's money was used to finance Wooten's campaign.

**\*32** After Wooten became the judge presiding over David's SAPCR, David's motion to modify was set to be heard by Wooten. However, shortly before the hearing on the SAPCR, Benavides appeared in the case on behalf of Jennifer. This appearance as counsel would result in Wooten's recusal because Wooten had indicated an intent to recuse herself for a period of nine months after January 2009 from cases in which Benavides appeared. The evidence showed David contacted Spencer regarding Benavides appearing in the SAPCR, and Spencer, in turn, contacted Benavides and Basinger and told them to "get off this case," despite not being able to provide a satisfactory reason. The evidence showed numerous other contacts between Spencer and David shortly after Benavides's appearance in the SAPCR. Further, the evidence showed that shortly after Benavides appeared in the SAPCR, Spencer contacted the office of Judge Oldner, the administrative judge. On this record, including evidence of the efforts of Spencer and David to avoid Wooten's recusal in the SAPCR, the effort of Spencer to make contact with the administrative judge that had advised Wooten to recuse herself, and Stacy's six transfers of funds to Spencer and the communications among Spencer, David, and Stacy at or about the time of the transfers, a rational jury could have reasonably inferred that Stacy, intentionally or knowingly, either as the primary actor or a party, offered, conferred, or agreed to confer a benefit, as to each of her transfers of funds to Spencer, as consideration for favorable rulings by Wooten

in cases in which David was a party. Further, the evidence showed that despite Benavides and Basinger appearing in the suit brought by Stacy against Jennifer and Suster that had been transferred to Wooten's court, Wooten did not voluntarily recuse herself in that lawsuit. On this record, including evidence of Wooten's failure to recuse herself from Stacy's lawsuit and Stacy's six transfers of funds to Spencer and the communications among Spencer, David, and Stacy at or about the time of the transfers, a rational jury could have reasonably inferred that Stacy, intentionally or knowingly, either as the primary actor or a party, offered, conferred, or agreed to confer a benefit to Wooten in consideration for favorable rulings by Wooten in cases in which Stacy was a party.

Stacy argues that the evidence does not show Stacy knew that any benefit to Wooten was supposed to constitute a bilateral agreement for favorable rulings by Wooten in cases in which David and Stacy were parties. Stacy cites _McCallum v. State,_ 686 S.W.2d 132 (Tex.Crim.App.1985), for the proposition that the phrase "as consideration for," as contained in the bribery statute, "requir[es] a bilateral agreement—in effect an illegal contract to exchange a benefit as consideration for the performance of an official function."_Id._ at 136. However, _McCallum_ is distinguishable from the instant case. "In _McCallum,_ the indictment alleged only that the defendant conferred the benefit on the recipient. Under that indictment, proof that the defendant offered the alleged benefit was not sufficient to convict."_Martinez,_ 696 S.W.2d at 932. Here, Stacy was indicted for offering, conferring, and agreeing to confer a benefit to Wooten as consideration for Wooten's running for election, proceeding or continuing with a campaign for election, and issuing favorable rulings in cases in which Stacy or David are parties. The jury was charged that they could find Stacy guilty of each count of bribery if they found she either offered, conferred, or agreed to confer a benefit to Wooten as consideration for Wooten's running for election, proceeding or continuing with a campaign for election, and issuing favorable rulings in cases in which Stacy or David are parties. _See id._ at 932–33 ("Common sense dictates that when it is alleged and proved that the defendant offered or solicited a proscribed benefit, it is not necessary to further prove that the offer or solicitation resulted in a bilateral agreement or unlawful contract with the other party."); _see also Valencia v. State,_ No. 13–02–020–CR, 2004 WL 1416239, at *2 (Tex.App.-Corpus Christi June 24, 2004, pet. ref'd) (mem. op., not designated for publication).

### Political Contribution Exception

**\*33** Reaching unassigned error, the dissent argues the State failed to prove the transfers from Stacy were not political contributions subject to section 36.02(d) of the penal code. Stacy did not raise as error a contention that the political contribution exception requires the reversal of her convictions. The dissent recognizes that there must be an exceptional reason for entertaining unassigned error but concludes it is appropriate in this case. We disagree that this case presents an appropriate circumstance for exercising our discretion to address, in the interest of justice, the argument made by the dissent. _See Pfeiffer v. State,_ 363 S.W.3d 594, 599 (Tex.Crim.App.2012) ("[A]ppellate courts _may_ review unassigned error-a claim that was preserved in the trial court but was not raised by either party on appeal.") (emphasis added). While an appellate court may in its _discretion_ address unassigned error, it is rarely required to do so, and the dissent does not argue this is a case involving fundamental unassigned error that an appellate court _must_ recognize on its own. Nevertheless, because the dissent raises the unassigned error, we will address the merits of the dissent's argument.

Under section 36.02(d), "[i]t is an exception to the application of Subdivisions (1), (2), and (3) of Subsection (a) that the benefit is a political contribution as defined by Title 15, Election Code, or an expenditure made and reported in accordance with Chapter 305, Government Code."TEX. PENAL CODE ANN. § 36.02(d). As the dissent acknowledges, the bribery counts specifically alleged that the benefits Stacy offered to, conferred on, or agreed to confer on Wooten were benefits "other than political contribution[s] as defined by Title 15, Election Code, or ... expenditures[s] made and reported in accordance with Chapter 305 of the Government Code."In accordance with the bribery counts, the jury charge instructed the jury that it could find Stacy guilty of bribery only if the transfers were "other than ... political contribution[s] as defined by Title 15, Election Code, or ... expenditure[s] made and reported in accordance with Chapter 305 of the Government Code."The jury charge also instructed the jury about the following definitions of "contribution," "political contribution," "campaign contribution," and "expenditure":

**\*34** "Contribution" means a direct or indirect transfer of money, goods, services, or any other thing of value and includes an agreement made or other obligation incurred, whether legally enforceable or not, to make a transfer. The term includes a loan or extension of credit, other than those expressly excluded by law, and a guarantee of a loan or extension of credit, including a loan described by law. The term does not include a loan made in the due course of business by a corporation that is legally engaged in the business of lending

money and that has conducted the business continuously for more than one year before the loan is made or an expenditure required by law to be reported.

"Political contribution" means a campaign contribution or an officeholder contribution.

"Campaign contribution" means a contribution to a candidate or political committee that is offered or given with the intent that it be used in connection with a campaign for elective office or on a measure. Whether a contribution is made before, during, or after an election does not affect its status as a campaign contribution.

"Expenditure" means a payment, distribution, loan, advance, reimbursement, deposit, or gift of money or any thing of value and includes a contract, promise, or agreement, whether or not legally enforceable, to make an expenditure.

Each of those definitions essentially tracks the language of the applicable statute, *see*TEX. ELEC.CODE ANN. § 251.001, and therefore properly instructed the jury.[19]As to each of the six bribery counts, the jury found Stacy guilty as alleged in the indictment.

The evidence showed Stacy did not transfer funds directly to Wooten's campaign; Stacy's contention was that she transferred funds to Spencer to compensate him for his work under the purported consulting agreement. Steusloff testified as to what constitutes a lawful political contribution under the election code in a race for a Collin County district court bench in 2008. According to Steusloff, a political contribution to a candidate for a Collin County bench could not exceed $2,500 for the election cycle. Each of the six transfers of funds from Stacy to Spencer that were funneled to the Wooten campaign vastly exceeded the amount of an allowable political contribution to a judicial candidate, and the transfers of funds were not reported by Wooten as political contributions under the election code on any campaign finance report or amended campaign finance report filed with the Ethics Commission or as loans under the election code on any personal financial statement filed with the Ethics Commission. *See*TEX. ELEC.CODE ANN. § 253.155(b) (West 2010).

Based on the applicable standard of review, a rational jury could have reasonably found that Stacy's payments were not political contributions as defined by the statute. Stacy does not argue otherwise on appeal.

*Conclusion*

**\*35** The jury was entitled to judge the weight of the evidence, resolve conflicts in the testimony, and draw reasonable inferences from basic facts to ultimate facts. *See Jackson,* 443 U.S. at 319. Based on our review of the record and viewing the evidence in the light most favorable to the jury's findings of guilt, we conclude that as to each conviction for bribery, the evidence is sufficient to allow a rational jury to find beyond a reasonable doubt that Stacy intentionally or knowingly offered, conferred, or agreed to confer on Wooten a benefit as consideration for Wooten proceeding or continuing with a campaign for election to the 380th Judicial District Court or for favorable rulings in cases in which Stacy or David were parties. *See id.* at 318–19; *see also Hooper,* 214 S.W.3d at 13; *see also*TEX. PENAL CODE ANN. § 36.02(a)(1), (2). Further, viewing the evidence in the light most favorable to the jury's findings of guilt, we conclude the evidence is sufficient to allow a rational jury to find beyond a reasonable doubt that, as to each conviction for bribery, Stacy acted with intent to promote or assist in the bribery, and solicited, encouraged, directed, aided, or attempted to aid Spencer or David in offering, conferring, or agreeing to confer on Wooten a benefit as consideration for Wooten proceeding or continuing with a campaign for election to the 380th Judicial District Court or for favorable rulings in cases in which Stacy or David were parties. *See*TEX. PENAL CODE ANN. § 7.02(a)(2); *see also Hooper,* 214 S.W.3d at 14, n3; *Hart,* 89 S.W.3d 61, 64 (Tex.Crim.App.2002) (direct evidence of intent may be inferred from any facts which tend to prove its existence, including acts, words, and conduct of the accused, and jury may infer knowledge from such evidence) (quoting *Manrique v. State,* 994 S.W.2d 640, 649 (Tex.Crim.App.1999)). We resolve Stacy's first issue against her.

### Engaging in Organized Criminal Activity and Money Laundering

In her second issue, Stacy contends the evidence is insufficient to support her conviction of engaging in organized criminal activity because there is insufficient evidence of the predicate offenses of bribery, money laundering,[20] or tampering with a government record[21] with which she was charged. In her third issue, Stacy argues that, because there was insufficient evidence of the predicate offense of bribery, there is insufficient evidence to support her conviction of money laundering.

We concluded with regard to Stacy's first issue that there

was sufficient evidence to support the jury finding Stacy guilty of the offenses of bribery. Accordingly, having concluded there was sufficient evidence of the predicate offense of bribery, we necessarily reject Stacy's contentions that there was insufficient evidence to support her convictions for engaging in organized criminal activity and money laundering because there was insufficient evidence of the predicate offense of bribery. We resolve Stacy's second and third issues against her.

### Exclusion of Evidence

**\*36** In her fourth issue, Stacy contends the trial court reversibly erred by excluding from evidence the findings of fact and conclusions of law signed by the judge hearing the SAPCR case involving David and Jennifer after Wooten recused herself. On appeal, she argues that the excluded evidence "completely vindicated David" and "undercut the charge that [David] had to bribe a judge to obtain favorable rulings." According to Stacy, Judge McCraw's findings "undo much of what Sandoval had done," and "undercut[ ] any alleged evidence that [David] attempted to bribe, or intended to bribe" Wooten, because the evidence shows David did not need to do so.

Before trial, the State objected to any evidence being admitted concerning rulings made by judges in the civil cases involving David, Stacy, and Jennifer, subsequent to Wooten recusing herself in the SAPCR case, as irrelevant to the allegations against Stacy that she "offered a bribe to Suzanne Wooten to encourage her to run for Judge, to continue to run for Judge once she filed to run, unseat Judge Sandoval from the bench and/or issue favorable rulings for Stacy and David." The trial court granted the State's motion in limine concerning reference to court rulings after Wooten ceased serving as the presiding judge on the cases.

Stacy filed a bill of exception containing Judge John L. McCraw, Jr.'s findings of fact and conclusions of law signed after Wooten recused herself from the SAPCR involving David and Jennifer. Stacy argued to the trial court that the findings of fact should be admitted in evidence to show Jennifer was the "one being stubbornly litigious." The trial court ruled that the proffered evidence was not relevant.

We review the trial court's decision to admit or exclude evidence under an abuse of discretion standard. *Martinez v. State,* 327 S.W.3d 727, 736 (Tex.Crim.App.2010). The trial court abuses its discretion when its ruling is arbitrary, unreasonable, or without reference to any guiding rules or

principles. *Lyles v. State,* 850 S.W.2d 497, 502 (Tex.Crim.App.1993). The trial court does not abuse its discretion unless its determination lies outside the zone of reasonable disagreement. *Martinez,* 327 S.W.3d at 736.

Stacy's argument on appeal does not comport with her argument for admission of the evidence at trial. At trial, she did not argue that the evidence should be admitted to undercut the charge that David had to bribe a judge to obtain favorable rulings, as she now argues on appeal. Instead, the argument advanced at trial for admission of the evidence was to show Jennifer was the "stubbornly litigious" individual in the SAPCR.

An appellate issue involving a proffer of evidence, in contrast to an issue involving an objection to evidence, must nevertheless satisfy the preservation-of-error requirements. *Reyna v. State,* 168 S.W.3d 173, 179 (Tex.Crim.App.2005). To preserve an issue for appellate review, rule 33.1 of the rules of appellate procedure requires the appellant to have made "a timely request, objection, or motion that stated the grounds for the ruling that the complaining party sought from the trial court with sufficient specificity to make the trial court aware of the complaint, unless the specific grounds were apparent from the context." TEX.R.APP. P. 33.1(a)(1)(A). Arguments on appeal must comport with the arguments made at trial and must bring to the trial court's attention the very complaint that is now made on appeal. *See Reyna,* 168 S.W.3d at 177. "[I]t is not enough to tell the judge that evidence is admissible. The proponent, if he is the losing party on appeal, must have told the judge why the evidence was admissible." *Id.* Stacy may not, for the first time on appeal, urge error not raised at trial. The explanation given at trial for admissibility must match the one urged on appeal. *See Martinez v. State,* 91 S.W.3d 331, 336 (Tex.Crim.App.2002) (under rule of appellate procedure 33.1, issue is whether complaining party on appeal brought to trial court's attention the very complaint that party is making on appeal).[22]

Stacy did not articulate to the trial court her assertion that the findings of fact and conclusions of law signed after Wooten recused herself was evidence David did not attempt or intend to bribe Wooten because the evidence showed David did not need to bribe Wooten.[23] Therefore, the trial court never had the opportunity to rule upon that specific rationale for admissibility. Because Stacy did not raise in the trial court the argument she now makes on appeal, she forfeited this appellate challenge to the trial court's refusal to admit that evidence. *See id.* We resolve Stacy's fourth issue against her.

**Conclusion**

**\*37** Having resolved Stacy's four issues against her, we affirm the trial court's judgments.

FITZGERALD, J., dissenting.

**DISSENTING OPINION**

Dissenting Opinion by Justice FITZGERALD.
**\*37** I dissent from the majority's opinion and judgment because the evidence is insufficient to support appellant's convictions.

With respect to the bribery charges at the heart of this case, this case is most unusual because the State's evidence is not merely insufficient—it affirmatively negates an essential element of the bribery charges and proves appellant not guilty. To convict appellant under the penal-code sections relied on by the State, sections 36.02(a)(1) and (a)(2), the State had to prove that certain transfers of funds by appellant were *not* political contributions. But the State's own theory of the case was that the transfers *were* political contributions-monies intended to be spent on a particular judicial candidate's campaign for office. Accordingly, the State could not properly charge appellant under sections 36.02(a)(1) and (a)(2), yet it did. Only section 36.02(a)(4) deals with political contributions of the sort involved in this case, and that section carries considerably more onerous requirements than the State was required to prove under sections 36.02(a)(1) and (a)(2) in this case.

**I. BRIBERY**

**A. Applicable law**

Appellant was convicted of six counts of bribery. The bribery statute provides as follows:

(a) A person commits an offense if he intentionally or knowingly offers, confers, or agrees to confer on another, or solicits, accepts, or agrees to accept from another:

(1) any benefit as consideration for the recipient's

decision, opinion, recommendation, vote, or other exercise of discretion as a public servant, party official, or voter;

(2) any benefit as consideration for the recipient's decision, vote, recommendation, or other exercise of official discretion in a judicial or administrative proceeding;

(3) any benefit as consideration for a violation of a duty imposed by law on a public servant or party official; or

(4) any benefit that is a political contribution as defined by Title 15, Election Code, or that is an expenditure made and reported in accordance with Chapter 305, Government Code, if the benefit was offered, conferred, solicited, accepted, or agreed to pursuant to an express agreement to take or withhold a specific exercise of official discretion if such exercise of official discretion would not have been taken or withheld but for the benefit; notwithstanding any rule of evidence or jury instruction allowing factual inferences in the absence of certain evidence, direct evidence of the express agreement shall be required in any prosecution under this subdivision.

(b) It is no defense to prosecution under this section that a person whom the actor sought to influence was not qualified to act in the desired way whether because he had not yet assumed office or he lacked jurisdiction or for any other reason.

**\*38** (c) It is no defense to prosecution under this section that the benefit is not offered or conferred or that the benefit is not solicited or accepted until after:

(1) the decision, opinion, recommendation, vote, or other exercise of discretion has occurred; or

(2) the public servant ceases to be a public servant.

(d) It is an *exception* to the application of Subdivisions (1), (2), and (3) of Subsection (a) that the benefit is a political contribution as defined by Title 15, Election Code, or an expenditure made and reported in accordance with Chapter 305, Government Code.
(e) An offense under this section is a felony of the second degree.[1]

The court of criminal appeals has explained that the phrase "as consideration for" means that the accused offered or conferred the benefit "as an inducement to an illegal contract, that of bribery."[2] When the allegation is that the accused actually conferred the benefit, the statute

requires "a bilateral arrangement—in effect an illegal contract to exchange a benefit as consideration for the performance of an official function."[3]The *McCallum* court favorably quoted commentary from the Model Penal Code in which the drafters opined on the significance of the "consideration" requirement in modern bribery statutes: "This is the more conventional formula in bribery legislation, *and prevents application of the bribery sanction to situations where gifts are given in mere hope of influencing, without any agreement by the donee.*"[4]Even when the conduct made the basis of a charge is an offer instead of a completed transfer of a benefit, the statute requires purposeful conduct aimed at an illegal contract-that is, an offer of a benefit with the purpose of accomplishing an exchange of the benefit for an official action.[5]

The superseding indictment charged appellant with bribery in counts two through seven. Count two is illustrative of all six of those counts, and in that count the State alleged as follows:

### COUNT TWO

### STACY STINE CARY

hereinafter styled Defendant, on or about January 4, 2008, and before presentment of this indictment, in the County and State aforesaid, did then and there intentionally and knowingly offer, confer, and agree to confer a benefit, other than a political contribution as defined by Title 15, Election Code, or an expenditure made and reported in accordance with Chapter 305 of the Government Code, to wit: $50,000, to Suzanne H. Wooten, a public servant, to-wit: a candidate for the office of Judge of the 380th Judicial District Court, and presiding Judge of the 380th Judicial District Court, as consideration for Suzanne H. Wooten's decision, opinion, recommendation, vote, and other exercise of discretion as a public servant and as consideration for Suzanne H. Wooten's decision, vote recommendation, and other exercise of official discretion in a judicial proceeding, to wit: filing paperwork to run for Judge of the 380th Judicial District Court, and as Judge of the 380th Judicial District Court presiding over and issuing favorable ruling cases in which the Defendant and David Cary are parties;

The jury was charged that appellant could be guilty of bribery either as a principal or as a party. Under the law of parties, a person is guilty of an offense if the offense is committed by another and the person is criminally responsible for the other person's conduct.[6]As relevant to this case, a person is criminally responsible for another's conduct if, acting with intent to promote or assist the commission of the offense, the person solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense.[7]To convict appellant of bribery as a party, the State had to prove (1) that someone else committed bribery, and (2) that appellant committed a listed act with the intent to promote or assist the commission of bribery.[8]

**\*39** Under the appropriate standard of review, we consider all of the evidence in the light most favorable to the jury's verdict and determine whether a rational fact finder could have found the essential elements of the crime beyond a reasonable doubt, based on the evidence and the reasonable inferences therefrom.[9]We must defer to the jury's credibility and weight determinations because the jury is the sole judge of the credibility of the witnesses and the weight to be given to their testimony.[10]It is not necessary for every fact to point directly and independently to appellant's guilt for us to uphold the conviction; the evidence is sufficient if the finding of guilt is warranted by the cumulative force of all the incriminating evidence.[11]

### B. Summary of the evidence

In 2003, appellant's future husband David Cary filed for divorce from his previous wife Jennifer Cary in the 380th Judicial District Court of Collin County. Charles Sandoval was the presiding judge of that court. The parties were divorced in October 2004, but contentious child-custody issues arose repeatedly after the divorce decree was signed. Appellant concedes the evidence supports the propositions that her husband thought Judge Sandoval was a bad and unfair judge, and that her husband wanted Judge Sandoval to be defeated in 2008.

There was evidence that James Spencer met with the Carys in October 2007, and that they discussed several topics, including promotion of "family-centered advocacy, with an emphasis on parental rights."The State introduced into evidence a purported engagement letter from Spencer to appellant dated October 1, 2007, in which Spencer stated that he would provide consulting services in four areas for $150 per hour up to a maximum budget of $250,000. The majority concludes that the jury could have inferred that Spencer actually created this document much later, perhaps as late as 2009, to create an explanation for appellant's large transfers of funds to

Spencer in early 2008. The evidence of the services Spencer allegedly performed for appellant under the agreement was such that the jury could have concluded that Spencer's services were not worth the $150,000 that appellant paid Spencer in the first three months of 2008.

There was evidence that in December 2007, Spencer recruited Suzanne Wooten to run against Judge Sandoval in the 2008 Republican primary, which was to be held on March 4, 2008. Wooten asked Spencer to be her campaign manager. Wooten filed as a candidate in the Republican primary on January 2, 2008, and appointed attorney Alma Benavides as her campaign treasurer. Soon thereafter, appellant transferred sums of money to Spencer as follows:

| | |
|---|---|
| January 4 | $50,000 |
| January 30 | $25,000 |
| February 14 | $25,000 |
| February 26 | $25,000 |
| March 7 | $10,000 |
| March 14 | $15,000 |

**\*40** Each of those transfers was the basis of one of the six bribery counts against appellant. Spencer testified that he used the money from appellant to pay for Wooten's campaign, but he also testified that it was his money to spend, that he thought Wooten would pay him back, and that Wooten did pay him back. As is chronicled in the majority opinion, appellant's payments to Spencer generally correlated with (1) the timing of certain telephone calls involving Spencer, the Carys' home telephone, David Cary's cell phone, Wooten, and campaign consultant Hank Clements, and (2) the timing of certain financial needs of the Wooten campaign. Given the evidence, the jury could reasonably infer that appellant made the payments when Spencer requested them, and that Spencer's requests were related to the financial needs of the Wooten campaign rather than any particular work he had done for appellant under the alleged October 2007 consulting agreement. The evidence did not show that Spencer ever made his requests for money directly to appellant; the evidence showed only that, around the times of the payments, Spencer had communications involving either David Cary's cell phone or the Carys' home telephone.

The State adduced other circumstantial evidence. David Cary's co-worker Jay Valentine testified that he had heard David Cary say Wooten was going to change rulings made in David Cary's family-law matter and that Spencer had "fixed his situation with the judge, and was going to get his situation reversed."Valentine also testified that Spencer said he "owned" Wooten. But there was no evidence that appellant was present when any of these statements were made. There was also evidence that Spencer and David Cary were particularly interested in the United States Supreme Court's *Caperton*[12] decision about the ramifications of campaign contributions to judges. There was evidence that David Cary told Spencer when David Cary's ex-wife hired Wooten's campaign treasurer Benavides to represent her in their family-law

case, that Spencer told Benavides and her law partner that they did not want to be involved in the case, and that Wooten recused herself after Benavides appeared in the case. And there was evidence that Wooten did not voluntarily recuse herself from appellant's lawsuit against Jennifer Cary and Israel Suster even though Benavides and her law partner appeared on Jennifer Cary's behalf in that matter.

### C. Application of the law to the facts

**\*41** The question presented is whether a rational jury, assessing all the evidence adduced at trial, could have found beyond a reasonable doubt that appellant herself committed bribery or that she encouraged or helped her husband or Spencer commit bribery with the intent to promote or assist the commission of the evidence. In my view, the answer is no, for several reasons.

### 1. The "political contribution" exception

The following analysis falls in the category of unassigned error. In my judgment, there must be an exceptional reason for entertaining unassigned error. This is such a case.

The State's theory of its bribery case was that appellant paid Spencer the $150,000 to spend on Wooten's judicial campaign. Although sections 36.02(a)(1) and (a)(2) of the bribery statute required, among other things, that the money not be a political contribution, and the indictment so alleged, the State's evidence showed the money was a political contribution. Thus, in offering evidence to prove bribery under sections 36.02(a)(1) and (a)(2), the State simultaneously negated an essential element of its case—that the payments were not political contributions. In addition, such evidence demonstrated that the prosecution could properly be brought under section 36.02(a)(4), with its attendant requirement of direct evidence of an express agreement.

We raise error sua sponte under the unassigned-error doctrine if the record discloses an error that should be addressed in the interest of justice.[13] A serious concern is that the bench and bar will construe the majority opinion as approval of a prosecution brought under sections 36.02(a)(1) and (a)(2), notwithstanding that the foundation of the case is built upon political contributions. Another concern is that the State failed to prove a substantial and critical element of the offense. Not only did the State fail to prove an element, the State also

proved appellant was not guilty of the crime charged. By disproving an element, that is, by proving the funds were political contributions, the State proved appellant did not commit and could not have committed the offenses charged and thus could not legally be convicted of a criminal offense under sections 36.02(a)(1) and (a)(2). A conviction for conduct that does not constitute an offense under the law is an injustice we may not ignore. Bribery charges, as serious as they are, must be properly brought and proved under the appropriate statutory provisions.

The State, in seeking a conviction under sections 36.02(a)(1) and (a)(2), sidestepped the obligation imposed by section 36.02(a)(4) to produce direct evidence of an express agreement and ignored the clear application of section 36.02(a)(4). An affirmance gives the seal of approval to a completely misdirected and unsupported prosecution and conviction that are not supported by law. For the more detailed reasons that follow, this case demands unassigned-error review.

At the outset, let us closely examine the provisions of the bribery statute. Sections 36.02(a)(1) and (a)(2) basically proscribe conferring a benefit on a public servant as consideration for an exercise of discretion as a public servant, or official discretion in a judicial proceeding.

Section 36.02(d) creates an **exception** to sections 36.02(a)(1), (a)(2), and (a)(3) for certain political contributions and political expenditures. In other words, if the exception applies, a person may not be prosecuted under either provision because, as to the particular circumstances described, political contributions, the person has not committed a criminal offense. The State is obliged to "negate the existence of an exception in the accusation charging commission of the offense and prove beyond a reasonable doubt that the defendant or defendant's conduct does not fall within the exception."[14]

**\*42** Accordingly, the superseding indictment specifically alleged that the benefits appellant offered to or conferred on Wooten were benefits "other than a political contribution as defined by Title 15, Election Code, or an expenditure made and reported in accordance with Chapter 305 of the Government Code."[15] The relevant provisions of the election code provide:

> (2) "Contribution" means a direct or indirect transfer of money, goods, services, or any other thing of value and includes an agreement made or other obligation incurred, whether legally enforceable or not, to make a transfer. The term includes a loan or extension of credit, other than those expressly excluded by this subdivision, and a guarantee of a loan or extension of

credit, including a loan described by this subdivision. The term does not include:

(A) a loan made in the due course of business by a corporation that is legally engaged in the business of lending money and that has conducted the business continuously for more than one year before the loan is made; or

(B) an expenditure required to be reported under Section 305.006(b), Government Code.

(3) "Campaign contribution" means a contribution to a candidate or political committee that is offered or given with the intent that it be used in connection with a campaign for elective office or on a measure. Whether a contribution is made before, during, or after an election does not affect its status as a campaign contribution.

(4) "Officeholder contribution" means a contribution to an officeholder or political committee that is offered or given with the intent that it be used to defray expenses that:

(A) are incurred by the officeholder in performing a duty or engaging in an activity in connection with the office; and

(B) are not reimbursable with public money.

(5) "Political contribution" means a campaign contribution or an officeholder contribution.

(6) "Expenditure" means a payment of money or any other thing of value and includes an agreement made or other obligation incurred, whether legally enforceable or not, to make a payment.

(7) "Campaign expenditure" means an expenditure made by any person in connection with a campaign for an elective office or on a measure. Whether an expenditure is made before, during, or after an election does not affect its status as a campaign expenditure.[16]

The State contended and the State's evidence showed that the monies transferred in this case were political contributions—monies used to defray political expenditures incurred by Wooten during her election campaign. Indeed, that was the heart of the State's theory of the case. Thus, section 36.02(d) comes into play, making the provisions of the bribery statute under which appellant was prosecuted inapplicable. In other words, under the facts in this case, in order to prosecute appellant under subsections (a)(1) and (a)(2), the State had to allege and prove the monies were not political contributions. The State properly alleged this, but the State's proof

showed the opposite, that the monies were political contributions used to pay political expenditures.

If appellant had been prosecuted under the proper provision, section 36.02(a)(4), the State would have had to allege and prove "*an express agreement.*" This provision also emphasized that "notwithstanding any rule of evidence or jury instruction allowing factual inferences in the absence of certain evidence, *direct evidence* of the express agreement shall be required in any prosecution under this subdivision."[17]The record is bare of such evidence.

**\*43** If these convictions for bribery were permitted to stand, the distinction between a straightforward bribery scheme involving the improper payment of money for an exercise of discretion or the inappropriate extension of special treatment in a non-election context and the unique circumstances present in an election context—circumstances that are inherently sensitive because of the nature of the political campaign process—with its additional elements of proof necessary to secure a conviction, would be erased by judicial fiat.

The majority concludes that the jury was entitled to find that appellant's payments to Spencer were not political contributions because there was evidence that those payments exceeded the legal contribution limits and there was evidence that Wooten did not report them in compliance with the election code. But the definitions of "contribution," "campaign contribution," and "political contribution" do not incorporate these other legal requirements. In other words, an illegal political contribution is still a political contribution.

The State adduced no evidence that appellant conferred any benefits on Wooten that were not political contributions as defined by Title 15 of the election code. Further, the State adduced evidence appellant was not guilty of the offense charged. Accordingly, the State failed to prove an essential element of its case under sections 36.02(a)(1), (a)(2), and (d); accordingly, we should reverse all six convictions for bribery and render judgments of acquittal.

## 2. Lack of consideration

The matter does not end there. Sections 36.02(a)(1), (a)(2), and (a)(4) all require a benefit to be conferred on someone (in this case, Wooten) in consideration for the recipient's decision, opinion, recommendation, vote or other exercise of discretion as a public servant. The first two methods delineated in the indictment, and the State's

evidence related thereto, involved Wooten's "filing paperwork to run for Judge and proceeding and continuing with a campaign to unseat the incumbent elected Judge."Neither act is inherently criminal. Neither act constituted consideration. And neither constituted a decision or act of discretion by Wooten as a public servant. These acts constituted only steps in the process of Wooten's attaining public office, that is, attaining the position of judge. Encouraging a person to run for office, any office, in and of itself, is a lawful and acceptable civic act, as is becoming a candidate for public office. Encouraging a person to proceed and continue with a campaign to unseat an incumbent judge is likewise a lawful and acceptable civic act. It is common for citizens to engage in such acts on a regular basis, and both acts are considered public spirited.[18]The bribery statute and the traditional idea of bribery involve the quid pro quo of paying a public servant so that the recipient will make decisions desired by the payor once the recipient assumes office.[19]In other words, bribery addresses graft and corruption. If acts such as encouraging a person to file or encouraging a person to keep running for office can be construed as the consideration to establish bribery, the statute will condemn legitimate civil and political activity and it will be left only to the State's imagination what an indictment could allege in terms of similar acts, such as seeking the signatures of enough voters to qualify to run, attending specific political events or gaining endorsements, and the like.[20]In summary, these first two alleged acts of filing paperwork to run and continuing to run constitute but steps in the political process, and neither constitutes the kinds of decisions or exercises of discretion contemplated by the statute as consideration.

Accordingly, we should render judgment acquitting appellant of all six counts of bribery.

### 3. Insufficiency of the evidence as to other elements

**\*44** Even setting aside the State's failure to disprove the political-contribution exception and the lack-of-consideration defect described above, I agree with appellant that the evidence was insufficient to support her bribery convictions. The jury reasonably could have believed that appellant's consulting agreement with Spencer was merely a cover story to justify appellant's sending Spencer money to pay for Wooten's campaign expenses. The jury reasonably could have believed that appellant wanted to help elect Wooten because she thought Judge Sandoval was a bad judge and was treating appellant's husband unfairly in his ongoing litigation with his ex-wife. The jury reasonably could have believed even that appellant expected and hoped that Wooten would

make rulings favorable to appellant's husband in that litigation. But, in my view, there is insufficient evidence to permit a reasonable jury to conclude beyond a reasonable doubt that appellant conferred monetary benefits on Wooten as consideration for Wooten's joining the race, for her staying in the race, or for favorable judicial rulings in cases. Nor is there sufficient evidence to permit a reasonable jury to conclude beyond a reasonable doubt (1) that appellant's husband or Spencer conferred monetary benefits on Wooten as consideration for Wooten's joining or staying in the race, or for favorable rulings in cases or (2) that appellant intentionally promoted or assisted them in committing that offense.

Before delving into the evidence, I point out that the State makes no argument that appellant was guilty under the "offers" or the "agrees to confer" prongs of the bribery statute. Although the State alludes to these theories and cites general but inapplicable authority, it does not set forth any facts which would establish either theory, and I have found no such facts in the record evidence. The majority recites evidence at length, notes the allegations in the indictment of offer, agree to confer, and confer and distinguishes the *McCallum* decision on the basis that *McCallum* involved only conferring, not offering or agreeing to confer. The majority thus excuses the State from the necessity of establishing a bilateral agreement in this case because the State alleged offering and agreeing-to-confer theories, even though the evidence at most supports only the "conferring" theory. The majority ultimately upholds the bribery convictions based on the theories and allegations for offering, agreeing to confer, and conferring as they relate to proceeding and continuing to run and for favorable rulings, but not as to filing paperwork to run for judge. Like the State, the majority fails to identify any evidence supporting the convictions on the theory that appellant offered or agreed to confer benefits in exchange for Wooten's proceeding and continuing to run and for favorable rulings.

In my judgment, all six of the bribery counts rest only on actual conferral of benefits—specific payments of specific amounts of money. Accordingly, I will not discuss the submitted but unsupported theories that appellant illegally offered Wooten any benefits or illegally agreed to confer any benefits on Wooten.

#### a. Becoming a candidate

**\*45** The State's first theory is that appellant bribed Wooten as consideration for Wooten to file the paperwork

to become a candidate for the Republican nomination to be judge of the 380th Judicial District Court. The majority concludes it is unnecessary to address this theory but notes appellant's argument that paying or offering to pay someone to become a candidate is not bribery as the offense is defined in the statute. I would address appellant's argument and rule in her favor. Before Wooten filed her paperwork to run for the Republican nomination, Wooten was not a "public servant" as defined in the statute.[21] So even if appellant or someone in league with her paid or offered to pay Wooten money as consideration for Wooten's becoming a candidate, that conduct would not be bribery.

Moreover, I see no evidence that appellant did such a thing before Wooten filed her paperwork to become a candidate, nor that her husband or Spencer committed such conduct either with or without appellant's aid or encouragement. There is evidence that Spencer recruited Wooten to run against Judge Sandoval, but there is no evidence that he gave her any improper inducement to do so.

### b. Remaining a candidate

The State's second theory is that appellant bribed Wooten as consideration for Wooten to proceed with or continue her campaign to become judge of the 380th Judicial District Court. The evidence supporting this theory fails on the essential element that the payments were made "as consideration for" Wooten's decision to continue her campaign. Again, as *McCallum* makes clear, a benefit conferred in the mere hope of influencing the recipient is not bribery; the benefit must be conferred for the purpose of achieving an exchange for the recipient's decision or action.[22]

The critical defect in the evidence is the lack of any proof of the requisite intent and exchange—there is no evidence that appellant, David Cary, or Spencer conferred any benefit on Wooten as consideration for Wooten's decision(s) to stay in the primary race against Judge Sandoval. The State argues that it did not have to prove that Wooten ever actually considered dropping out of the race, and this is correct. But the State did have to prove that appellant or someone in league with appellant conferred benefits on Wooten as consideration for—that is, in exchange for—Wooten's staying in the race. Proving that the benefits were conferred, even under dubious circumstances, does not prove the specific intent required for bribery. In *McCallum,* there was evidence that McCallum, a litigant in a pending civil trial,

encountered one of the jurors in a social setting after hours and bought champagne for her and her friends.[23] But the court of criminal appeals reversed McCallum's bribery conviction because there was no evidence that McCallum bought the champagne for the juror "in exchange for or in consideration of her vote as a juror."[24] The same is true in this case. The jury could infer that appellant wanted Judge Sandoval to lose and that she hoped Wooten would not abandon her campaign against him. But there is no evidence that appellant's transfers of money to Spencer or Spencer's spending on Wooten's campaign were done in exchange for Wooten's continuance of her judicial campaign.[25]

Absent evidence that appellant, her husband, or Spencer conferred benefits on Wooten with the intent of accomplishing an exchange of benefits for Wooten's decision to stay in the race, any finding that appellant, her husband, or Spencer had the proscribed intent is based on speculation, not on evidence, and certainly not on proof beyond a reasonable doubt. There is no evidence to support appellant's bribery convictions under this theory of the case.

### c. Judicial rulings

**\*46** The State's last theory is that appellant bribed Wooten in consideration for Wooten's presiding over and issuing favorable rulings in cases in which appellant or her husband was a party. Again, the evidence falls short on the essential element of consideration—that appellant or someone in league with her conferred a benefit on Wooten *as consideration for* Wooten's decisions or other exercises of discretion in a judicial proceeding.

The evidence shows that David Cary was a party to a long-running family-law case pending in the 380th Judicial District Court, and the jury could infer that he thought Judge Sandoval was a bad and unfair judge. The evidence also shows that appellant intervened in her husband's case and also filed a separate lawsuit against Israel Suster that was transferred from another court to the 380th Judicial District Court in May 2008. And, as previously discussed, the evidence supports reasonable inferences that appellant transferred money to Spencer six times during the primary campaign and shortly thereafter at Spencer's requests (made either to appellant or to her husband), and that Spencer used that money to pay for Wooten's campaign expenses. But the evidence does not permit an inference beyond a reasonable doubt that appellant paid the money, or Spencer spent the money with appellant's intentional aid or encouragement, as

consideration for Wooten's judicial rulings or exercises of discretion in appellant's or David Cary's cases. The evidence is equally consistent with the proposition that appellant merely hoped or believed that Wooten would make better rulings than Judge Sandoval had. Under *McCallum,* such evidence is not sufficient to prove bribery.[26]

The after-the-fact evidence regarding Wooten's handling of the Carys' litigation does not aid the State's position. There was evidence that in early 2009 Spencer tried to dissuade Benavides from representing David Cary's ex-wife in her ongoing dispute with David Cary, and given the pattern of telephone calls around that time, the jury might reasonably infer that Spencer did so because he and David Cary did not want Wooten to recuse herself from David Cary's case. But this does not show that appellant, individually or through her husband or Spencer, had bribed Wooten a year earlier. It shows only that David Cary thought Wooten was preferable to other judges who might preside over his case if she recused herself. And Wooten did in fact recuse herself without making any rulings in David Cary's case. So Wooten's handling of David Cary's case constitutes no evidence that anyone had bribed her.

As to appellant's December 2007 lawsuit against Suster, there was evidence that in mid–2008 appellant fought to keep that lawsuit in County Court at Law No. 4 instead of having it transferred to the 380th Judicial District Court. There was also evidence that appellant did not press for certain discovery in her suit until Wooten had taken the bench in January 2009, that Wooten granted partial relief on a discovery motion filed by appellant, and that appellant later dismissed her suit. Again, this evidence does not show that appellant committed bribery, either personally or through her husband or Spencer. Wooten's granting of only part of the relief appellant sought does not tend to show that appellant or someone in league with her had previously bribed Wooten in exchange for favorable rulings. Nor does Wooten's failure to recuse herself in that matter indicate that appellant or someone in league with her had previously bribed Wooten.[27]

**\*47** There was other evidence of conduct by appellant's husband and Spencer that put them in a bad light. There was evidence that in June 2009, Spencer and David Cary emailed each other about the Supreme Court's decision in *Caperton v. A.T. Massey Coal Co., Inc.,*[28] which imposed due-process limitations on elected judges' ability to hear cases involving their campaign contributors. Notably, *Caperton* was not a bribery case, and the Court did not question the subjective impartiality of the judge involved in that case.[29]The jury reasonably could have concluded

that Spencer and David Cary were interested in the *Caperton* decision because appellant had supplied much of the money used in the Wooten campaign, and *Caperton* had the potential to require Wooten's recusal in future cases on constitutional grounds. But again, this does not show that appellant conferred benefits on Wooten in exchange for favorable rulings in her cases or David Cary's case. Nor does it show that Spencer or David Cary conferred benefits on Wooten in exchange for favorable rulings, with appellant's intentional aid or encouragement. Concern over *Caperton* is as consistent with a mere belief that Wooten would make favorable rulings as it is with prior acts of bribery.

The testimony of Jay Valentine also put Spencer and David Cary in a bad light. According to Valentine, David Cary said that he was trying to get Wooten elected, that Wooten was going to change the rulings in David Cary's family-law case, and that Spencer "fixed his situation with the judge and was going to get his situation reversed."Valentine also testified that Spencer told Valentine that Spencer was able to get Wooten elected and that "he owned her." There is no evidence that appellant was present when any of the statements described by Valentine were made.

In summary, I would hold that the evidence in this record is insufficient to prove that appellant, Spencer, or David Cary conferred a benefit on Wooten as consideration for favorable judicial rulings once Wooten took office. Specifically, there is no evidence that any of the three alleged conspirators reached an *agreement* to an illegal exchange with Wooten.

Moreover, even assuming there was sufficient evidence that Spencer committed bribery, for appellant to be guilty of his act, the State had to prove appellant solicited, encouraged, or aided in committing the offense "with intent to promote or assist the commission of the offense."[30]Although appellant's transfers of money to Spencer may have aided him in committing the offense, there is still no evidence that she acted with the intent of promoting or assisting the commission of the offense of bribery. There is no evidence that she knew of any understanding, express or tacit, between Spencer and Wooten that Wooten would make favorable judicial rulings in David Cary's litigation in exchange for the campaign expenditures. For all the evidence shows, appellant may have helped finance Wooten's campaign in the mere hope of influencing Wooten—or in the mere hope of defeating Judge Sandoval—without knowledge of any agreement Spencer may have struck with Wooten and without any intent to promote such an illegal agreement.

### 4. Conclusion

**\*48** The State did not prove that the exception found in section 36.02(d) did not apply. Moreover, the State failed to prove beyond a reasonable doubt that appellant committed the elements of section 36.02(a)(1) or (a)(2), either individually or under the law of parties. I would reverse her bribery convictions and acquit her of those charges.

### OTHER CRIMES

Appellant's conviction for money laundering stands or falls with her bribery convictions. Because I conclude that appellant's bribery convictions are supported by insufficient evidence, I would also reverse her conviction for money laundering.

Appellant's conviction for engaging in organized criminal activity stands on a slightly different footing. The State submitted three theories of this crime to the jury. One theory was that appellant participated in a combination to commit bribery and another was that appellant participated in a combination to commit money laundering in connection with bribery. Both of those theories fail because of the insufficiency of the evidence to support the commission of bribery at all. The third and final theory of engaging in organized criminal activity was that appellant participated in a combination to commit tampering with a governmental record, specifically Wooten's preparation and filing of personal financial statements that did not identify appellant, David Cary, or Spencer as people who had given Wooten loans or gifts during the relevant time period. This theory is unaddressed by the majority because it is unnecessary to the majority's disposition of the case. For present purposes, it is enough for me to state my conclusion that there is no evidence in the record that appellant intentionally participated in any combination for the purpose of having Wooten commit the offense of tampering with a government record.

I would reverse appellant's convictions for engaging in organized criminal activity and money laundering based on insufficiency of the evidence, and I would acquit her of those charges.

### EXCLUSION OF EVIDENCE

**\*49** I also disagree with the majority's conclusion that appellant failed to preserve her fourth issue on appeal. At trial, appellant offered into evidence some findings of fact and conclusions of law from a trial judge who presided over David Cary's family-law case after Wooten recused herself. The findings were favorable to David Cary and critical of his ex-wife. The trial judge excluded the evidence. On appeal, appellant argues that the evidence was relevant and admissible to show that David Cary did not need to bribe a trial judge to obtain favorable rulings, and thus that he lacked the intent to commit bribery. The majority refuses to consider the merits of appellant's argument, concluding that appellant presented a different argument for admissibility in the trial court. According to the majority, appellant's only argument for admissibility in the trial court was that the findings of fact and conclusions of law showed that David Cary's ex-wife was being "stubbornly litigious."

I would conclude that appellant adequately preserved error in the trial court. She did not argue precisely that the findings of fact and conclusions of law were admissible to show that David Cary did not need to bribe a judge in order to win his case. But she did argue, albeit not very clearly, that the findings of fact and conclusions of law showed that David Cary's position was right. The record shows the following argument by appellant's counsel:

> Counsel: Judge, we spent, I don't know, four days proving that David Cary, and by way of David Cary, that Stacy Cary must also be stubbornly litigious. Well, here's the proof that this stubborn litigiousness **was on the right side of right. They were doing the right thing.** This Jennifer Cary character is the one being stubbornly litigious.
>
> The Court: I think in the end, all that's irrelevant. I think there's been evidence that both sides were litigious and was heated. I don't think who ultimately prevailed in the end on the custody case makes any difference.
>
> Counsel: Judge, I think it goes to show she was the one bringing the heat, not us, **and that we're just trying to do the right thing. That's why we have courts.**

(Emphases added.) In other words, appellant's counsel argued to the trial judge that the findings of fact and conclusions of law were admissible to show that David Cary was in the right in his child-custody litigation against his ex-wife. Appellant has made the argument with greater detail on appeal, but there is nothing wrong

with that; arguments made in the heat of trial need not satisfy standards of appellate eloquence in order to preserve error.

I would conclude that appellant's fourth issue was sufficiently preserved in the trial court. Given that I would reverse all of her convictions, I will refrain from addressing the merits of appellant's fourth issue.

**CONCLUSION**

I would reverse all of appellant's convictions. Because the majority does not, I respectfully dissent.

Footnotes

1    Stacy posted an appeal bond, thereby delaying the commencement of her community supervision. *See*TEX.CODE CRIM. PROC. ANN. art. 44.04(c) (West 2006); *Lebo v. State,* 90 S.W.3d 324, 329 (Tex.Crim.App.2002) (those placed on ten years' community supervision may seek release on bail pending appeal).

2    The divorce decree signed by Sandoval named the parties joint managing conservators with David paying child support of $500 per month. David and Jennifer were awarded nearly equal possession of the children. The decree required the parents to reside in Dallas or Collin County. The decree also ordered each parent to pay one-half of the children's school tuition for the 2004 school year and that $75,000 from an investment account owned by David be used to establish a fund for the children's educational expenses. *In re C.H.C.,* 396 S.W.3d 33, 39 (Tex.App.-Dallas 2013, no pet.).

3    This Court issued a memorandum opinion on July 19, 2005 relating to a petition for writ of mandamus filed by David, in which he complained that Sandoval erred in denying his motion to dismiss Jennifer's petition to modify the parent-child relationship and, alternatively, denying his motion to transfer venue of the SAPCR to Dallas County, Texas. We concluded that David had not shown Sandoval clearly abused his discretion in denying his motions, and we denied David's petition for writ of mandamus. *In re David Cary,* No. 05–05–00979–CV, 2005 WL 1670797, at *1 (Tex.App.-Dallas July 19, 2005, orig. proceeding) (mem.op.).

4    Other Sandoval rulings included appointing Jennifer as the sole managing conservator of the children, modifying the schedule for the parents' possession of the children by denying David possession of the children on weekdays, increasing the amount of child support David was to pay and ordering payment of retroactive child support, modifying the terms for reimbursement of the children's medical expenses, and ordering David to place $30,000 each year into an account for private education and medical expenses of the children. *See In re C.H.C.,* 396 S.W.3d at 39.

5    This Court issued a memorandum opinion on March 13, 2007 relating to a petition for writ of mandamus filed by David, in which he complained that Sandoval abused his discretion in denying David's motion to transfer the SAPCR to Dallas County. We concluded that David had not shown Sandoval abused his discretion, and we denied David's petition for writ of mandamus. *In re David F. Cary,* No. 05–07–00265–CV, 2007 WL 740895, at *1 (Tex.App.-Dallas March 13, 2007, orig. proceeding [mand. denied] ) (mem.op.).

6    Poinsett testified that in 2007, he met with Spencer, who was interested in issues related to family law and, specifically, issues related to grandparents' access to children. Also in 2007, Poinsett met with David and Stacy, and they spoke with him about "presumed equal joint parenting issues."

7    Stacy paid Spencer approximately $15,000 in 2007. That payment was not the subject of a bribery charge.

8    Stacy's brother, Scott Nicholas Stine (Stine), testified that Stacy is an owner of the family business, and she had other individual business ventures in addition to the family business. He testified that his family has hired consultants to advise on new investments, and such use of consultants is a "standard thing" in the oil industry. The consultants' fees would be divided among the family members when the consultants were hired for family business. When Stine hired consultants on his individual business deals, he paid those consultants. Stine testified that he vetted business consultants before they were hired by meeting with them and considering recommendations.
    According to Stine, the family business was sold on November 30, 2007 and the $6,375,000 proceeds were divided between Stacy, Stine, and their sister. To his knowledge, Stacy never invested in Smart Grid technology. Stacy had not shown Stine the DHI and Smart Grid documents provided her by Spencer, however Stine reviewed those documents before Stacy's trial at the request of Stacy's attorney.

9   Spencer was at least generally familiar with David's SAPCR proceeding. Spencer acknowledged discussing the case with David and testified that David had sent him pleadings in the case.

10  Steusloff testified that if a candidate files a statement that she is not going to accept or spend more than five hundred dollars on an election, she is not required to file a pre-election campaign finance report thirty days and eight days before the election.

11  Wendy Kelly, an investment analyst at the financial planning firm of Paladini Financial, testified that Stacy was a customer of Paladini Financial. On the morning of January 3, 2008, Stacy requested that Kelly wire $50,000 from one of her accounts to Security State Bank, Fredericksburg, Texas, for the benefit of Spencer. The wire transfer did not successfully transmit. Kelly contacted Stacy and advised her that the wire transfer had failed and that there was additional paperwork Stacy needed to complete before a third-party wire transfer could be accomplished. Stacy then transferred money from one of her accounts to an account at Tolleson Private Bank, which was able to wire transfer $50,000 to Spencer.

12  There are discrepancies between the invoices Spencer produced in a previous hearing and the invoices he submitted to the Wooten campaign as reported by Wooten to the Ethics Commission. Wooten's campaign finance reports indicate she paid more to Spencer than was billed on the invoices produced by Spencer in the previous hearing. For example, Spencer submitted multiple invoices from Booker Industries to the Wooten campaign, but Spencer had not paid Booker Industries. Call Plus, a phone bank vendor that made telephone calls on behalf of the Wooten campaign, appears to be another vendor which had not received payment from Spencer, although Spencer invoiced the Wooten campaign for that expense. Spencer invoiced the Wooten campaign $403.15 for a purported organizational meeting with counsel and consultants, and Swihart testified that does not appear to be a legitimate charge. According to Swihart, Spencer overcharged the Wooten campaign for radio advertising when he invoiced the campaign for $17,005, but paid only $14,454.25 for that advertising.

13  Valentine was terminated by TDI on April 9, 2009 for "lack of performance." Valentine filed an employment discrimination complaint, asserting he was terminated by TDI for making the sexual harassment complaint. Valentine's employment discrimination complaint was arbitrated. According to Johnson, Valentine's claims were denied by the arbitrator; however, TDI was required to pay $20,000 of Valentine's attorney's fees and $10,000 for Valentine's shares of TDI stock.

14  It is proper for an indictment to allege different methods of committing the offense in the conjunctive and for the jury to be charged in the disjunctive. *Vaughn v. State,* 634 S.W.2d 310, 312 (Tex.Crim.App. [Panel Op.] 1982). If there is sufficient evidence to prove one of the methods of committing the offense of bribery, this Court need not consider whether the evidence is also sufficient to prove the alternative theory or theories. *See Pinkerton v. State,* 660 S.W.2d 58, 62 (Tex.Crim.App.1983).

15  Stacy does not contend that a candidate for public office running in a party primary is not considered a public servant under the bribery statute. TEX. PENAL CODE ANN. § 1.07(41).*See Kaisner v. State,* 772 S.W.2d 528, 529 (Tex.App.-Beaumont 1989) ("As a candidate in a party primary, Robinson was clearly a public servant under the [Penal] Code. The decision to withdraw from the runoff would have been the exercise of discretion as a public servant."), *pet. ref'd,*780 S.W.2d 226 (Tex.Crim.App.1989) (per curiam).

16  Stacy does not contend that a sitting judge ruling on pending cases is not considered a public servant under the bribery statute. TEX. PENAL CODE ANN. § 1.07(41).

17  In her appellate briefing, Stacy acknowledged that the evidence shows Spencer did not immediately bill Wooten's campaign for campaign expenditures. The evidence showed Wooten's campaign was not billed for most of the campaign expenses paid by Spencer from the money transferred to him by Stacy until after the Republican primary. The jury heard testimony from Spencer that he did not want the expenditures timely shown on Wooten's campaign finance reports because those are public records and he did not want it publicly known how much money was being spent on Wooten's campaign. The jury also heard the testimony of Steusloff that a candidate must report a campaign expenditure when the amount is readily determinable, regardless of when the expense is actually billed. *See* Election Law Op. No. JWF–22 (1983) (where contract was entered into by a campaign to rent office space at a rate that exceeded $50 per month and was an expenditure under the election code upon the creation of the lessee's obligation to pay a definite amount of money, the amount of expenditure was readily determinable at the time of contracting, and election code required candidate to report on applicable sworn statement the total amount of rent payable under the contract as an expenditure as of the day of contracting).

18    Spencer later changed his testimony and indicated that David gave him a business card at the end of the October 2, 2007 meeting.

19    *See Morales v. State,* 357 S.W.3d 1, 5 (Tex.Crim.App.2011); *Martinez v. State,* 924 S.W.2d 693, 699 (Tex.Crim.App.1996) ("Following the law as it is set out by the Texas Legislature will not be deemed error on the part of a trial judge.").

20    Under section 34.02(a) of the penal code, a person commits the offense of money laundering if the person knowingly:
         (1) acquires or maintains an interest in, conceals, possesses, transfers, or transports the proceeds of criminal activity;
         (2) conducts, supervises, or facilitates a transaction involving the proceeds of criminal activity;
         (3) invests, expends, or receives, or offers to invest, expend, or receive, the proceeds of criminal activity or funds that the person believes are the proceeds of criminal activity; or
         (4) finances or invests or intends to finance or invest funds that the person believes are intended to further the commission of criminal activity.
      TEX. PENAL CODE ANN. § 34.02(a) (West 2011).

21    Section 37.10(a)(5) of the penal code provides that a person commits the offense of tampering with a governmental record if he "makes, presents, or uses a governmental record with knowledge of its falsity."TEX. PENAL CODE ANN. § 37.10(a)(5) (West Supp.2014).

22    *See also Lofton v. State,* No. 05–10–01265–CR, 2011 WL 6225415, at *2 (Tex.App.-Dallas Dec.9, 2011, pet. ref'd) (not designated for publication) (issue is whether complaining party brought to trial court's attention the very complaint the party is now making on appeal) (citing *Martinez,* 91 S.W.3d at 335–36); *Segovia v. State,* No. 05–09–01070–CR, 2010 WL 2387511, at *3 (Tex.App.-Dallas June 16, 2010, no pet.)(not designated for publication) (trial court never had opportunity to rule upon specific rationale for admissibility; because appellant did not raise in trial court argument in support of admissibility he made on appeal, he forfeited his appellate challenge).

23    Even if this argument had been made before the trial court, it is unpersuasive. The evidence Stacy would like to have in the record shows, according to Stacy, that when a judge other than Sandoval was presiding over David's SAPCR, rulings were more favorable to David. This evidence does not advance Stacy's cause.

1    TEX. PENAL CODE ANN. § 36.02 (West 2011) (emphasis added).

2    *McCallum v. State,* 686 S.W.2d 132, 135 (Tex.Crim.App.1985).

3    *Id.* at 136.

4    *Id.* at 135 (quoting Model Penal Code, Reprint—Proposed Official Draft, § 240.1 (May 4, 1962)) (emphasis in original).

5    *See Martinez v. State,* 696 S.W.2d 930, 933 (Tex.App.-Austin 1985, pet. ref'd).

6    TEX. PENAL CODE ANN. § 7.01 (West 2011).

7    *Id.*§ 7.02(a)(2).

8    *See Beier v. State,* 687 S.W.2d 2, 3 (Tex.Crim.App.1985).

9    *Winfrey v. State,* 393 S.W.3d 763, 768 (Tex.Crim.App.2013).

10    *Id.*

11    *Id.*

12    *Caperton v. A.T. Massey Coal Co., Inc.,* 556 U.S. 868, 129 S.Ct. 2252, 173 L.Ed.2d 1208 (2009).

13    See *Perez v. State,* 323 S.W.3d 298, 307 n. 5 (Tex.App.-Amarillo 2010, pet. ref'd).

14    TEX. PENAL CODE ANN. § 2.02 (West 2011).

15    *See*TEX. PENAL CODE ANN. § 32.06(d).

16    TEX. ELEC.CODE ANN. § 251.001(2)-(7) (West 2010).

17    *See*TEX. PENAL CODE ANN. § 36.02(a)(4) (emphasis added).

18    This scenario is different from the fact pattern presented in cases like *Valencia v. State,* No. 13–02–020–CR, 2004 WL 1416239 (Tex.App.-Corpus Christi June 24, 2004, pet. ref'd) (mem. op., not designated for publication).*Valencia* was a routine bribery case in which a county commissioner offered to vote for two men to be appointed as county constables if they agreed to exercise their discretion to hire as deputies two people designated by the county commissioner. *Id.* at *1. A paid job is clearly a benefit, unlike a decision to run for office or a decision to continue an already-started political campaign.

19    See *United States v. Ciavarella,* 716 F.3d 705, 731 (3d Cir.2013) ("A payment constitutes a bribe as long as the essential intent—a specific intent to give or receive something of value *in exchange* for an official act—exists.") (internal quotation and citation omitted), *cert. denied,* —— U.S. ——, 134 S.Ct. 1491, 188 L.Ed.2d 378 (2014); *United States v. Wright,* 936 F.Supp.2d 538, 545 (E.D.Pa.2013) ("Bribery involves a 'quid pro quo—a specific intent to give or receive something of value in exchange for an official act.'") (citation omitted).

20    See *Luzerne Cnty. Retirement Bd. v. Makowski,* 627 F.Supp.2d 506, 561 (M.D.Pa.2007) ("[A]ccepting a compaign contribution does not equal taking a bribe unless the payment is in exchange for an explicit promise to perform or not perform an official act.") (internal quotation and citation omitted).

21    *See*TEX. PENAL CODE ANN. § 1.07(41) (West Supp.2013) (defining "public servant").

22    See generally *McCallum,* 686 S.W.2d at 135–36, 139 (reversing bribery conviction for lack of evidence of "a bilateral agreement").

23    *Id.* at 136–39.

24    *Id.* at 139.

25    As the majority notes, there was some evidence that Wooten had a line of credit. Neither side developed this evidence, nor did either side develop a detailed description of how much funding was necessary for Wooten to run a financially reasonable judicial campaign. The State argues that appellant's funds "were necessary for Wooten to run for and maintain her campaign for the seat of the 380th Judicial District Court," but there is absolutely no evidence that this is so. It is entirely possible that Wooten simply would have run a less-expensive campaign if appellant's money had not been available.

26    See *McCallum,* 686 S.W.2d at 134–35.

27    In my view, judicial rulings are rarely persuasive evidence of bribery. The State can always argue that rulings favorable to the person accused of bribery demonstrate a quid pro quo, and that rulings against that person are made only to cover the parties' tracks, even if those rulings are perfectly reasonable under the law and the facts. The State can argue that rulings that split the difference, like Wooten's ruling on appellant's motion, are sinister from both angles. Only a truly outlandish ruling that is utterly divorced from the facts and law of the case might constitute some evidence of bribery—and even then, the ruling might reflect only the judge's lack of common sense rather than bribery.

28      556 U.S. 868, 129 S.Ct. 2252, 173 L.Ed.2d 1208 (2009).

29      *Id.* at 882.

30      TEX. PENAL CODE ANN. § 7.02(a)(2).

---

**End of Document**                                    © 2015 Thomson Reuters. No claim to original U.S. Government Works.

_____

IN THE COURT OF CRIMINAL APPEALS
OF TEXAS
_____


DAVID FREDERICK CARY,
                                    Appellant/Respondent,

        v.

THE STATE OF TEXAS,
                                    Appellee/Petitioner.
_____


From the Court of Appeals, Fifth District of Texas at Dallas
Court of Appeals No. 05-13-01010-CR
_____


## APPENDIX C
## STATE'S PETITION FOR DISCRETIONARY REVIEW

ACCEPTED
05-13-01010-CR
FIFTH COURT OF APPEALS
DALLAS, TEXAS
9/10/2014 4:38:29 PM
LISA MATZ
CLERK

5th Court of Appeals
FILED: 9/15/2014
Lisa Matz, Clerk

# No. 05-13-01010-CR

IN THE COURT OF APPEALS
FIFTH DISTRICT OF TEXAS
DALLAS, TEXAS

RECEIVED IN
5th COURT OF APPEALS
DALLAS, TEXAS
9/10/2014 4:38:29 PM
LISA MATZ
Clerk

DAVID FREDERICK CARY,

Appellant,

v.

THE STATE OF TEXAS,

Appellee.

On Appeal from the 366th Judicial District Court
Of Collin County Texas

## STATE'S BRIEF

GREG ABBOTT
Attorney General of Texas

EDWARD L. MARSHALL
Chief, Criminal Appeals Division

HARRY E. WHITE
Assistant Attorney General

*GRETCHEN B. MERENDA
Assistant Attorney General
State Bar No. 24010233

P. O. Box 12548, Capitol Station
Austin, Texas 78711
Telephone: (512) 936-1400
Facsimile: (512) 936-1280

*Lead Appellate Counsel

ATTORNEYS FOR THE STATE

# TABLE OF CONTENTS

INDEX OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iv

**STATEMENT REGARDING ORAL ARGUMENT** . . . . . . . . . . . . . . 1

**STATEMENT OF THE CASE** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

**STATEMENT OF THE FACTS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

       **A.**    **Spencer's consulting work with Stacey and TDI.** . . 30

       **B.**    **Spencer's campaign work with Wooten** . . . . . . . . . . 34

       **C.**    **The flow of monies** . . . . . . . . . . . . . . . . . . . . . . . . 38

       **D.**    Communications . . . . . . . . . . . . . . . . . . . . . . . . . . 40

**SUMMARY OF THE ARGUMENTS** . . . . . . . . . . . . . . . . . . . . . . . 48

**ARGUMENT** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

**I.**    **STATE'S REPLY TO POINT OF ERROR ONE** . . . . . . . . . . . 51

       A.    Standard of review for sufficiency of the evidence challenges. . . . . . . . . . . . . . . . . . . . . . . . 51

       B.    Applicable law to establish bribery . . . . . . . . . . . . . . 52

       C.    Applicable law to the six charges of bribery against Appellant. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

       D.    The evidence is sufficient to support the jury's findings of consideration for favorable rulings and Appellant's intent to commit bribery. . . . . . . . . . . . . . . . . . . . . . . . 56

E.  The evidence sufficiently supports Appellant's convictions for bribery as charged under § 36.02 (a)(1), (2). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68

F.  The evidence is sufficient to establish that a "public servant" was bribed by Appellant in exchange for the public servant's exercise of discretion, and thus sufficient to sustain Appellant's convictions for bribery. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 76

II.  STATE'S REPLY TO APPELLANT'S POINT OF ERROR THREE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 79

A.  Applicable law to establish money laundering. . . . . . . . . 79

B.  The evidence was sufficient to support Appellant's conviction for money laundering. . . . . . . . . . . . . . . . . . . 79

III.  STATE'S REPLY TO APPELLANT'S POINT OF ERROR TWO. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 80

A.  Standard of review for a challenge to the sufficiency of the evidence. . . . . . . . . . . . . . . . . . . . . . . . . . 80

B.  Applicable law to establish EOCA . . . . . . . . . . . . . . . 81

1.  Applicable law to underlying criminal activities of bribery and money laundering. . . . . . . . 82

2.  Applicable law to underlying criminal activities of bribery and money laundering. . . . . . . . 83

C.  Sufficient evidence supports Appellant's conviction for EOCA in committing or conspiring to commit bribery and/or money laundering. . . . . . . . . . . . . . . . . . 84

D.    Sufficient evidence supports Appellant's conviction for EOCA in the commission or conspiracy to commit tampering with a governmental record. . . . . . . . . . . . . . . 85

IV.   STATE'S REPLY TO POINT OF ERROR FOUR . . . . . . . . . . . 88

A.    Ineffective Assistance of Counsel Standards . . . . . . . . . . 88

B.    Appellant was not Prejudice by Counsel's Performance at the Punishment Phase of Trial. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 91

V.   STATE'S REPLY TO POINTS OF ERRORS FIVE AND SIX . 98

A.    Appellant's Waived Challenges to the Constitutionality of Texas Penal Code Section 36.02. . . . . . . . . . . . . . . . 98

A.    Forfeiture of Complaint . . . . . . . . . . . . . . . . . . . . . . . . 98

B.    Standard of Review for Claim Five . . . . . . . . . . . . . . . 100

C.    The Benefit Given by Appellant to Ms. Wooten Did Not Constitute Protected First Amendment Speech. . . 100

D.    Standard of Review for Claim Six . . . . . . . . . . . . . . . . 108

E.    Section 36.02 is Not Unconstitutionally Overbroad. . . . 110

F.    Section 36.02 is Not Unconstitutionally Vague. . . . . . . 111

PRAYER FOR RELIEF . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 114

CERTIFICATE OF COMPLIANCE WITH TEXAS RULE OF APPELLATE PROCEDURE 9.4 . . . . . . . . . . . . . . . . . . . . . . . . . 115

CERTIFICATE OF SERVICE . . . . . . . . . . . . . . . . . . . . . . . . . . 116

# INDEX OF AUTHORITIES

*Adames v. State*, 353 S.W.3d 854 (Tex. Crim. App. 2011) . . . . . . . . . 55

*Aguirre v. State,* 732 S.W.2d 320 (Tex. Crim. App. 1982) . . . . . . 84, 85

*Alvarado v. State,* 912 S.W.2d 199 (Tex. Crim. App. 1995) . . . . . . . 113

*Arroyo v. State,* 117 S.W.3d 795 (Tex. Crim. App. 2003) . . . . . . . . . 101

*Bates v. State,* 587 S.W.2d 121 (Tex. Crim. App. 1979) . . . . . . . . . . 77

*Beasley v. State,* 838 S.W.2d 695 (Tex. App.–Dallas 1992) . . . . . . . . 95

*Beier v. State,* 687 S.W.2d 2 (Tex. Crim. App. 1985) . . . . . . . . . . . . 57

*Boykin v. State,* 818 S.W.2d 782 (Tex. Cri. App. 1991) . . . . . . . . . . 104

*Briggs v. State,* 789 s.W.2d 918 (Tex. Crim. App. 1990) . . . . . . . . . 109

*Brooks v. State,* 323 S.W.3d 893 (Tex. Crim. App. 2010) . . . . . . . . . 51

*Buckley v. Valeo,* 424 U.S. 1 (1976) . . . . . . . . . . . . . . . . . . . . . . 102, 107

*In re C.H.C.,* 396 S.W.3d 33 (Tex. App.– Dallas 2013) . . . . . . . . . . . 3, 4

*Caperton v. A.T. Massey Coal Co.,* 556 U.S. 868 (2009) . . . . . 41, 42, 66

*Citizens United v. FEC,* 558 U.S. 310 (2010) . . . . . . . . . . . . . . . . . 102

*Citizens United v. Federal Election Commission,*
    130 S. Ct. 876 (2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 107

*Colten v. Kentucky,* 407 U.S. 104 (1972) . . . . . . . . . . . . . . . . . . . . 111

*Connally v. General Construction Company,* 269 U.S. 385 (1925) . . 114

*Cordova v. State,* 698 S.W.2d 107 (Tx. Crim. App. 1985) . . . . . . . . . . 58

*Crum v. State,* 946 S.W.2d 349 (Tex. App.–Houston
[14th Dist.] 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 82, 87

*Davidson v. State,* 737 S.W.2d 942 (Tex. App.–Amarillo, 1987) . . . . 102

*Draughon v. State,* 831 S.W.2d 331 (Tex. Crim. App. 1992) . . . . . . . . 98

*Duncantell v. State,* 230 S.W.3d 835 (Tex. App.–Houston
[14th Dist.] 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Passim

*Eichelberger v. State,* 232 S.W.3d 225 (Tex. App.–
Fort Worth 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 95

*Ervin v. State,* 331 S.W.3d 49 (Tex. App.– Houston
[1st Dist.] 2010 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51, 52, 81

*Evans v. State,* 656 S.W.2d 65 (Tex. Crim. App. 1983) . . . . . . . . . . . . 94

*Federal Elections Commission v. Beaumont,* 539 U.S. 146 (2003) . . 106

*Fuller v. State,* 827 S.W.2d 919 (Tex. Crim. App. 1992) . . . . . . . . 84, 85

*Gahl v. State,* 721 S.W.2d 888 (Tex. App,.–Dallas 1986) . . . . . . . . . . 77

*Gamboa v. State,* 822 S.W.2d 328 (Tex. App.–Beaumont 1992) . . . . . 91

*Garza v. State,* 841 S.W.2d 19 (Tex. App.–Dallas 1992) . . . . . . . . 52, 81

*Gear v. State,* 340 S.W.3d 743 (Tex. Crim. App. 2011) . . . . . . 51, 76, 80

*Gibbs v. State,* 7 S.W.3d 175 (Tex. App.–Houston
[1st Dist.] 1999 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 90

*Gonzales v. State,* 723 S.W.2d 746 (Tex. Crim. App. 1987) . . . . . . . . 53

*Ex Parte Gonzalez,* 945 S.W.2d 830 (Tex. Crim. App. 1997) . . . . . . . 88

*Grayned v. Rockford,* 408 U.S. 104 (1972) . . . . . . . . . . . . . . . . . . . . . . 100

*Guevara v. State,* 152 S.W.3d 45 (Tex. Crim. App. 2004) . . . . 52, 58, 67

*Hagens v. State,* 979 S.W.2d 788 (Tex. App.–Houston
[14th Dist.] 1998 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 91

*Haley v. State,* 1 S.W.3d 510 (Tex. Crim. App. 2005) . . . . . . . . . . . . 98

*Hart v. State,* 89 S.W.3d 61 (Tex. Crim. App. 2002) . . . . . . . . . . . 57, 82

*Hayes v. State,* 265 S.W.3d 673 (Tex. App.–Houston
[1st Dist.] 2008 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54, 55, 67

*Hernandez v. State,* 988 S.W.2d 770 (Tex. Crim. App. 1999) . . . Passim

*Holmes v. State,* 380 S.W.3d 307 (Tex. App.–Fort Worth 2012) . . . 100

*Hooper v. State,* 214 S.W.3d 9 (Tex. Crim. App. 2007) . . . . . . 52, 58, 81

*Hubbard v. State,* 668 S.W.2d 419 (Tex. App.–Dallas 1984) . . . . . . . 54

*Isassi v. State,* 330 S.W.3d 633 (Tex. Crim. App. 2010) . . . . . . . . 51, 80

*Jackson v. Virginia,* 443 U.S. 307 (1979) . . . . . . . . . . . . . . . . . . . Passim

*Jones v. State,* 119 S.W.3d 766 (Tex. Crim. App. 2003) . . . . . . . . . . 101

*Joubert v. State,* 235 S.W.3d 729 (Tex. Crim. App. 2007) . . . . . . 94, 95

*Kaisner v. State,* 772 S.W.2d 528 (Tex. App.–Beaumont 1989) . . . . . 78

*Kaisner v. State,* 780 S.W.2d 226 (Tex. Crim. App. 1989) . . . . . . . . . 78

*Karenev v. State,* 261 S.W.3d 428 (Tex. Crim. App. 2009) . . . . . . . . . 99

*Kfouri v. State,* 312 S.W.3d 89 (Tex. App.–Houston
   [14th Dist.] 2010 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 108

*Kitchens v. State,* 823 S.W.2d 256 (Tex. Crim. App. 1991) . . . . . 84, 85

*Lawton v. State,* 913 S.W.2d 542 (Tex. Crim. App. 1995) . . . . . . 53, 113

*Long v. State,* 931 S.W.2d 285 (Tex. Crim. App. 1996) . . . . . . . . . . . 100

*Mallett v. State,* 65 S.W.3d 59 (Tex. Crim. App. 2001) . . . . . . . . . . . 89

*Marable v. State,* 85 S.W.3d 287 (Tex. Crim. App. 2002) . . . . . . . . . . 55

*Marin v. State,* 851 S.W.2d 275 (Tex. Crim. App. 1993) . . . . . . . . . . 98

*Ex Parte Martinez,* 330 S.W.3d 891 (Tex. Crim. App. 2011) . . . . . . . . 96

*Martinez v. State,* 696 S.W.2d 930 (Tex. App.– Austin 1985) . . . 53, 57

*McCallum v. State,* 686 S.W.2d 132 (Tex. Crim. App. 1985) . . . . 53, 71

*McConnell v. Federal Elections Commission,* 540 U.S. 93 (2003) . . 106

*McCutcheon v. Fed. Election Comm'n,* 134 S. Ct. 1434
   (2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 102, 103

*McElroy v State,* 720 S.W.2d 490 (Tex. Crim. App. 1986) . . . 72, 73, 74

*McFarland v. State,* 928 S.W.2d 482 (Tex. Crim. App. 1996) . . . . . . . 89

*McGee v. State,* 909 S.W.2d 516 (Tex. App. –Tyler 1995) . . . . . . 82, 87

*McMorris v. State,* 516 S.W.2d 927 (Tex. Cr. App. 1974) . . . . . 111, 114

*Mendoza v. State*, 2008 WL 2403769 (Tex. App.–Houston
[14 Dist.[, Jun 12, 2008) . . . . . . . . . . . . . . . . . . . . . . . 90

*Milburn v. State*, 15 S.W.3d 267, 270 (Tex. App.–Houston
[14th Dist.] 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 96

*Miller v. Dretke,* 420 F.3d 356 (5th Cir. 2005) . . . . . . . . . . . . . . . . . . 90

*Miller v. State,* 83 S.W.3d 308 (Tex. App.–Austin 2002) . . . . . . . . . . 58

*Montoya v. State,* 65 S.W.3d 111 (Tex. App.–Amarillo 2000) . . . . . . . 95

*Montoya v. State,* 810 S.W.2d 160 (Tex. Crim. App. 1989) . . . . . . . . . 56

*Moore v. Avoyelles Corr. Ctr.*, 253 F.3d 870 (5th Cir. 2001) . . . . . . . 105

*Morris v. State,* 940 S.W.2d 610 (Tex. Crim. App. 1996) . . . 94, 95, 111

*Mosley v. State,* 983 S.W.2d 249 (Tex. Crim. App. 1998) . . . . . . 53, 113

*Mosley v. State,* 983 S.W.2d 249 (Tex. Crim. App. 2001) . . . . . . . . . . 89

*Munoz v. State*, 29 S.W.3d 205 (Tex. App.–Amarillo 2000) . . . . . . . . . 86

*Mustard v. State,* 711 S.W.2d 71 (Tex. App.–Dallas 1986) . . . . . . . . . 53

*Mutscher v. State,* 514 S.W.2d 905 (Tex. Crim. App. 1974) . . . . . . . 113

*Neal v. State,* 150 S.W.3d 169 (Tex. Crim. App. 2004) . . . . . . . . . . . . 98

*Papachristou v. City of Jacksonville,* 405 U.S. 156 (1972) . . . . . . . . 111

*Patterson v. State,* 950 S.W.2d 196 (Tex. App.–Dallas 1997) . . . . 56, 67

*Pesina v. State,* 949 S.W.2d 374 (Tex. App.–San Antonio 1997)   . . . . 58

*Ex Parte Prior,* 540 S.W.2d 723 (Tex. Crim. App. 1976) . . . . . . . . . . 58

*Prystash v. State,* 3 S.W.3d 522 (Tex. Cri. App. 1999)  . . . . . . . . . . . 101

*Ransom v. State,* 920 S.W.2d 288 (Tex. Crim. App. 1994)   . . . . . . 56, 58

*Robertson v. State,* 187 S.W.3d 475 (Tex. Crim. App. 2006)   . . . . . . . 89

*Sanchez v. State,* 995 S.W.2d 677 (Tex. Crim. App. 1999)  . . . . . Passim

*Swearingen v. State,* 101 S.W.3d 89 (Tex. Crim. App. 2003)   . . . . . . 113

*State v. Garcia,* 823 S.W.2d 793 (Tex. App.–San Antonio 1992)   . . . 103

*State v. Yount,* 853 S.W.2d 6 (Tex. Crim. App. 1993) . . . . . . . . . . . . 101

*Strickland v. Washington,* 466 U.S. 668 (1984)   . . . . . . . . . . . . . Passim

*Thomas v. State,* 9 S.W.3d 808 (Tex. Crim. App. 1999)   . . . . . . . . 88, 91

*Thompson v. State,* 9 S.W.3d 808 (Tex. Crim. App. 1999)   . . . . . . . . . 89

*Torres v. State,* 92 S.W.3d 911 (Tex. App.–Houston
    [14th Dist.] 2002   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 95

*Tovar v. State,* 978 S.W.2d 584 (Tex. Crim. App. 1998)   . . . . . . . . . . 87

*Trenor v. State,* 333 S.W.3d 799 (Tex. App.–Houston
    [1st Dist.] 2010   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56, 68

*United States v. Marchetti,* 466 F.2d 1309 (4th Cir. 1972)   . . . . . . . 111

*Vasquez v. State,* 665 S.W.2d 484 (Tex. Crim. App. 1984)   . . . . . . . . 53

*Vela v. Estelle*, 708 F.2d 954, 965 (5th Cir. 1983) . . . . . . . . . . . . . . . 96

*Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.,*
    455 U.S. 489 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 109

*Walker v. State,* 530 s.W.2d 572 (Tex. Crim. App. 1975) . . . . . . . . . . 95

*Watts v. State,* No. 09-11-00383-CR, 2012 WL 403859, *2
    (Tex. App. – Beaumont 2012) . . . . . . . . . . . . . . . . . . . . . . . . 57, 58

*Weyandt v. State,* 35 S.W. 3d 144 (Tex. App.–Houston
    [14th Dist.] 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 100

*Wright v. State,* 28 S.W.3d 526 (Tex. Crim. App. 2000) . . . . . . . . . . . 98

## Constitutions, Statutes and Rules

U.S. Const., amend. I . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Passim

U.S. Const. Amend. VI . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 88

Model Penal Code § 240.1, Comment 4(b), (c) . . . . . . . . . . . . . 53, 71, 72

Tex. Penal Code § 1.05 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 104

Tex. Penal Code § 1.07 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 77

Tex. Penal Code Ann. § 2.02 (Vernon 2013) . . . . . . . . . . . . . . . . 69, 70

Tex. Penal Code Ann. § 6.03 (Vernon 2008) . . . . . . . . . . . . . . . . . . 57

Tex. Penal Code Ann. § 7.01 . . . . . . . . . . . . . . . . . . . . . . . . . 55, 56, 67

Tex. Penal Code Ann. § 7.02 . . . . . . . . . . . . . . . . . . . . . . . . . 55, 56, 67

Tex. Penal Code Ann. § 34.02 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 79, 82

Tex. Penal Code Ann. § 36.02 (Vernon 2008) . . . . . . . . . . . . . . . Passim

Tex. Penal Code Ann. § 36.02 (West 2007) . . . . . . . . . . . . . . . . . . . 111

Tex. Penal Code Ann. § 36.04 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 108

Tex. Penal Code Ann. § 37.01 (Vernon 2008) . . . . . . . . . . . . . . . . . . 83

Tex. Penal Code Ann. § 37.10 (Vernon 2008) . . . . . . . . . . . . . . . . . . 83

Tex. Penal Code Ann. § 71.01 (Vernon 2008) . . . . . . . . . . . . . . . . 81, 86

Tex. Penal Code Ann. § 71.02 (Vern0n 2008) . . . . . . . . . . . . . . . . . . . 81

Tex. Code Crim. Proc. Ann. Art. 1.05 (West 2011) . . . . . . . . . . . . . . . 88

Tex. Code Crim. Pro. Art. 37.07 (West 2010) . . . . . . . . . . . . . . . . . . 92

Tex. Ann. Civ. Stat. Art. 5472(e) . . . . . . . . . . . . . . . . . . . . . . . . . . 72

Tex. R. App. Proc. 33.1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 98, 99

Tex. R. App. Proc. 38.1 (I) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 113

Texas Elec. Code § 251.001 (West 2008) . . . . . . . . . . . . . . . . . . . 70, 77

Texas Elec. Code § 254.031 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 104

Texas Elec. Code § 253.155 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 104

Title 15, Election Code . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Passim

Tex. Gov't Code § 311.021 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 104

Tex. Gov't Code § 572.021 (Vernon 2008) . . . . . . . . . . . . . . . . . . . . . . 84

Tex. Gov't Code § 572.023 (Vernon 2008) . . . . . . . . . . . . . . . . . 84, 85, 87

Tex. Gov't Code, Chapter 305 . . . . . . . . . . . . . . . . . . . . . . . . 69, 70, 110

Branch's Ann. P.C., 3rd ED., Vol. III, § 36.02 . . . . . . . . . . . . . . . . . . 71

Tex. Const. Art I, sec. 10 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 81

## STATEMENT REGARDING ORAL ARGUMENT

The State does not believe that oral argument is necessary to assist the Court in resolving this appeal, especially in light of its recent decision of co-conspirator *Stacy Stine Cary v. State*, No. 05-12-01421 (Tex. App.–Dallas Aug 28, 2014), 2014 WL 4261233. Should the Court, however, determine that argument is advised, the State will attend and participate to assist the Court.

## STATEMENT OF THE CASE

In a Superceding Indictment filed on July 14, 2011, the Grand Jury of the 366th Judicial District Court of Collin County, Texas, indicted Appellant, David Cary, on one count of engaging in organized criminal activity ("EOCA"), six counts of bribery, and one count of money laundering in cause number 366–81636–2011. 1 CR 157-65.[1] Count One alleged that Appellant worked in combination with his wife Stacy Cary, judicial candidate and ultimately judge-elect Suzanne Wooten, and Wooten's campaign manager James "Stephen" Spencer, in committing bribery, money laundering, or tampering with a government record. 1 CR 157-59. Counts Two through Seven alleged that Appellant bribed Wooten in

---

[1] "CR" refer to the Clerk's Record of papers filed in the trial court, preceded by the volume number and followed by the page number(s). "RR" refers to the Reporter's Record of the transcribed trial proceedings which occurred April 16, 2013 through April 26, 2013, preceded by the volume number and followed by the page number(s). "MNT RR" refers to the transcribed motion for new trial hearing, followed by the page number(s).

1

exchange for Wooten entering the judicial race, continuing her campaign for judge, and presiding over and issuing favorable rulings in cases to which Appellant and his wife were a party. 1 CR 159-64. And Count Eight alleged Appellant was funding the criminal activity of bribery. 1 CR 164-65. On April 16, 2013, Appellant pleaded not guilty to each charge. 2 RR 41-42. On April 25, 2013, the jury found Appellant guilty of all eight counts. 9 RR 117-19; 2 CR 654-58, 681-97 (Judgment). On April 26, 2013, Appellant was sentenced in each count to fourteen years' imprisonment. 10 RR 113-16; 1 CR 666-76. Appellant filed a motion for new trial claiming that trial counsel, Lawson Pedigo, was ineffective for failing to make a timely election of punishment by the court. 2 CR 757-1014; MNT RR 4-100. On June 21, 2013, after hearing evidence on the motion for new trial, the trial court denied Appellant's motion. MNT RR 100. Subsequently, Appellant filed a timely notice of appeal on July 25, 2013. 2 CR 1027-28.

## STATEMENT OF FACTS

Because the State presented nearly the same evidence at Appellant's trial, the following summary of evidence is largely excerpted from this Court's evidentiary summary in *Stacy Stine Cary v. State*, No. 05-12-01421-CR, 2014 WL 4261233, *29-33 (Tex. App.—Dallas Aug. 28, 2014) (unpub.). The State-Appellee marks all altered text within brackets

below—primarily, citations to Appellant's trial records, as well as any text changes based upon the specific facts presented at Appellant's trial.

Rick Robertson

David Cary (David) filed for divorce from Jennifer Cary (Jennifer) in December 2003. [2 RR 101; State's Exhibit ("SX") 7A.] The divorce petition was filed in the 380th Judicial District Court of Collin County, Texas. [*Id.*; 2 RR 99-100.] Judge Charles Sandoval (Sandoval) was the presiding judge of that court. [2 RR 112-14.] Rick Robertson, a board certified family law attorney practicing in Collin County, represented Jennifer throughout the divorce proceeding. [2 RR 84, 87.] Robertson testified at trial regarding the divorce and a subsequent suit affecting the parent-child relationship (SAPCR). [2 RR 86-172.] . . . [I]n the divorce proceeding and subsequent SAPCR[ (Suit Affecting the Parent-Child Relationship),] many depositions were taken and hearings conducted. [2 RR 124-26.]

In the divorce proceeding, David and Jennifer reached an agreement regarding the terms of possession of their twin daughters, the amount of child support, and a fund to be established by David for the children's education expenses. Sandoval signed the final divorce decree on October 5, 2004.[2] [SX 7A; 2 RR 105-06.] In April 2005, Jennifer filed a SAPCR in the 380th Judicial District Court. [2 RR 106.] [David filed a motion to transfer the proceeding to Dallas County, Texas, which Jennifer opposed. [2 RR 112-15.] Sandoval denied David's motion to transfer the case.[3] [*Id.*]] The parties mediated

---

[2] [footnote omitted, referring to facts in *In re C.H.C.*, 396 S.W.3d 33, 39 (Tex. App.-Dallas 2013, no pet.).]

[3] [footnote omitted, discussing actions in *In re David Cary*, No. 05-05-00979-CV, 2005 WL 1670797, at *1 (Tex. App.—Dallas July 19, 2005, orig. proceeding) (mem. op.).]

Jennifer's SAPCR, and a partial mediated settlement agreement was signed in June 2005 and filed in Sandoval's court in July 2005. [2 RR 106-12.]

In the summer or fall of 2005, a hearing in the SAPCR proceeding was conducted on Jennifer's motion for temporary orders. [2 RR 113-14.] In April 2006, David filed a motion to recuse Sandoval. [2 RR 115-17.] On May 8, 2006, the judge appointed to hear the motion to recuse denied that motion. [2 RR 117-19.] . . . [A] trial was conducted before Sandoval concerning a number of issues in the SAPCR. [2 RR 118-22.] Among Sandoval's rulings following the trial was an order that David pay Jennifer's attorney's fees in the amount of $416,543.16.[4] [2 RR 124-26.] A final order of modification was signed by Sandoval on December 1, 2006. [2 RR 127.] Robertson testified that David appealed almost every order signed by Sandoval, and Robertson found it unusual that neither David nor Jennifer appealed Sandoval's final order of modification. [2 RR 119-21, 126-28.] In January 2007, David filed a motion to modify the prior order in the SAPCR. [2 RR 128-29.] Robertson testified that in moving to modify a SAPCR order, one typically must allege some change in circumstances occurring since the last order. [2 RR 128.] Robertson was surprised by David's motion to modify, because it was filed the month after Sandoval's December 2006 final order of modification[, and that i]n his motion to modify, David asserted he had secured full-time employment at a higher salary than attributed to him at the entry of prior modification orders,[ and] he had married Stacy . . . resulting in a [change] in his monthly expenses . . . [2 RR 128-29.] David also moved again for transfer of the proceeding to Dallas County.[5] [2 RR 129-30.

---

[4]  [footnote omitted, describing "other Sandoval rulings," citing *In re C.H.C.*, 396 S.W.3d at 39].

[5]  (footnote omitted, relaying procedural history in *In re David F. Cary*, No. 05-07-00265-CV, 2007 WL 740895 (Tex. App.–Dallas March 13, 2007, orig. proceeding [mand. denied] ) (mem. op.).)

Appellant filed a Writ of Mandamus, appealing Judge Sandoval's denial of transfer, but his writ was denied; Appellant's Writ of Mandamus to the Supreme Court following this Court's denial was also rejected. 2 RR 131.] Jennifer answered the January 2007 motion to modify and sought an order that David pay her attorney's fees and sanctions for filing frivolous pleadings. [2 RR 131-32.] Sandoval denied David's motion to modify the December 1, 2006 order. [2 RR 132.] On June 25, 2007, Sandoval signed an order sanctioning David in the amount of $50,000. [2 RR 132-36.]

Sandoval was opposed by Suzanne Wooten (Wooten) in the 2008 Republican primary for judge of the 380th Judicial District Court. [2 RR 145-46.] There was no candidate in the 2008 Democrat primary for judge of the 380th Judicial District Court, so the winner of the Republican primary would be elected judge of that court in the 2008 general election. [*Id.*] Sandoval was defeated by Wooten in the 2008 Republican primary[.] [2 RR 141.] Wooten became the judge of the 380th Judicial District Court in January 2009. [*Id.*]

Robertson testified that in January 2009, David filed another motion to modify in the SAPCR. [2 RR 128, 141.] Robertson understood Jennifer retained attorney Kyle Basinger [and Alma Benavides] to represent her in David's motion to modify[, but another attorney finalized the case. 2 RR 142.] . . .

[Robertson affirmed that Appellant's motion to modify led to "the situation [being] reversed and [Appellant's daughters] with special needs were put into the home of [Appellant] with his new wife Stacy Cary" in 2010. 2 RR 156, 158-61. On re-direct, Robertson also affirmed that the change in circumstances—as found by the Honorable Judge McCraw, nearly four years after Judge Sandoval signed the prior possession order—included Jennifer's new marriage and move

5

to Fort Worth; that Appellant and his wife lived about ten miles from the twins' school; and the daily commute for the twins between their primary residence in Fort Worth to their school in Dallas was "detrimental and potentially dangerous." 2 RR 164-67.]

## Israel Suster

Jennifer retained attorney Israel Suster to assist her in the collection of $416,543.16 in attorney fees and the $50,000 sanction Sandoval had previously ordered David to pay. [2 RR 176, 180.] Suster testified that to facilitate collection of these sums, he filed a Motion for Turnover Order in Sandoval's court. [2 RR 174-78.] In the application, Jennifer sought to require the turnover to a previously appointed receiver of funds held by David's legal counsel that allegedly constituted an unused retainer paid by David, and funds held by Tolleson Private Bank that allegedly were owned by or for the benefit of David and which he had the authority to withdraw. [2 RR 189-92.] In support of Jennifer's Motion for Turnover Order, Suster filed his affidavit and supporting exhibits which, among other things, stated that documents produced by David's legal counsel in response to a subpoena duces tecum indicate the counsel was in possession of [nearly $13,000.00] being held on behalf of David for the purpose of payment of future legal services, and that upon Suster's information and belief, David was the owner and/or beneficiary of funds held at Tolleson Private Bank. [*Id.*] Attached as Exhibit 2 to Suster's affidavit is a copy of a $30,000 cashier's check issued by Tolleson Private Bank, representing payment by David to Jennifer of educational funds for their children that had been ordered by Sandoval. [2 RR 192-94.] Suster therefore assumed the educational fund payment originated from an account held by or on behalf of David at Tolleson Private Bank. [*Id.*]

Suster filed a motion to hold David in contempt for failure to pay the $50,000 sanction and for failure to provide information and documents as ordered by Sandoval on January 31, 2007. [2 RR 180-85, 189-90.] Shortly after Sandoval signed the requested turnover order, Stacy filed a petition in intervention and motion to dissolve the turnover order, and objections to subpoenas seeking information from third parties pursuant to the turnover order. [2 RR 193-95.] Stacy sought sanctions against Suster. [2 RR 194.] David filed a motion to set aside the turnover order and the orders imposing sanctions and awarding attorney's fees. [2 RR 193-96.] At the January 3, 2008 hearing of David's motions, Stacy testified she intervened in the lawsuit because Suster and Jennifer were trying to seize Stacy's funds, claiming the funds were owned by David. [2 RR 202-03.] At the hearing, Stacy testified she purchased the cashier's check from Tolleson Private Bank used by David to establish the educational fund ordered by Sandoval in order to keep David from being held in contempt for failure to make the payment. *Id.* Stacy also testified at the hearing regarding payments she made to attorneys who represented David. [2 RR 203-04.] Sandoval quashed the prior turnover order and denied Stacy's motion for sanctions against Suster. [2 RR 197, 201.]

On January 3, 2008, Suster was served with a December 2007 lawsuit filed by Stacy against him in County Court at Law No. 4, Collin County, Texas. [2 RR 205-06; SX 67, 92, 173.] Stacy alleged Suster had committed fraud by filing a lien in the 380th Judicial District Court in conjunction with the application for a turnover order. [2 RR 205-09.] On May 28, 2008, [County Court] Judge Wheless signed an order transferring Stacy's lawsuit against Suster from County Court at Law No. 4 to the 380th Judicial District Court to be consolidated with the SAPCR involving David and Jennifer over which Sandoval was presiding. [2 RR 212-13.] Stacy objected to Wheless transferring her lawsuit against Suster to the 380th Judicial District Court and filed a motion to

reconsider the transfer. After Stacy's lawsuit against Suster was transferred to the 380th Judicial District Court, Stacy did not press for the discovery she had sought while the case was pending in the County Court at Law. [2 RR 213-19.] However, after Wooten became judge of the 380th Judicial District Court in January 2009, Stacy pursued her motions for additional discovery and depositions. [2 RR 217-19.] When Wooten allowed only a limited amount of the discovery Stacy requested, Stacy dismissed her lawsuit against Suster. [2 RR 226-27.]

## Michael Puhl

Michael Puhl is a board certified family law attorney practicing in Collin County, Texas. [3 RR 137-38.] In 2006, the judge of the 366th Judicial District Court in Collin County was not seeking reelection, and Puhl ran as a candidate for election to that bench. [3 RR 139.] Puhl's campaign expenses totaled [$15,000] to $25,000, and $5,000 to [$10,000] of that amount was funded from Puhl's personal resources. [3 RR 139-40.] Puhl testified that his opponent spent over $100,000 on the campaign. [3 RR 140-41.] Puhl was not successful in that election. [2 RR 141.]

In the fall of 2007, Puhl received a telephone call from James Spencer. [3 RR 142.] Spencer told Puhl that he was interested in speaking to Puhl about the possibility of Puhl running for election against Sandoval as the sitting judge of the 380th Judicial District Court. [3 RR 143, 151.] [Puhl agreed to meet with Spencer. 3 RR 145.] . . . Either in the phone conversation or in the subsequent meeting, Spencer told Puhl that he was involved with the Texas Home School Coalition (THSC), and there were several people he knew who were dissatisfied with decisions rendered by Sandoval and were seeking an opponent for Sandoval in the 2008 Republican primary. [3 RR 144-45.] Spencer indicated to Puhl that he could provide financial support for Puhl's campaign as well as

volunteer support for walking neighborhoods to distribute campaign materials. [*Id.*] With regard to financial support, Spencer's representations to Puhl were very general in nature; Puhl's impression was that Spencer could marshal supporters who would provide financial assistance to the campaign. [3 RR 145.] Puhl also testified that most attorneys are not inclined to contribute to a campaign against an incumbent judge, because ["it's very difficult for people to publicly acknowledge support for someone who is not a sitting judge."] [3 RR 146.] . . .

. . . Puhl declined to run as a candidate in the election[ and, to his recollection at trial, did not provide any other leads for Spencer to pursue as candidates. 3 RR 145, 147. Puhl testified with certainty that he did not recommend his law partner, Brian Loughmiller, due to Loughmiller's strong support for Judge Sandoval. 3 RR 147. Puhl also admitted he was surprised that Wooten was "able to, as her first race, take on an incumbent and then prevail." 3 RR 152.]

Daniel Dodd

Daniel Dodd, chair of the Democratic Party in Collin County in 2007, testified that in early November 2007, he learned Wooten wanted to run for election as a Collin County judge. [3 RR 128, 129-30.] At a meeting with Dodd, Wooten indicated she was considering running for judge of the 380th Judicial District Court against Sandoval, but Wooten had not decided whether to run as a Democrat or a Republican. [3 RR 130, 132.] Dodd informed Wooten that if she ran as a Democrat, he could not give her money for signs because of a lack of funds. [*Id.*] Dodd advised Wooten that if she had signs, the Democratic Party would make sure they were distributed. [*Id.*]

After Dodd met with Wooten, he received a telephone call from an individual in Austin, Texas. [3 RR 132-33.] Dodd could

not remember the name of the caller, but the man told Dodd that ["he was a lawyer, and he was a Republican, and they were interested in supporting Suzanne Wooten." [3 RR 132.] Dodd remembered the caller saying "he could get a hundred thousand dollars through the lawyers down there in Austin. They didn't like Sandoval either, and they wanted to get rid of him." [3 RR 133.] . . . The man was requesting permission to contact Wooten. [*Id.*] [Dodd testified that the call was unusual because "[i]t was for a particular thing, and it was really Suzanne Wooten's decision whether to go Republican or Democratic." *Id.*] . . . Sometime after that, Dodd contacted Wooten and inquired whether she was going to run for election as a Democrat or a Republican. [3 RR 134.] Wooten informed Dodd she was going to run for election as a Republican. [*Id.*] [Dodd testified that an individual had better odds of being elected in Collin County running as a Republican. 3 RR 134.]

. . .

[Dee Dee] Kedzie

Deanna ["Dee Dee"] Kedzie, a certified public accountant, testified that her practice focuses upon tax accounting and Stacy was her client. [5 RR 141-44.] Kedzie testified about a 2008 income and expense report dated March 16, 2009 that was prepared by Stacy. [5 RR 146-67; SX 171, 179.] According to Kedzie, the report indicates legal fees of $226,602.96 were incurred in 2008 relating to divorce and child custody issues. [5 RR 148-49.] Kedzie testified that Stacy wanted to deduct from 2008 taxable income a total of $226,773 for legal and professional fees. [5 RR 149-50.] Kedzie also testified about a March 31, 2008 email to her from Stacy, relating to Stacy's 2007 tax return, in which Stacy wrote that her legal expenses were high "THANKS TO MY STEP CHILDREN'S LITIGIOUS/ABUSIVE/ NARCISSIsTC[sic]/GOLD DIGGING MOTHER" and inquired why legal fees "defending my home and family" could not be deducted from taxable income on her 2007 income tax return. [5 RR 152-54; SX 172.] Kedzie testified

10

that none of Stacy's legal fees relating to divorce and child custody issues were actually deducted from taxable income on her income tax returns. [5 RR 150-51.]

. . . None of the backup documentation for calendar years 2007 and 2008 income and expense that Stacy provided to Kedzie for purposes of income tax return preparation contained any indication Stacy paid Spencer for consulting work during that period. [5 RR 155-58.] According to Kedzie, if Stacy was unsure about how to address the tax aspects of an expenditure or deduction, Stacy would typically contact Kedzie for advice; and if Stacy had needed any advice on how to address the tax aspects of a $150,000 consulting agreement, Stacy would most likely have contacted Kedzie because Kedzie prepared Stacy's personal and business tax returns. [5 RR 158-60.] Stacy did not seek advice from Kedzie concerning the consulting agreement with Spencer[, and Kedzie likely "would have been told had [Stacy] discussed it with" Kedzie's boss. 5 RR 160. Kedzie also affirmed that, although consulting fees for a 1031-real estate exchange transaction would most likely result in tax savings, Stacy did not report the $25,000.00 fee for Spencer's services pertaining to a 1031-exchange, per their contract. 5 RR 177-79.]

[Kedzie also testified that Stacy sent her paperwork for the 2008 tax year, in which Stacy noted a total sum of $556 that she was seeking as a deduction Cornwall Consulting, Family Focus Graphics. 5 RR 162-65. But upon researching Family Focus, Kedzie determined that no deductions could be taken. 5 RR 166-67.]

Kyle Basinger

Attorney Kyle Basinger testified that [he had known Wooten for approximately ten years before going into law practice with her—specifically,] Wooten previously had

operated a Collin County office for Basinger's law firm. [3 RR 104, 59-60.] . . .

. . . [During their friendship and professional partnership, Wooten had conveyed to Basinger that she had aspirations to be a district judge. 3 RR 63. Just few months prior to the 2008 election, Wooten made "an offhand comment" about running for judicial office." *Id.* Basinger advised Wooten that she "needed to run as a Republican" if she was going to run, because the Republican Party in Collin County was very strong. 3 RR 63-64.]

. . . Basinger learned of Wooten's decision to run for judicial office [less than a month] before the filing deadline in January 2008. [3 RR 65.] [Wooten announced her decision at their firm's litigators' meeting, "mention[ing] that the incumbent she was going to run against [was] well-financed and was well-[e]ntrenched." 3 RR 66.] Basinger was concerned that it seemed a last minute decision by Wooten. [3 RR 66-67, 68.] . . . [After her announcement, Basinger and his law partners decided to shut down their Collin County branch which had been operated by Wooten, in the event she won the election. 3 RR 69-70.]

Benavides, an associate in Basinger's law firm, served as Wooten's campaign treasurer. [3 RR 69.] After her election, Wooten requested that members of Basinger's law firm not appear in her court for a period of nine months in order to avoid the appearance of impropriety. [3 RR 74.] With respect to a Basinger firm case pending in Sandoval's court at the time Wooten assumed office, Basinger testified that his office would contact Wooten's court coordinator to advise her of the pending case, and the case would be ministerially transferred to another Collin County judge. [3 RR 73-76; *see* 3 RR 102-04, SX 66.]

Basinger represented Jennifer with regard to a motion to modify filed in the SAPCR involving David and Jennifer that was pending in Wooten's court. [3 RR 76.] On February 27, 2009, at 9:59 a.m., Basinger's law firm filed pleadings on behalf of Jennifer concerning the motion to modify. [3 RR 97-98.] Basinger received a telephone call from Spencer . . . on February 27, 2009[, "sometime between 9:59 a.m. and noon." 3 RR 98.] Basinger was aware Spencer had served as Wooten's campaign manager. [3 RR 99.] Basinger testified this was the only time he had received a telephone call from Spencer, and he was surprised Spencer was calling him . . . [*Id.*] . . . Spencer asked that Basinger consider withdrawing from the SAPCR involving David and Jennifer. Spencer's position was that Basinger needed "to get [out of the Cary] case." [3 RR 99.] . . . [Basinger asked Spencer why, and Spencer "started quoting that there was a pending trial or a pending investigation against Judge Sandoval, and I did not want to be involved in this case." *Id.* But, because Basinger only knew Spencer casually, and Basinger had already contracted with Jennifer to represent her legal interests, Basinger "saw no reason to withdraw." 3 RR 100. He pressed Spencer for more information than "some investigation of the former judge to get [him] off the case." *Id.* But Spencer failed to provide any further details, and Basinger continued representing Jennifer. 3 RR 100-01.] . . .

On March 3, 2009, Basinger's law firm filed a motion to recuse Wooten in connection with the pending motion to modify the SAPCR. [3 RR 78, 77-80.] Basinger's and Benavides's names were listed as counsel on that motion. [3 RR 77.] On March 4, 2009, Wooten granted the motion to recuse. [3 RR 84.]

Jennifer approached Basinger regarding his firm representing her in two additional civil litigation matters, one pending in Collin County and the other pending in Dallas County. [3 RR 82.] The civil litigation in Collin County was

13

related to the SAPCR between David and Jennifer; the case was filed by Stacy against Jennifer and Suster, who was attempting to collect attorney's fees Sandoval had ordered David to pay Jennifer in the SAPCR. [3 RR 82-83.] . . .

Basinger and Benavides are listed as counsel on an April 23, 2009 pleading filed on behalf of Jennifer in the lawsuit filed by Stacy against Jennifer and Suster that was pending before Wooten. [3 RR 83-84.] . . . On May 8, 2009, Basinger filed a motion to recuse Wooten in Stacy's lawsuit against Jennifer and Suster. [3 RR 85-87.] Basinger anticipated the motion to recuse would be granted because Wooten had recused herself previously with regard to the motion to modify filed in the SAPCR involving David and Jennifer, and there were overlapping facts in Stacy's lawsuit against Jennifer and Suster. [3 RR 87-90.]

Unlike the prior motion to recuse, however, Wooten did not voluntarily recuse herself from Stacy's lawsuit against Jennifer and Suster. [3 RR 90.] Judge G. Calhoun, Jr. was appointed to hear the motion to recuse Wooten in that matter. [3 RR 92.] On June 29, 2009, Basinger forwarded correspondence to Wooten withdrawing Jennifer's motion to recuse. [3 RR 93.] Basinger testified that his law partner had [requested him to sign a letter addressed to both Wooten and Judge Calhoun, informing them that] the decision had been made to withdraw the motion to recuse Wooten. 3 RR 93-94.] . . .

14

## Hank Clements

[George Henry "Hank"] Clements, an attorney and registered lobbyist in Texas, testified that his firm provides political and legislative consulting services, including lobbying. Clements also provides services to candidates for public office, including campaign management, direct mail advertisement, media strategies, and speech preparation. [6 RR 190-93, 200. At trial, Clements indicated he has worked on campaigns for "everything from local City council races, up through U.S. Congress and U.S. Senate." 6 RR 192.] . . .

In the spring of 2007, Clements met Spencer in the office of a legislator. [6 RR 194-96.] Clements believes Spencer was there with regard to a family law issue. [6 RR 194.] Spencer told Clements he was interested in managing political campaigns, advocating for parental rights legislation, and ["that he had several judges around the state targeted that he wanted to see defeated and that he had a coalition that was out to defeat them." 6 RR 196-97.] . . . It was Clements's understanding from speaking with Spencer in the fall of 2007 that Spencer wanted to field a candidate in a judicial race. [6 RR 197.] Spencer specifically asked if Clements had ever managed a campaign in Collin County, and Clements advised Spencer that he had. [6 RR 196.] . . . . Spencer identified Wooten as a potential candidate who was considering entering the race. [6 RR 197.] Spencer wanted Clements to talk to Wooten regarding the magnitude of such a campaign. [6 RR 198-99.] Clements spoke on the telephone with Wooten toward the end of 2007, and he met with her on a Saturday in December 2007. [6 RR 199.] Clements gave Wooten an idea of the time commitment and cost required for an effective political campaign. [6 RR 199-200.] [He] also told Wooten it would require a substantial commitment on Wooten's part to defeat an incumbent judge, and that the campaign would cost ["about"] $70,000 or more. [6 RR 200.]

15

By late December 2007 . . . , Clements knew Wooten was going to run against Sandoval in the Republican primary for judge of the 380th Judicial District Court. [6 RR 203.] . . . Although Spencer had never managed a political campaign, Clements testified Spencer wanted to run Wooten's campaign and Wooten hired Spencer as her campaign manager. [6 RR 204.] Spencer hired Clements as a subcontractor to handle media, prepare a campaign plan, develop overall strategies, and design a direct mail plan. [*Id.*] Clements was to be paid [$25,000] for the scope of work[, the sum of which included a victory bonus to be paid] if Wooten won the race. [6 RR 204.] Clements received cashier's checks for payment of his fees as follows: $7,500 on January 7, 2008, $7,500 on January 8, 2008, and $10,000 on March 7, 2008 after Wooten defeated Sandoval in the March 4, 2008 Republican primary. [SX 1.]

Clements did not send his bills directly to Wooten. [*See* 6 RR 204, 7 RR 24-25.] . . . According to Clements, management of a campaign is characterized as "turnkey" when the candidate pays a fee to a campaign manager or political consultant, and the manager or consultant is then responsible for paying vendors and service providers. [7 RR 24-25, 31.] Clements indicated that Spencer provided turnkey management of Wooten's election campaign. [7 RR 24-25, 28-29.]

In [some of his previous] campaigns, Clements assisted the candidate in preparing campaign finance reports to be filed with the Ethics Commission. [7 RR 21.] He was not asked to review Wooten's campaign finance reports. [*Id., see* 6 RR 249.] . . . Campaign finance reports filed with the Ethics Commission are public records, and the public can view the reports to see how candidates raised and spent their campaign funds. [*See* 6 RR 248.]

. . . [The State questioned Clements about an email from Spencer, addressed to both Clements and Wooten,] regarding

16

how much money Sandoval had raised in his campaign[.] [6 RR 248, SX 14.] . . . Sandoval's Campaign Finance Report filed with the Ethics Commission on February 4, 2008 was [previously] admitted in evidence [through Spencer. 4 RR 95, SX 175.] That report reflected Sandoval had raised $12,575 in campaign contributions, had expended $8,997.08, and on February 4, 2008, his campaign account had a balance of $4,231.37. [*Id.*] Spencer sent an email to Wooten and Clements regarding Sandoval's February 4, 2008 Campaign Finance Report. [6 RR 248.] In that email, Spencer said Sandoval had "raised some money," but Spencer did not think Sandoval was "in a position to match our resources." [*Id.*] Clements did not know what Spencer meant by his reference to "resources" in that email. [*Id.*] Spencer did not tell Clements that there were contributors Spencer could go to for money, but that was Clements's interpretation of the email. [6 RR 248.] . . . . Clements testified he had no role in raising money for Wooten's campaign or in managing the finances of the campaign. [*Id.*]

Records regarding paid political advertisements for the Wooten campaign on local radio stations were admitted in evidence. For example, a $6,000 cashier's check from Spencer for payment for radio advertisements airing on a radio station from February 25 through February 28, and on March 3, 2008, was admitted in evidence. [SX 25, 6 RR 215.] The invoice for the radio advertisements was dated March 10, 2008. [6 RR 214-15.] A $4,000 cashier's check from Spencer for payment for radio advertisements airing on another radio station from February 25 through February 28, and on March 3, 2008 was also admitted in evidence. [SX 24, 6 RR 215-16.] The contract confirmation for that radio advertising was dated February 22, 2008, and the invoice for that radio advertising was dated March 10, 2008. [6 RR 208-10, 214-15.] . . . Documents on which Wooten gave approval for campaign expenditures and edited or approved campaign advertisements and media materials were admitted in evidence. [6 RR 205-49.]

17

Ian Steusloff

Ian Steusloff, an assistant general counsel for the Ethics Commission, testified that the Ethics Commission is an agency that, among other things, administers laws relating to campaign finance, ethics disclosure, and regulation of lobbyists. [6 RR 26-28.] It also serves as an enforcement agency. [6 RR 28-29.]

Steusloff testified regarding filings with the Ethics Commission that candidates and officeholders are required to make. [6 RR 28-29.] Candidates for election to a judicial office are required to file campaign finance reports. [6 RR 38-40.] Those reports show campaign contributions, campaign expenditures made from a campaign account, campaign expenditures made from personal funds, and loans to a campaign. [6 RR 38-40, 43.] Typically candidates must file campaign finance reports on January 15th and July 15th. [6 RR 38-39.] If opposed in an election, candidates must also file campaign finance reports thirty days and eight days before the election.[6] [6 RR 39.] Candidates are required to swear the information provided in a campaign finance report is true and correct. [6 RR 36, 42.] The campaign finance reports filed by a judicial candidate are public records, and the Ethics Commission posts those reports on its internet website. [6 RR 42, 51.]

Steusloff testified that contributions to a judicial campaign must be individually itemized on the campaign finance report if the contribution, whether money or in-kind .

---

[6] Steusloff testified that if a candidate files a statement that she is not going to accept or spend more than five hundred dollars on an election, she is not required to file a pre-election campaign finance report thirty days and eight days before the election. [6 RR 39.]

. . .[6 RR 28-29.] A candidate must also disclose on the campaign finance report outstanding loans to a judicial campaign. [6 RR 40, 43.] . . . For disclosure purposes, an expenditure is deemed made when the amount of the expenditure is readily determinable. [6 RR 44.] Steusloff testified that, in 2008, when an individual or entity made an expenditure of more than $100 that benefitted, but was independent from, a campaign, such as paying for advertising that benefitted a candidate, the individual or entity was required to file a report with the Ethics Commission disclosing the expenditure and send a report of the expenditure to the candidate. [6 RR 40.] . . .

[Steusloff acknowledged that, if a candidate hired an independent consultant and delegated authority to the consultant to make decisions concerning campaign expenditures without the candidate's approval, it could be lawful for the candidate to report those expenses on the date an invoice is submitted to them by their consultant – in some circumstances. 6 RR 67-75, 80-83. However, Steusloff testified that the only lawful date of reporting is the date the expenditure is "readily determinable," which may or may not coincide with the date of invoice submitted to the candidate from the consultant. 6 RR 44-46, 66-70. Steusloff also denied that the Ethics Commission has issued a blanket approval for lawful reporting dates for expenditures, based upon agreements between a candidate and their consultant—rather, each determination is fact-specific. 6 RR 84.]

Steusloff testified that in judicial races, there are limits on campaign contributions. [6 RR 35-36.] The limit depends on the population of the judicial district. If the population in the judicial district is between 250,000 and one million, as in Collin County in 2008, the contribution limit is $2,500. [6 RR 37.] . . . When a candidate pays campaign expenditures from personal funds, there is a limit on reimbursement of those expenditures

from campaign contributions; the limit is five times the maximum permissible campaign contribution. [6 RR 48.] Therefore, where the campaign contribution limit for a judicial race is $2,500, the total amount of reimbursement from campaign contributions of a candidate's out-of-pocket campaign expenditures is $12,500. [*Id.*]

Wooten's Campaign Finance Report for the period January 25, 2008 through February 23, 2008 indicated she had received a total of $10,425 in campaign contributions, with total political expenditures of $11,734.41. [SX 62; 6 RR 62-63.] Wooten's Campaign Finance Report for the period February 24, 2008 through June 30, 2008 indicates she received [$60,115.19] in campaign contributions and expended $65,515.91. [SX 62, 6 RR 78-79.] Wooten's January 11, 2009 Campaign Finance Report filed for the period July 1, 2008 to December 31, 2008 indicates she received campaign contributions of $5,150 and expended $42,419.91. [SX 62, 6 RR 93.]

Wooten's January 11, 2009 Campaign Finance Report indicates payments to Spencer in the amounts of $1,500 and $7,550 for "[t]urnkey mgmt svcs fees and costs—per invoice[s]." [SX 62.] Earlier campaign finance reports and amended campaign finance reports filed by Wooten in 2009 disclose the following payments to Spencer: an August 28, 2008 payment in the amount of $33,369, 91 for "turnkey mgmt svcs fees and costs—per invoice"; a February 13, 2008 payment in the amount of $4,002.32 for signs and fees; a February 22, 2008 payment in the amount of $4,527.50 for campaign material and fees; a March 7, 2008 payment in the amount of $2,400 for a direct mailer; a May 29, 2008 payment in the amount of $5,000 for "turnkey management svcs fee and costs—per invoice[s]"; June 24, 2008 payments of $5,241.50 and $2,700 for "turnkey mgmt svcs fees and costs—per invoice"; a June 30, 2008 payment in the amount of $7,550 for "turnkey management services fees and costs—per invoice"; and a June 30, 2008

payment of $1,500 for "turnkey management services fees and costs—per invoice." [*Id.*] The campaign finance reports also include campaign expenditures for "CBS radio buy—per invoice" on March 31, 2008 in the amount of $10,000, "WBAP radio buy fee" on April 17, 2008 in the amount of $12,000, and "radio buy and direct mail—per invoice" on April 28, 2008 in the amount of $14,000. [*Id.*] A campaign finance report reflects a "personal loan" from Wooten to the campaign on August 28, 2008 in the amount of $33,369.91, matching the August 28, 2008 payment of $33,369.91 to Spencer for "turnkey mgmt svcs fees and costs—per invoice." [*Id.*]

Kyle Swihart

Kyle Swihart, a certified fraud examiner and a forensic auditor employed by the office of the Texas Attorney General, testified that he investigates allegations and complaints of white-collar crime relating to public integrity and money laundering. [7 RR 78-82.] His investigation of [David] included review of bank records; phone records; campaign finance reports; credit card statements and documents establishing a credit card account; invoices; payments made by Wooten to Spencer; and records of emails and other forms of communication. [7 RR 82-96.]

A chart created by Swihart containing a summary of the evidence he relied upon was admitted in evidence. [7 RR 96, SX 94.] That chart contained a summary of bank records, invoices for services or products provided to Wooten's campaign, transfers of money from Stacy to Spencer, the dates when products or services benefitting the Wooten campaign were purchased or rendered, and the dates Spencer invoiced Wooten's campaign. [*Id.*] The summary of the evidence spans the period of January 1, 2008, the day before Wooten filed her candidacy for judge of the 380th Judicial District Court, and August 29, 2008, when Wooten wrote a check in the amount of

21

$33,369.91 from her line of credit to Spencer. [7 RR 96-98.] The records Swihart reviewed establish Spencer made six deposits to his bank account of funds transferred to him by Stacy in the form of wire transfer or check. [*Id.*]

On January 3, 2008, Spencer had $2.39 in his bank account and Wooten had $25 in her campaign account. [SX 94.] On January 4, 2008, $50,000 was deposited in Spencer's bank account from Stacy's first transfer of money to him. [*Id.*] Without the money transferred by Stacy to Spencer on January 4, 2008, Spencer did not have funds in his bank account, and Wooten did not have funds in her campaign account, for Spencer to make payment by cashier's check to Clements on January 7, 2008 in the amount of $7,500 and on January 8, 2008 in the amount of $7,500. [7 RR 102-03.] On January 23, 2008, Spencer had a balance of $7,656.31 in his bank account remaining from the January 4, 2008 transfer of money from Stacy, $16,856.37 having been spent by Spencer on Wooten's campaign.[SX 94.]

On February 4, 2008, a payment from Stacy to Spencer in the amount of $25,000 was posted to Spencer's bank account. [7 RR 104, SX 94.] Before this deposit, Spencer had an account balance of $5,545.51, and Wooten had a balance of less than $3,000 in her campaign account.[*Id.*] After that deposit, the balance in Spencer's bank account was $25,692.30. [*Id.*] The records show that on February 5, 2008, Spencer began using the $25,000 for Wooten's campaign, including an expenditure of $2,345 for an advertisement in the Plano Profile magazine, and payments of $4,036.75 and $3,877.32 to Cartwright Signs. [7 RR 105.] Without Stacy's February 4, 2008 payment of $25,000 to Spencer, these campaign expenses could not have been paid from either Spencer's bank account or Wooten's campaign account.[7 RR 104-05.]

On February 13, 2008, Spencer had $1,180.97 in his bank account and Wooten had $5,885.06 in her campaign account. [SX 94.] On February 15, 2008, another $25,000 check from Stacy was posted to Spencer's bank account. [7 RR 108.] After deposit of that check, Spencer's bank balance was $25,000.92. [SX 94.] Spencer used the money in his account after that deposit to purchase cashier's checks on February 20, 2008 totaling $10,000 to pay invoices for radio advertisements.[7 RR 108.] Absent the $25,000 from Stacy, neither Spencer's bank account nor Wooten's campaign account had sufficient funds for payment of the radio stations' advertising invoices.[7 RR 108-09.]

On February 26, 2008, a $25,000 wire transfer from Stacy posted to Spencer's bank account. [7 RR 110.] Prior to that deposit, Spencer had $5,565.18 in his bank account and Wooten had $5,166.58 in her campaign account. [SX 94.] The day Stacy's wire transfer was made, Spencer made additional radio advertisement purchases in the amount of $14,454.25, as well as payments to the THSC Political Action Committee for a mailer and to an assistant. [7 RR 111, 113-14.] Without the $25,000 payment from Stacy, Spencer did not have sufficient funds in his bank account, and Wooten did not have sufficient funds in her campaign account, to pay those campaign expenses. [7 RR 112, 114.]

On March 7, 2008, after the March 4, 2008 Republican primary, Stacy wire-transferred a fifth payment to Spencer in the amount of $10,000. [7 RR 118.] At the time of that transfer, Spencer had $11,707 in his bank account, and Wooten had $2,710.08 in her campaign account. [SX 94.] Approximately one hour after the $10,000 wire transfer, Spencer purchased a cashier's check in the amount of $10,000 made payable to Clements. [7 RR 118.] A sixth payment by wire transfer in the amount of $15,000 was made by Stacy to Spencer on March 13,

2008. [SX 94.] On March 14, 2008, that payment was posted to Spencer's bank account. [*Id.*]

Swihart reviewed phone and email records of Stacy, David, Clements, Spencer, and Wooten. Swihart testified regarding the dates and times of communications among those individuals and others. [7 RR 160-62.] The first communication Swihart was able to document between Spencer and David and Stacy was September 21, 2007. [7 RR 164.] Swihart was able to document a telephone call from Wooten to Spencer on December 20, 2007. [7 RR 164.] Swihart testified regarding communications occurring around the dates of payments from Stacy to Spencer. [7 RR 164-213.] Swihart also testified regarding communications occurring around the dates of events in matters before the 380th Judicial District Court after Wooten became judge of that court.

At 3:40 p.m. on January 2, 2008, Wooten filed as a candidate for the 380th Judicial District Court. [7 RR 176.] Moments before that filing, Wooten spoke to Spencer by telephone. [*Id.*] After Wooten filed as a candidate, Spencer communicated with David.[*Id.*] Between 6:49 p.m. and 9:45 p.m. that night, Spencer communicated with David on David's cell phone, with Wooten on her cell phone, and with David, Stacy, or both, on the telephone at the Cary home. [SX 98C.]

At 10:17 a.m. on January 3, 2008, Paladini Financial requested a third-party wire transfer from one of Stacy's accounts to Spencer in the amount of $50,000.[7] [7 RR 178.]

---

[7] Wendy Kelly, an investment analyst at the financial planning firm of Paladini Financial, testified that Stacy was a customer of Paladini Financial. [4 RR 4-5.] On the morning of January 3, 2008, Stacy requested that Kelly wire $50,000 from one of her accounts to Security State Bank, Fredericksburg, Texas, for the benefit of Spencer. [4 RR 6-7.] The wire transfer did not successfully transmit. [4 RR 8-9.] Kelly contacted Stacy and advised her that the wire transfer had failed and that there was additional paperwork Stacy needed to

There were two attempts by Spencer to reach David and Stacy's home phone during that day, and David spoke to Spencer from 1:13 p.m. to 1:23 p.m. [SX 98C.] At 4:49 p.m., Stacy was sent new wiring instructions because the earlier wire transfer could not be completed. On January 4, 2008, the date of the first wire transfer to Spencer from Stacy, Spencer had three telephone communications with someone on David and Stacy's home phone.[7 RR 179-80.] Swihart assumed those conversations were with Stacy as they occurred during the work day; David worked outside the home and Stacy had an office in her home from which she worked. [7 RR 180.] After the wire transfer of $50,000 was posted to Spencer's account at 4:34 p.m., Spencer telephoned Wooten's office. [*Id.*] Thereafter, there was a brief telephone call to Spencer from David.

On January 29, 2008, the night before the second payment by Stacy to Spencer, Spencer telephoned David's cell phone. [7 RR 184-85.] Immediately thereafter, either David or Stacy telephoned Spencer from David and Stacy's home phone. [7 RR 185.] Spencer then telephoned Wooten. [*Id.*] After the telephone call to Wooten, Spencer telephoned David and Stacy's home. [*Id.*] Stacy made a second payment to Spencer on January 30, 2008, and Spencer deposited that payment on February 1, 2008. [*Id.*, SX 94, 98C.] That payment posted to Spencer's bank account on February 4, 2008. [*Id.*] On February 5, 2008, Spencer sent an email to Wooten that Sandoval "cannot match our resources," even though Wooten had raised only $3,620 from campaign contributions at that time.

On February 14, 2008, Stacy made her third payment to Spencer. [7 RR 186.] On that day, Spencer exchanged text messages by phone with David between 5:12 p.m. and 5:23 p.m. [7 RR 187, SX 98C.] Between 5:34 p.m. and 5:46 p.m., Spencer

---

complete before a third-party wire transfer could be accomplished. [4 RR 10-11.] Stacy then transferred money from one of her accounts to an account at Tolleson Private Bank, which was able to wire transfer $50,000 to Spencer. [4 RR 11-12.]

then communicated in succession with Wooten, Clements, and David. [7 RR 188.] Stacy's third payment to Spencer posted to his account on February 15, 2008. [*Id.*]

On February 26, 2008, Stacy made her fourth payment to Spencer. [7 RR 188-89.] At 4:41 a.m., Spencer's assistant confirmed to Spencer by email that radio advertising time had been purchased for Wooten's campaign. [SX 98C.] At 5:24 a.m. and 6:59 a.m., David received text messages from Spencer. [*Id.*, 7 RR 189.] At 9:17 a.m., Stacy sent instructions to Tolleson Private Bank to wire $25,000 to Spencer. [*Id.*] At 2:14 p.m., the wire transfer was posted to Spencer's account. [*Id.* At 2:37 p.m. and 2:53 p.m., Spencer's wife, Kipling Spencer, purchased cashier's checks for payment of Wooten campaign expenses from the funds wired to Spencer's account by Stacy. [*Id.*, 7 RR 191.]

. . .

On March 4, 2008, Wooten won the Republican primary. On March 7, 2008, Stacy made the fifth payment to Spencer. [7 RR 192-93.] On March 7, 2008, between 7:07 a.m. and 8:29 a.m., Spencer text-messaged four times with David. [7 RR 193-94, SX 98C.] Clements text-messaged Spencer at 8:17 a.m. [*Id.*] David and Stacy had three phone conversations between 8:45 a.m. and 9:10 a.m. Between 9:23 a.m. and 10:02 a.m., Spencer and David exchanged thirteen text messages. [*Id.*] At 10:47 a.m., Stacy attempted to reach David by telephone. [*Id.*] At 10:58 a.m., Stacy sent instructions to Tolleson Private Bank to wire $10,000 to Spencer. [*Id.*] At 11:40 a.m., David text-messaged Spencer. At 2:51 p.m., the wire transfer of $10,000 posted to Spencer's bank account. [*Id.*] Between 3:21 p.m. and 3:52 p.m., Spencer and David exchanged eleven text messages. [*Id.*] At 3:59 p.m., Kipling Spencer purchased a cashier's check made payable to Clements in the amount of $10,000. [7 RR 194.]

Between 6:24 p.m. and 6:31 p.m. on March 13, 2008, the day of the sixth payment from Stacy to Spencer, Spencer text messaged David six times. [7 RR 195, SX 98C.] At 9:41 p.m., Stacy sent instructions by email to Tolleson Private Bank to wire Spencer $15,000. [*Id.*] On March 14, 2008, the sixth payment from Stacy to Spencer in the amount of $15,000 was posted to Spencer's bank account. [*Id.*]

On January 2, 2009, Wooten was sworn in as judge of the 380th Judicial District Court. At 9:59 a.m. on February 27, 2009, Benavides's pleading regarding her appearance on behalf of Jennifer in the SAPCR case pending in Wooten's court was file-stamped. [7 RR 196.] At 11:03 a.m., there was a one-minute phone call between Spencer and David's cell phone. At 11:04 a.m., there was a two-minute telephone call from Spencer to Benavides's cell phone. At 11:06 a.m., Spencer attempted to call David. [7 RR 197.] Between 11:08 a.m. and 11:13 a.m., there was a telephone call from David to Spencer. [*Id.*] Between 11:14 a.m. and 11:17 a.m., there was a telephone call from Spencer to Benavides. [*Id.*] From 11:18 a.m. to 11:21 a.m., there was a telephone call from Spencer to David. [*Id.*]

Swihart testified regarding events of March 2, 2009. [7 RR 198-200.] On that date, Wooten was still presiding over the SAPCR involving David and Jennifer. Wooten and Spencer were communicating by text message. In the midst of their text messages, Spencer telephoned Judge Oldner's office. . . . On March 2, 2009, Spencer and David exchanged thirty-one text messages. [SX 98C.] On March 3, 2009, there were eight text messages between Spencer and David. [*Id.*] On March 4, 2009, Wooten recused herself from the SAPCR involving David and Jennifer. [SX 7A.] There was one phone call between Spencer and David that day.

Swihart testified regarding Wooten's campaign expenditures and Spencer's invoices to the Wooten campaign

for the period January 7, 2008 through August 29, 2008. [7 RR 144-53, SX 97.] Swihart compiled a summary of those expenses and invoices from forty-two exhibits and testimony from a previous hearing.[8] Swihart testified that pre-election expenditures on behalf of the Wooten campaign for the period January 1, 2008 through the Republican primary on March 4, 2008 totaled $81,215.26. The total amount of contributions deposited in Wooten's campaign account for that period was $12,370. Swihart testified that Spencer spent about $118,000 on Wooten's campaign, and Wooten actually paid back only about $102,000 of that amount. [7 RR 156.]

Swihart testified David had a motive to bribe Wooten. Swihart explained there was a connection between the money Stacy paid to Spencer and the money Spencer spent on behalf of the Wooten campaign, and there was a connection among Stacy, David, Spencer, and Wooten. [8 RR 139-45, 68-73.] . . .

2014 WL 4261233, *3-24.

## James Stephen Spencer [9]

Spencer testified that he was charged with "essentially the same indictment as Mr. David Cary." 3 RR 161. He confirmed that he was being compelled to testify under a grant of testimonial immunity. *Id.*

Spencer had an employment background in health care administration, but for the past fifteen years has done independent consulting work in areas ranging from marketing to finance, with some

---

[8]    (Footnote omitted.)

[9]    Although the State-Appellee has re-formatted and edited the summary of Spencer's testimony from this Court's *Stacy* opinion, the content primarily quotes *Stacy*, 2010 WL 4261233, *6-14.

work involving political, regulatory, and legislative matters. 3 RR 164-65, 196-97. Spencer had some limited experience in the area of oil and gas, principally involving oil field services and removal of salt water from oil wells. 3 RR 238. He has no college degrees. 3 RR 196. He lives in Dripping Springs, Texas, which is approximately thirty-five minutes from the Capitol in Austin. 3 RR 171.

Beginning in "the latter part of the 90's," Spencer became engaged in a contentious legal fight with his wife's parents over rights of possession with his child and stepchild. 3 RR 168. Spencer "went to the legislature" beginning in 2005 to try to amend laws regarding parental rights that he believes are unconstitutional. 3 RR 169-71. Spencer is not a registered lobbyist in Texas; his legislative advocacy was in advancement of his personal interests. 3 RR 171-72. According to Spencer, he had a conversation in 2007 with Tim Lambert of the THSC, and—having had "some bills that we had worked on pass"—they discussed that their legislative success was "pointless" without judges who would follow the law. [3 RR 176, 180-81. They also discussed the "necessity to replace judges" with "judges who would actually follow the law the legislature passed." 3 RR 225.

Royce Poinsett, general counsel for the Speaker of the Texas House of Representatives from 2004 to 2008, put Spencer in touch with David and

Stacy in September 2007.[10] 3 RR 21, 181. On September 19, 2007, Spencer emailed David and Stacy. 3 RR 186-87. The first time Spencer met David and Stacy was at their home in Dallas, Texas on October 2, 2007. 3 RR 187-88. That meeting lasted approximately two or three hours. 3 RR 198.

### A. Spencer's consulting work with Stacy and TDI

In the October meeting with the Carys, Spencer learned that Stacy had an interest in a family-owned oil and gas company and also had some independent investments in the oil and gas industry. 3 RR 238-39. There was to be some liquidation of an investment Stacy or her family had, and Stacy planned to take those proceeds and invest it into real estate properties. 4 RR 168. Spencer offered his assistance, and generally discussed his interest in providing her consulting services in the following areas:

1. Assessment of possible investment in new pumping technology;

2. Analysis of the U.S. electric marketplace, and potential investment in SmartGrid-related ventures;

---

[10] Poinsett testified that in 2007, he met with Spencer, who was interested in issues related to family law and, specifically, issues related to grandparents' access to children. 3 RR 11-12. Also in 2007, Poinsett met with David and Stacy, and they spoke with him about "fathers' rights," meaning "who would have the most rights to a child in the event of divorce or what factors would be considered as to whether the father got more custody or the mother." 3 RR 17-18.

3. Assistance in assessing and securing counsel in anticipation of and for contemplated litigation; and

4. Assessment and proposal for family-centered advocacy, with an emphasis on parental rights.

3 RR 195-96, 237-41; SX 130. According to Spencer, this discussion culminated in an Acknowledgment of Engagement letter dated October 1, 2007 (the consulting agreement) between Spencer and Stacy, which was admitted in evidence. *Id.* Stacy agreed to pay Spencer $250,000 based on the "overall project," and $150 per hour pursuant to a fee schedule. SX 130. The term of the agreement was October 1, 2007 to December 31, 2009. 3 RR 237-38. Spencer testified the consulting agreement was drafted sometime in the first half of October 2007 and back-dated to October 1, 2007. 3 RR 230, 237-38. He testified he hand-delivered the consulting agreement to Stacy in October or early November 2007. 3 RR 232.

Spencer also testified that he began doing work with TDI in the middle of 2008, which he then would have known was David's employer. 4 RR 116. The first time Spencer was paid by TDI was in July or August 2008. *Id.* Also admitted in evidence was Spencer's October 15, 2009 "Engagement Letter for Outsourced Marketing Services" relating to consulting services to be provided by Spencer to TDI, David's employer. 4 RR 115-22.

Spencer testified regarding certain aspects of those two documents, including:

- The consulting agreement was not signed by Stacy and was dated prior to the date Spencer testified he first met Stacy on October 2, 2007. 3 RR 240.

- The TDI Engagement Letter for Outsourced Marketing Services was signed by William Johnson, Chief Executive Officer of TDI, on October 14, 2009, however the date of Johnson's signature was the day before the date of the engagement letter. 4 RR 119.

- Spencer's consulting agreement with Stacy and the TDI engagement letter each indicate the term of the agreement ended on December 31, 2009.  3 RR 238, 4 RR 120-21.

- Spencer did not perform any work for Stacy after August 1, 2008 that had not been "prepaid," despite his invoice indicating one project was completed, one project suspended, and the two remaining projects were "pending."  4 RR 17-21, 122; SX 137.

- Stacy's consulting agreement (dated October 1, 2007) and the TDI Engagement Letter for Outsourced Marketing Services (dated October 15, 2009) both contain an identical phrase relating only to TDI: "[a]ny additional time spent on TDI's behalf is part and parcel to, and inclusive of this engagement."4 RR 120-211, 5 RR 94-95.

Spencer initially testified that in October 2007, he did not know the TDI company name, but he later changed his testimony and indicated that David gave him a business card at their October 2, 2007 meeting. 5 RR 95-96.

Spencer also admitted that, in addition to the mistakes he made in Stacy's consulting agreement, he also made mistakes in the paperwork supporting invoices to Stacy. 3 RR 241-52.  For example, Spencer testified that, according to the schedule of payments due under the consulting agreement with Stacy, she was to pay him $25,000 "per project," totaling $100,000 in sum, according to the schedule.  3 RR 243. But an August 1, 2008 "summary" invoice from Spencer to Stacy shows that credits were applied to the "balance" of $100,000 for the following transfers of money to Spencer: $25,000 on February 5, 2008; $25,000 on February 14, 2008; $15,000 on March 4, 2008; and $10,000 on March 7, 2008. 3 RR 246. Spencer did not include the $25,000 transfer on February 26, 2008, however that transfer is handwritten on Stacy's copy of the "summary" invoice. The "summary" invoice did not include the January 4, 2008 wire transfer of $50,000 from Stacy. 3 RR 248, 5 RR 115-16.

One of the "projects" for which Spencer testified he was paid $25,000 or more by Stacy involved possible equity investment by Stacy in Down Hole Injections (DHI). 3 RR 248-50; 5 RR 12. Spencer provided information to Stacy concerning DHI which included eighteen pages of DHI financial statements contained in a private offering memorandum given to Spencer in mid–2007 by an individual living in Dripping Springs, Texas. 5 RR 12-16. By letter dated April 7, 2008, Spencer advised Stacy he did not believe DHI was a good investment for her. *Id.*

Another "project" for which Spencer testified he was paid $25,000 by Stacy involved analysis of the rural electricity marketplace. 3 RR 264-65; 5 RR 16-17. By letter dated July 10, 2008, Spencer sent Stacy a summary analysis of the "U.S. Electric Co–Op Market and Potential Venture to Acquire Broadband Service Delivery Rights." *Id.*; 3 RR 264-66; 4 RR 20. Spencer acknowledged that the contents of that letter were taken in large part from an article published in the Harvard Journal of Legislation. 3 RR 266-68; 4 RR 20-22. Spencer testified he also provided information to Stacy in July 2008 concerning new pumping technology, the U.S. electric marketplace, and ventures related to Smart–Grid technology, based upon materials he had previously received. 4 RR 20-22, 5 RR 16-17.

With regard to the "project" concerning parental rights for which Stacy was to pay Spencer $25,000, a power point presentation was introduced in evidence that described creation of a for-profit internet service provider that could "sustain advocacy of parental rights," and, according to the presentation, would gross $46,000,000 in revenue during a one year period, although Spencer testified he did not have experience creating an email and internet service provider. 3 RR 253-65.

### B. Spencer's campaign work with Wooten

In the October 2007 meeting with the Carys, David and Stacy shared with Spencer their experience in meeting with legislators and advocating for change in laws relating to parental rights. 3 RR 188. Spencer testified

34

that the "greatest substance" of their conversation was about the issue of parental rights, and Spencer wanted to do research on David and Stacy's legislative agenda, which involved shared-custody concepts. 3 RR 189. At the meeting, David and Stacy told Spencer they had been through a significant, lengthy, and expensive family law battle that was continuing. 3 RR 189-95.

Following his meeting with the Carys, Spencer reviewed David's divorce and SAPCR case file in the 380th Judicial District Court in October or November 2007. 3 RR 193-95, 198-99. One of Sandoval's rulings that Spencer found"funky" was a ruling in which Sandoval sanctioned David and his attorney, and ordered more than $400,000 in attorney's fees be paid to David's ex-wife, Jennifer. 3 RR 199-201.

Spencer testified that in late November 2007, he decided he wanted to find a candidate to unseat Sandoval as judge of the 380th Judicial District Court, and he acknowledged that David's divorce and SAPCR were factors in that decision. 3 RR 204. Spencer testified that he had also reviewed one other family law case, but primarily focused on searching the success rates of particular attorneys appearing before Sandoval; asking several people about Sandoval, including "some interested family rights and parental rights folks;" and an article on Sandoval's orders related to enrollment in a drug program. 3 RR 201-07. Spencer learned that in the

history of Collin County, there had never been a challenger to a sitting district judge. 3 RR 208.

With regard to identifying potential candidates to run against Sandoval, Spencer believed he telephoned several people for recommendations. Spencer testified that he contacted attorney Puhl regarding running against Sandoval. 3 RR 204-10. Spencer told Puhl he could provide operational support, grassroots support, and organizational support. 3 RR 207-08. Spencer told Puhl that he would help him raise money for the race if he committed to run. *Id.* Spencer told Puhl he thought it would require between $100,000 and $150,000 to run a "successful, to even run a notable challenge." 3 RR 208. Spencer acknowledged that very few lawyers would want to contribute to a campaign in opposition to Sandoval. 3 RR 215. Spencer knew that anyone running against Sandoval would not raise much money from attorneys before election day and that most contributions to judicial campaigns are made by lawyers. *Id.* Puhl declined to run against Sandoval. 3 RR 209.

Spencer called Puhl's former law partner, Brian Loughmiller, about running against Sandoval, but Loughmiller declined to run against Sandoval. 3 RR 210-12. Loughmiller told Spencer he did not think Sandoval was going to be defeated in the next election cycle. 3 RR 211.

Spencer testified that Wooten's name, as a potential candidate to run against Sandoval, came up "in a conversation." 3 RR 216. In October or

November of 2007, Spencer contacted Dodd. 3 RR 212-16. Spencer told Dodd he was looking for a candidate to run in the Republican primary against Sandoval, and he had heard the Democratic Party was recruiting Wooten to run for office. 3 RR 212-13. Spencer learned Wooten was interested in running but had declined to run as a Democrat. 3 RR 218.

Spencer testified he telephoned Wooten in mid-December 2007, in advance of the January 2, 2008 deadline to file as a candidate for the March 4, 2008 Republican primary. 3 RR 217-18. Spencer told Wooten the campaign would cost $100,000 to $150,000, and Wooten thought that was a reasonable estimate. 4 RR 23-24. Spencer told Wooten he would do everything he could to be supportive of her campaign. 4 RR 24.

In 2005 or 2007, Spencer met Hank Clements, a registered lobbyist, who also had political campaign experience. 3 RR 181. Clements was very knowledgeable about political advertising, including purchasing radio broadcasting time and preparation of mail, flier, and sign advertising. *Id.*, 4 RR 26. Clements's original quote to Spencer for working on a district court judicial campaign was $50,000, but Spencer negotiated his fee to $15,000 up front (paid in two payments of $7,500), and a $10,000 victory bonus. 4 RR 41. Wooten eventually spoke to Clements in the latter half of December 2007. 4 RR 23-25. Ultimately, Clements worked on the Wooten campaign and was paid $25,000 for his services.

## C. The flow of monies

Between January 1, 2008 and March 15, 2008, Stacy paid Spencer $150,000 in the form of checks and wire transfers. 3 RR 247-48; 4 RR 41-43, 65. Spencer testified this compensation related to his consulting agreement with Stacy, although he had not yet submitted or completed any projects at that point. 3 RR 246-47.

At the time he was recruiting Wooten as a candidate for the 380th Judicial District Court, and when Wooten agreed to run for election, Spencer was receiving money from Stacy. 4 RR 173-87. He admitted that, without the $150,000 from Stacy, he probably would not have been able to pay for all of Wooten's campaign expenses but–in his mind–he was spending "his" money on Wooten's campaign. 4 RR 41-44, 174. Spencer testified he believed Wooten would pay him back and she did. 4 RR 88-89. Spencer denied that David and Stacy were the "resources" he alluded to within an email regarding Wooten's available resources in comparison to Sandoval's, and Spencer also denied Wooten relied on the Carys' money to finance her campaign by suggesting Wooten could have financed some of her campaign expenses with the line of credit she had taken. 4 RR 128-29. However, Spencer admitted that she did not use her line of credit during the campaign. 4 RR 129.

On the evening of March 4, 2008, the day Wooten won the Republican primary, or on March 5, Clements called Spencer for his $10,000 victory

bonus. 4 RR 63-64. On March 7, 2008, the fifth transfer of money from Stacy to Spencer occurred in the amount of $10,000. 4 RR 65. On March 6, 2008, Spencer's bank balance was $2,407.69. 4 RR 64. After the transfer of $10,000, Spencer's bank balance was $11,707. 4 RR 65. Within an hour of Stacy's March 7, 2008 wire transfer of $10,000 to Spencer's account, Spencer's wife purchased a cashier's check for payment of Clements's $10,000 victory bonus. *Id.*, SX 1. The sixth transfer of money from Stacy to Spencer occurred on March 14, 2008, in the amount of $15,000.

Copies of Spencer's invoices and his "working copy" of bills to Wooten's campaign were admitted in evidence. 5 RR 35-47, 81-83. Spencer invoiced Wooten's campaign $4,536.75 on February 20, 2008, $2,409.25 on March 4, 2008, $10,009.25 on March 23, 2008, $12,000 on April 16, 2008, $15,000 on April 25, 2008, and $5,000 on May 26, 2008. *Id.* On May 29, 2008, Spencer invoiced Wooten's campaign $84,368.75, with credits and adjustments of $51,929.82 for payments between February 13, 2008 and April 28, 2008, leaving a balance due of $37,438.93. 5 RR 82. Spencer invoiced Wooten's campaign $9,241.50 on June 3, 2008. By invoice dated July 1, 2008, Spencer's cumulative bill to Wooten showed she still owed Spencer $33,369.91. 5 RR 45-48, 115.

In the cover letter forwarding Spencer's May 29, 2008 invoice to Wooten, he advised that "we recognize your July filing deadline with the Ethics Commission, and will render a supplemental Invoice to your office

39

in June." 5 RR 84-85. Spencer testified he knew Wooten needed information regarding amounts spent or incurred for the benefit of her campaign in order to report these items properly on her campaign finance report filed with the Ethics Commission.5 RR 83-84. Spencer believed a candidate is required to report not only campaign contributions and expenses on campaign finance reports, but also must list funds the candidate holds in a campaign account on a given date. Spencer testified he did not prepare Wooten's campaign finance reports, but when asked, he provided the information she needed to prepare the reports. *See* 5 RR 83-84.

### D. Communications

According to Spencer, he did not reveal details about his business relationship with Wooten to the Carys, or the Carys' business with Wooten. 4 RR 173-74. Spencer testified he did not provide information to David and Stacy about Wooten's campaign, and had told David that David could not participate in supporting the campaign. 4 RR 127-29. Spencer went to David's office at some point during Wooten's campaign and saw a Wooten campaign sign there. 4 RR 128.

Spencer also testified regarding the events surrounding Wooten's recusal in March 2009 from David's SAPCR. 4 RR 130-34. Spencer acknowledged at trial that David contacted him to advise him that an answer had been filed for Jennifer in the SAPCR by Benavides. 4 RR 131.

Benavides, Wooten's campaign treasurer and an associate with the law firm with which Wooten practiced before her election, filed an answer on behalf of Jennifer on February 27, 2009 at 9:59 a.m., in advance of a March 2, 2009 hearing before Wooten. 5 RR 88; SX 217. David called Spencer, mentioning Benavides was Jennifer's new counsel. 4 RR 132-33. Spencer testified that he called Benavides because of this information, and he knew that Benavides had been Wooten's campaign treasurer. *Id.*

But phone records show that David called Spencer at 11:03 a.m., and the two talked for "a minute," after which Spencer called Benavides, but not at David's request. 5 RR 88-90, SX 8A. David then called Spencer and spoke to him for several minutes. 5 RR 90-91, SX 8A. After speaking with David, Spencer talks with Benavides by phone, and then calls back David at the end of his call with Benavides. 5 RR 91, SX 8A. Spencer maintained at trial that he did not discuss with David any of those phone calls with Benavides. *Id.*

A June 9, 2009 email exchange between David and Spencer was admitted in evidence regarding a June 8, 2009 decision of the United States Supreme Court in *Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868 (2009), a case involving judge recusal. 4 RR 133. Spencer's email to David included the following text from an article about the decision:

41

> Today's decision by the U.S. Supreme Court that judges who receive campaign contributions large enough to create the appearance of bias should recuse themselves.... In *Caperton v. Massey*, the nation's high court ruled 5–4 that because a West Virginia Supreme Court justice received $3 million in campaign contributions from an energy company executive, the judge should not have taken part in a decision affecting the executive's company.

4 RR 133-34. Spencer emailed David that "I think you'll understand why I'm interested in this subject matter." *Id.* David then emailed the article to Spencer. 4 RR 135. Spencer denied that the reason he and David were interested in the news article was because Stacy's money was used to finance Wooten's campaign. 4 RR 135-36. Instead, Spencer indicated that he was interested in the article as it pertained to another family he had heard about, in which the grandparents had filed and successfully obtained custody of the granddaughter after the girl's mother had passed away. 4 RR 136. When questioned by the State as to why Spencer had not ever mentioned this reason in any previous hearings, Spencer responded that he had never been asked about his interest in the article at those hearings. *Id.* But Spencer acknowledged that, at the time he and David exchanged the above email, a motion for recusal was pending before Wooten. 4 RR 135.

John "Jay" Valentine[11]

John "Jay" Valentine testified that he served on a board of directors with Appellant beginning in 2000 or 2001, and the two remained friendly after their service term ended. 8 RR 148. Appellant later contacted Valentine about working for TDI, and Valentine joined the software company in November of 2007 as vice president of sales and marketing. 8 RR 148-49, 174.

Earlier in 2007, Appellant told Valentine that he was going through "a family situation," though Valentine did not recall if it was a divorce or custody suit. 3 RR 152. Appellant indicated that he "was making efforts to change family law through an organization he was involved in," and also "trying to make some changes in one of the elected officials" to "change some rulings that he had had." 8 RR 152. Appellant did not directly name Judge Sandoval as the elected official, but did convey that Judge Sandoval had "made an adverse set of rulings" against him; Valentine recalled that, over several conversations through early 2008, Appellant had said that he "hired an individual through the Speaker of the House's office in the State Capitol and was working with that person, and that they were running a campaign to get rid of this Mr. Sandoval." 8 RR 152-54. Valentine later learned that individual hired by Appellant was Spencer. 8 RR 154-55.

_____

[11] The State-Appellee presents its own summary of Valentine's testimony, except for the portion marked as quoted.

43

Valentine testified that he saw campaign signs for Wooten in Appellant's office.  8 RR 154-55.

In October or November of 2008, the TDI sales team was "really struggling" and having difficulty selling the software; Appellant told Valentine he should hire Spencer because "he's a fixer." 8 RR 156-57. When Valentine met Spencer in November or December of 2008, Spencer told him that Spencer "could help [TDI] in some of the things because he knew all these legislators."  8 RR 158.  Spencer gave Valentine the impression that he had worked with Appellant on the "Sandoval situation," which involved a hard campaign" but they succeeded in "boot[ing] out Mr. Sandoval." *Id.* Spencer commented several times that he "owned" Wooten, and "that she was going to help in their endeavor for making some changes"—specifically, reverse the adverse rulings in Appellant's divorce or child-custody case.  8 RR 158-59.

Although Valentine resisted hiring a "lobbyist" who knew nothing about TDI's software, Appellant was "really driving the effort to bring Stephen Spencer;" Spencer was eventually hired as a consultant.  3 RR 159-60.  Both Spencer and Appellant commented "several times" to Valentine that "Spencer was hired to fix David Cary's divorce case."  8 RR 173.

> In March 2009, Valentine complained about Spencer to the TDI Board of Directors and demanded an outside investigation of Spencer by the Board based on an incident Valentine thought

was a basis for TDI severing its relationship with Spencer. [8 RR 165-67.] Valentine's complaints about Spencer related to Spencer's interaction with a female marketing director while on a business trip. [8 RR 161-62, 166.] In an email and memorandum setting forth his complaints about Spencer, Valentine also included information about the claims David and Spencer had made about getting Wooten elected and what Wooten was going to do in connection with David's family law matters. [8 RR 162-66, SX 104, 105.] . . . [To Valentine's knowledge, the Board took no investigative action. 8 RR 166.]

. . . TDI fired Valentine in April 2009. [8 RR 169.] In June 2009, Valentine filed an employment discrimination claim against TDI. [8 RR 166-67.] In the employment discrimination complaint, Valentine asserted that David and Spencer had told him about their role in getting Wooten elected and bragged about bribing a judge. [8 RR 167-68 (SX 104, 105 marked as exhibits, submitted with Valentine's EEOC complaint), *see* 8 RR 163-67.] Valentine testified that the reason he included those claims in his employment discrimination complaint was to show David's conflict of interest with regard to Spencer. [*See* 8 RR 166-67.] Valentine testified that his employment discrimination claim against TDI was arbitrated, resulting in an arbitration award in his favor. [8 RR 170-71.]

2014 WL 4261233, *25.

<u>David Stinnett</u>[12]

Between 2008 and 2010, David Stinnett worked at TDI as a sales manager, and interacted with Appellant at work. 8 RR 190-91. Stinnett testified that Appellant "was pretty passionate about family law and family protection" and told Stinnett on several occasions how "Collin

---

[12] David Stinnett was not called to testify at Stacy's trial.

County, itself was – he felt like there was some crooked judges in the county as relating to his personal experience with them." 8 RR 192-93. In late 2008, Stinnett met Spencer, whom Stinnett was told "was just a person of influence within the state itself, and that he could help [TDI] by influencing people within the State of Texas to have meetings[.]" 8 RR 194. But during Stinnett's career with TDI, Spencer "arranged" two meetings that Stinnett attended, one with an associate from Austin Energy and the other with the Department of Information Resources; neither meeting resulted in sales, and not for lack of effort on Stinnett's part. 8 RR 199-202.

Stinnett also testified that, during their return drive from one of those meetings, Spencer made a phone call, asking the other party if that person was "willing to run for judge" and that he "had the funding able to find" him. 8 RR 203. After ending the call, Spencer told Stinnett that he had worked with Appellant, and "[t]here was a judge up in Collin County that we helped get removed and replaced," and that was how he spent his time "on the side kind of doing some of this stuff." 8 RR 204. Also, "by taking what Stephen Spencer had talked about and the information David Cary had given [him]," Stinnett testified that he "put two and two together" and understood Appellant had "the judge in his child-custody case removed from office," particularly after Appellant had stated "how they[sic] were some dirty judges [within Collin County] and that he's

46

particularly worked on getting a judge removed out of office and replaced with somebody else." 8 RR 205.

It appeared to Stinnett that Spencer and Appellant were good friends, and Appellant also told Stinnett that he and Spencer "had worked together to get a judge replaced within Collin County." 8 RR 195, 209. On cross-examination from Appellant's counsel, Stinnett admitted neither Spencer nor Appellant had mentioned a specific judge, and he hadn't "take[n] it in any kind of nefarious or illegal or bad way." 8 RR 217. But upon re-direct, Stinnett clarified that his impression was that Appellant and Spencer had "actively sought a candidate to replace the judge that he was displeased with," as Stinnett had had no knowledge prior to trial of campaign signs placed by Appellant, or that Spencer was "a manager or anything at that time" for Wooten's campaign. 8 RR 218-19. Stinnett also denied knowing over what matters or cases the judge whom Spencer and Appellant were "targeting" handled. 8 RR 219.

## Brian Webb[13]

Brian Webb is an attorney who has practiced family law since 1975. 6 RR 20. At the time of Appellant's trial, he was the President of the Texas Family Law Foundation, "an organization of family lawyers that tries to influence the legislature regarding family law legislation, statutes, pro and con." 6 RR 21. Webb testified that the first legislative session that the

---

[13] Brian Webb was not called to testify at Stacy Cary's trial.

47

foundation visited was in 2007. 6 RR 22. One day during that session, Spencer approached him about a bill Spencer had drafted relating to grandparents' rights and parents' rights. 6 RR 23. Webb and the Texas Family Law Foundation suggested some changes to create an "acceptable alternative bill," but Spencer "and those supporting him really weren't interested in the changes we were wanting to make." 6 RR 24. Webb also denied that Spencer ever called him to "ask for advice about getting a candidate to run against Charles Sandoval;" denied telling Spencer he will not practice in Collin County because of Judge Sandoval; and denied considering himself "to be someone that Stephen Spencer could call and bat ideas around with." 6 RR 24-25.

## SUMMARY OF THE ARGUMENTS

Appellant raises three claims of insufficient evidence, one claim of ineffective assistance of counsel, and two claims that the bribery statute is unconstitutional as applied to Appellant and on its face as vague and overbroad. In his first point of error, Appellant claims the evidence is insufficient to sustain his six convictions for bribery because, (A) the evidence showed that monies paid by Appellant's wife under his direction were consisted of "political contributions"; (B) the State could not prove Wooten was a "public servant" at the time she allegedly considered becoming a judicial candidate in exchange for benefits offered or given by Appellant, as the decision to [run for candidacy] is made as a private

48

citizen; (C) the State failed to demonstrate that Wooten ever considered leaving the judicial race, and thus the State did not meet its burden of proof in demonstrating Wooten proceeded and continued with her judicial campaign in exchange for benefits offered or given by Appellant; (D) there was no evidence that supported Wooten had agreed to issue favorable rulings in Appellant's civil cases in exchange for the benefits offered or given by Appellant; and (E) the State failed to demonstrate Appellant had the requisite intent to commit bribery. In his third point of error, Appellant claims the evidence is insufficient to sustain his conviction for money laundering, given that the State failed to demonstrate Appellant committed the alleged predicate crime of bribery for the reasons listed in Appellant's first point of error. In his second point of error, Appellant claims there is insufficient evidence to support the jury's finding of guilt in the charge of engaging in organized criminal activity ("EOCA"), as the State failed to prove any of the alleged predicate crimes-bribery, money laundering, or tampering with a government record-were committed. But the evidence adduced at trial disproves these arguments and demonstrates Appellant's guilt.

In his fourth point of error, Appellant alleges that trial counsel was ineffective because he failed to file timely amended election of punishment by the court, arguing that if counsel had timely amended the election, counsel would have been able to present evidence of the sentences received

49

by Wooten and Stacy Cary for their participation in the offenses were relevant to Appellant's sentencing. Appellant, however, is incorrect because, the Court of Criminal Appeals has held that a defendant has no right to present evidence of a co-defendant's punishment as mitigating circumstances.

And in his final two points of error, Appellant claims that the bribery statute, Section 36.02(a)(1),(4), is unconstitutional as applied to him and the statute is vague and overbroad on its face. First, Appellant failed to preserve the issues for appeal and is estopped from asserting a claim that is inconsistent with his prior conduct at trial. Regardless, courts have already found that bribery is not protected by the First Amendment.

## ARGUMENT

## I. STATE'S REPLY TO POINT OF ERROR ONE[14]

In his first claim, Appellant alleges that the evidence adduced at trial is insufficient to sustain his six convictions for bribery. Brief at 13-31. But, as this Court already determined when it overruled the legal sufficiency argument in the Stacy Cary appeal,[15] the evidence, when

---

[14] In his opening brief, Appellant did not frame his argument with reference to explicit "points of error." As a result, the State has organized its argument in the order that it believes the Court may best proceed to resolve this appeal. *See* Tex. R. App. P. 38.2(a)(C) (West 2014).

[15] Although the Court's opinion in *Stacy Cary v. State* is unpublished—and, hence, does not bind the panel Court under principles of *stare*

viewed in the light most favorable to the verdict, demonstrates that a rational trier of fact could have convicted Appellant of bribery beyond a reasonable doubt; hence, the Court should overrule Appellant's point of error number one.

## A. Standard of review for sufficiency of the evidence challenges.

The Texas Court of Criminal Appeals has mandated that the sufficiency of evidence standard established in *Jackson v. Virginia*, 443 U.S. 307 (1979) is the only standard to be used in a criminal case. *Brooks v. State*, 323 S.W.3d 893, 895 (Tex. Crim. App. 2010) (plurality op.); *see e.g. Ervin v. State*, 331 S.W.3d 49, 52-56 (Tex. App.-Houston [1st Dist.] 2010, pet. ref'd). On review, all evidence, and any reasonable inferences from the evidence, is viewed in the light most favorable to the verdict and it is determined whether any rational trier of fact could have found the elements of the offense beyond a reasonable doubt. *Jackson*, 443 U.S. at 319; *Gear v. State*, 340 S.W.3d 743, 746 (Tex. Crim. App. 2011).

The jury is the exclusive judge of witness credibility and the weight of the evidence. *Isassi v. State*, 330 S.W.3d 633, 638 (Tex. Crim. App. 2010). The jury also resolves or reconciles conflicts in the evidence in favor of the verdict. *Id.*; *Jackson*, 443 U.S. at 326. "An appellate court

*decisis*–because the evidence in both appeals is largely identical, the State contends that the Stacy Cary appeal has persuasive authority, as would any unpublished opinion of this Court.

determines whether the necessary inferences are reasonable based upon the combined and cumulative force of all the evidence when viewed in the light most favorable to the verdict." *Ervin*, 331 S.W.3d at 55. The appellate court must view both direct and circumstantial evidence equally when reviewing the record based on a sufficiency of the evidence claim. *Jackson*, 443 U.S. at 326; *Hooper v. State*, 214 S.W.3d 9, 16-17 (Tex. Crim. App. 2007). The reviewing court does not resolve any conflict of fact, reweigh the evidence, or evaluate the credibility of the witnesses. *Garza v. State*, 841 S.W.2d 19, 21 (Tex. App.-Dallas 1992, no pet.).

When a court's charge authorizes the jury to convict on more than one theory, the verdict of guilty will be upheld if the evidence is sufficient on any one of the theories. *Guevara v. State*, 152 S.W.3d 45, 49 (Tex. Crim. App. 2004).

B.  Applicable law to establish bribery

As relevant to this case, a person commits bribery if he intentionally or knowingly offers, confers, or agrees to confer on another, any benefit as consideration for (1) the recipient's decision, vote, recommendation, or other exercise of official discretion in a judicial proceeding, or (2) the recipient's decision, opinion, recommendation, vote, or other exercise of discretion as a public servant. Tex. Penal Code Ann. § 36.02(a)(2), (1) (Vernon 2008) (respectively). Also, it is an exception to the application of

52

either of those provisions-as relevant to Appellant-that the benefit is a political contribution as defined by the Election Code. *Id.* at § 36.02(d).

When it is alleged that an individual offers, confers, or agrees to confer on another, and the jury was properly instructed that proof of any one of the three alleged acts would warrant conviction, no proof of a bilateral agreement is needed.[16] *Martinez v. State*, 696 S.W.2d 930, 933 (Tex. App.–Austin 1985, pet. ref'd) (distinguishing from *McCallum v. State*, 686 S.W.2d 132 (Tex. Crim. App. 1985) (proof of a bilateral agreement required where indictment only alleged a single theory of bribery)). Rather, in such an instance, the offense of bribery is complete when the offer is made. *Martinez*, 696 S.W.2d at 933 and n.3 (noting the "McCallum court's understanding of the 'as consideration for' language found in § 36.02 and in Model Penal Code § 240.1 is not that of the model code commentators") (citing Model Penal Code § 240.1, Comment 4(b), (c)); *see Mustard v. State*, 711 S.W.2d 71, 75 (Tex. App.–Dallas 1986) ("The offense of bribery focuses on the mental state of the actor, and is complete if a private citizen, by offering, conferring, or agreeing to confer intends an

---

[16] *Vasquez v. State*, 665 S.W.2d 484 (Tex. Crim. App. 1984), *overruled on other grounds by Gonzales v. State*, 723 S.W.2d 746 (Tex. Crim. App. 1987) (en banc); *see also Lawton v. State*, 913 S.W.2d 542, 551 (Tex. Crim. App. 1995) (en banc) (where State pleads alternative theories of same offense, it need not prove guilt under all theories alleged), *overruled on other grounds by Mosley v. State*, 983 S.W.2d 249 (Tex. Crim. App. 1998).

agreement.") (citing *Hubbard v. State*, 668 S.W.2d 419, 421 (Tex. App.-Dallas 1984, pet. granted)).

### C. Applicable law to the six charges of bribery against Appellant.

Appellant was charged by indictment with committing six acts of bribery, generally by "intentionally and knowingly offer, confer, and agree to confer a benefit, . . . to Suzanne H. Wooten, a public servant, . . . as consideration for Suzanne H. Wooten's decision, opinion, recommendation, vote, and other exercise of discretion as a public servant and as consideration for Suzanne H. Wooten's decision, vote, recommendation, and other exercise of official discretion in a judicial proceeding[.]" 1 CR 159-64 (Counts Two through Seven, alleging a payment of $50,000.00 on January 4, 2008; $25,000.00 on January 30, 2008; $25,000.00 on February 14, 2008; $25,000.00 on February 26, 2008; $10,000.00 on March 7, 2008; and $15,000.00 on March 14, 2008, respectively).

The jury charge instructed that Appellant may be found criminally responsible for bribery, either as a primary actor or under the law of parties. 2 CR 643-48. A party may be criminally responsible under the law of parties in several ways. *Hayes v. State*, 265 S.W.3d 673, 678 n.4 (Tex. App.–Houston [1st Dist.] 2008, pet. ref'd). "An individual is criminally responsible as a party to an offense if the offense is committed by his own conduct, by the conduct of another for which he is criminally

responsible, or both." Tex. Penal Code Ann. § 7.01(a). A person is also criminally liable for an offense committed by the conduct of another if "acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense." *Id.* at § 7.02(a)(2).

The jury charge instructed that Appellant may be found criminally responsible for bribery, either as a primary actor or under the law of parties. 2 CR 643-48. A party may be criminally responsible under the law of parties in several ways. *Hayes v. State*, 265 S.W.3d 673, 678 n.4 (Tex. App.–Houston [1st Dist.] 2008, pet. ref'd). "An individual is criminally responsible as a party to an offense if the offense is committed by his own conduct, by the conduct of another for which he is criminally responsible, or both." Tex. Penal Code Ann. § 7.01(a). A person is also criminally liable for an offense committed by the conduct of another if "acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense." *Id.* at § 7.02(a)(2).

It is well-settled that a jury may be charged on the law of parties even though no such allegation is contained in the indictment. *Marable v. State*, 85 S.W.3d 287, 287 & n.2 (Tex. Crim. App. 2002) (collecting cases); *see Adames v. State*, 353 S.W.3d 854, 861 (Tex. Crim. App. 2011) (reaffirming that state and federal law both specify that due process does

55

not require defendant's culpability as a party to be pled in charging instrument), *cert. denied*, 132 S. Ct. 1763 (2012). "This rule applies not only to the law of parties found in [s]ection 7.02(a)(2) [of the Penal Code] but also the law of parties found in [s]ection 7.02(b)." *Montoya v. State*, 810 S.W.2d 160, 165 (Tex. Crim. App. 1989).

With respect to sections 7.01 and 7.02(a)(2), a conviction under the law of parties requires a showing that, at the time of the offense, the parties acted together and contributed to a common purpose. *Patterson v. State*, 950 S.W.2d 196, 202 (Tex. App.-Dallas 1997, pet. ref'd). In other words, the State must show conduct constituting an offense, plus an act by the defendant "done with the intent to promote or assist such conduct." *Trenor v. State*, 333 S.W.3d 799, 806 (Tex. App.–Houston [1st Dist.] 2010, no pet.). To determine whether a defendant participated as a party, the Court may examine events occurring before, during, and after the commission of the offense and may rely on actions demonstrating an understanding to commit the offense. *See Ransom v. State*, 920 S.W.2d 288, 302 (Tex. Crim. App. 1994).

## D. The evidence is sufficient to support the jury's findings of consideration for favorable rulings and Appellant's intent to commit bribery.

Appellant argues that there was insufficient evidence of bribery as consideration for favorable rulings, and insufficient evidence to demonstrate Appellant had the requisite intent to commit bribery. Brief

at 26-31. But the record reflects that the evidence presented at trial supports the jury's finding of guilt in all six charges of bribery committed by Appellant.

A person acts intentionally when it is his conscious objective or desire to engage in the conduct or cause the result. Tex. Penal Code §6.03(a) (Vernon 2008). A person acts knowingly with respect to the nature of his conduct or to circumstances surrounding his conduct when he is aware of the nature of his conduct or that the circumstances exist. *Id.* at § 6.03(b). Intent or knowledge may be inferred from the accused's acts, words, and conduct. *Hart v. State*, 89 S.W.3d 61, 64 (Tex. Crim. App. 2002). When it is alleged and proved that the defendant offered a proscribed benefit, it is not necessary to further prove that the offer resulted in a bilateral arrangement or unlawful contract with the other party. *Watts v. State*, No. 09-11-00383-CR, 2012 WL 403859, *2 (Tex. App.-Beaumont 2012) (mem. op..), citing *Martinez*, 696 S.W.2d at 933. And important here: The offense of bribery is complete when the offer is made. *Id.*

To prove that a person is a party to the offense, if not the primary actor, the State must prove conduct constituting an offense plus an act by the defendant done with the intent to promote or assist such conduct. *Beier v. State*, 687 S.W.2d 2, 3 (Tex. Crim. App. 1985). Since an agreement between parties to act together in a common design can seldom be proved by words, the State may rely on the actions of the parties to establish an

understanding or a common design to commit the offense, shown by direct or circumstantial evidence. *Ex parte Prior*, 540 S.W.2d 723, 727-28 (Tex. Crim. App. 1976); *Miller v. State*, 83 S.W.3d 308, 314 (Tex. App.-Austin 2002); *Pesina v. State*, 949 S.W.2d 374, 383 (Tex. App.-San Antonio 1997, no pet.).

Again, the reviewing court may look to events before, during, and after the commission of the offense. *Ransom*, 920 S.W.2d at 302. There must be sufficient evidence of an understanding and common design to commit the offense. *Guevara v. State*, 152 S.W.3d 45, 49 (Tex. Crim. App. 2004) (citing *Cordova v. State*, 698 S.W.2d 107, 111 (Tex. Crim. App. 1985)). Each fact need not point directly to the guilt of the defendant, as long as the cumulative effect of the facts are sufficient to support the conviction under the law of parties. *Id.* As stated by the Beaumont Court, when it reviewed a claim that the State failed to demonstrate the appellant had intentionally or knowingly committed an illegal act:

> The jury bore the burden of deciding whether [Appellant] merely wired money at [her son]'s direction under the belief that [her son] was helping [a correctional officer] and the inmates or acted with an understanding and common design to commit the offense of bribery. *See Hooper*, 214 S.W.3d at 13; *see also Ransom*, 920 S.W.2d at 302.

*Watts*, 2012 WL 403859 at *2-3.

Similarly here, the jury bore the burden of deciding whether Appellant had no part in the payments totaling $150,000.00, made by his

58

wife to Spencer, pursuant to a contract agreement for Spencer's services-or whether Appellant participated with an understanding and common design to commit the offense of bribery.

At trial, the State presented evidence that Judge Sandoval presided over Appellant's divorce proceedings-a "contentious" and "litigious" suit which was finalized in the fall of 2004. 2 RR 99-101, 119. Within six months of that final order, Appellant's ex-wife filed a Petition to Modify the Parent-Child Relationship, after several other motions had been mediated or otherwise resolved-including the denial of Appellant's motion for Judge Sandoval to recuse himself, Appellant's motion to transfer venue, and Appellant's writs of mandamus regarding Judge Sandoval's rulings. 2 RR 106, 111-14, 117-21. Ultimately, Judge Sandoval entered an order regarding the Petition to Modify, removing Appellant as joint managing conservator of his daughters, and, among other rulings, for Appellant to pay for his ex-wife's attorney's fees in excess of $416,000.00. 2 RR 126-27. Rather than appeal, Appellant filed a new motion to modify nearly two months later, plus another motion to transfer; the attorney who represented Appellant's ex-wife-an attorney who is board certified in family law and who has practiced law for more than 30 years-testified he believed those motions were "really a thinly veiled attempt simply to transfer the case rather than to actually modify the support," given that he had never seen a motion requesting to increase the amount of child

59

support a petitioner should pay. 2 RR 128-30. Judge Sandoval ultimately found Appellant was filing frivolous pleadings and sanctioned him $50,000.00. 2 RR 132-37.

The State also presented evidence that, in the same year as Judge Sandoval's rulings, Appellant felt there were "some crooked judges in [Collin County] as relating to his personal experience with them," namely his child-custody proceedings. 8 RR 192. Appellant also told his former colleague, Jay Valentine, that he "was trying to make some changes in one of the elected officials . . . to change some rulings that he had had," and that he was working with someone in "running a campaign to get rid of" that elected official. 8 RR 151-54. Although Appellant did not specify "who the elected official was," Appellant had mentioned, at some point, "a judge named Sandoval" who was a "person that had made an adverse set of rulings" against him. 8 RR 151-54.

From this evidence, a rational jury could have reasonably concluded that Appellant wanted Sandoval unseated from the bench so that Sandoval would be removed from his cases.

Additionally, the State presented the following evidence: [17]

After being introduced to one another, Spencer and Appellant exchanged emails, agreeing to meet on Tuesday, October 2, 2007, at the home of Appellant and his wife in Dallas. [3 RR 187-88.] . . . Spencer traveled from his home near Austin, Texas to meet with [Appellant] and Stacy. [3 RR 162, 168-69.] Shortly after that meeting, Spencer reviewed the court file in [Appellant]'s divorce case and [Suit Affecting the Parent-Child Relationship] SAPCR and began contacting individuals in Collin County to find a candidate to run against Sandoval for the office of judge of the 380th Judicial District Court. [3 RR 199-215.] The deadline for filing as a candidate in that race was January 2, 2008. [3 RR 65, 224.] Therefore, there was a limited amount of time to locate a candidate. Because there was no Democrat candidate in that judicial race, the winner of the Republican primary would be the elected judge following the general election in the fall of 2008. [2 RR 146, 3 RR 70, 153.]

In his discussions with Wooten, Spencer expressed his belief that a successful campaign to unseat Sandoval would require $100,000 to $150,000, and Wooten believed that was a reasonable estimate. [3 RR 208, 4 RR 24.] The primary election was to be held only two months after Wooten declared her candidacy, and the evidence indicated it was not likely Wooten could solicit significant campaign contributions in that limited period of time, particularly since the majority of campaign contributions in judicial races are made by lawyers and lawyers are not readily inclined to make contributions to a candidate seeking to unseat an incumbent judge. [2 RR 143-44.] Despite

---

[17] Except for the bracketed text, this summary of evidence was presented in this Court's opinion in *Stacy Stine Cary v. State*, No. 05-12-01421-CR, 2014 WL 4261233, *29-33 (Tex. App.-Dallas Aug. 28, 2014) (unpub.); although these trials were severed, nearly the same evidence was produced at Appellant's trial, as indicated by the bracketed citations to Appellant's trial records.

this fund-raising challenge, Wooten agreed to run for election, and she appointed Spencer, who had never before managed a political campaign, to serve as her campaign manager.

[Stacy made payments to Spencer and Spencer used a large portion of those payments to make campaign expenditures for the Wooten campaign at times when the campaign had not raised enough money to cover them.] . . . For example, the day following Wooten's January 2, 2008 declaration of her candidacy, Stacy attempted to wire transfer $50,000 to Spencer. [4 RR 6-7.] When that wire transfer was unsuccessful, Stacy wire transferred $50,000 the following day, January 4, 2008. [4 RR 8-9.] Before that wire transfer, Spencer had $2.39 in his bank account. [SX 94.] The evidence establishes Spencer immediately began utilizing money transferred by Stacy to pay campaign consultant Clements and other campaign expenses. [7 RR 102-03, SX 94.] Spencer testified that without the money wire transferred by Stacy, he would not have been able to pay Clements $7,500 on January 7, 2008, and $7,500 on January 8, 2008. [4 RR 44.]

Sandoval's February 4, 2008 Campaign Finance Report indicated Sandoval had raised $12,575 in campaign contributions, had expended $8,997.08, and had a balance of $4,231.37 in his campaign account. [SX 175, 4 RR 95.] The bank records for Wooten's campaign account show that on February 4, 2008, the account had a balance of $2,366, and on February 5, 2008, the account had a balance of $1,933. [SX 94, 4 RR 97-99.] Despite the fact Sandoval had received significantly greater campaign contributions than Wooten, Spencer told Clements he was not impressed with the amount Sandoval had raised. [4 RR 94-95, SX 14.] Spencer also communicated to Wooten and Clements that Sandoval was not "in a position to match our resources." [*Id.*] Clements interpreted Spencer's email to mean that there were people Spencer could go to for money. [6 RR 248.]

The evidence showed numerous communications between Spencer, David, and Stacy at or about the time of transfers of funds from Stacy to Spencer. [SX 98C, 7 RR 176-91.] For example, on January 29, 2008, the night before the second payment by Stacy to Spencer, Spencer telephoned David's cell phone. [7 RR 184-85.] Immediately thereafter, either David or Stacy telephoned Spencer from David and Stacy's home phone. [*Id.*] Spencer then telephoned Wooten. [*Id.*] After the telephone call to Wooten, Spencer telephoned David and Stacy's home.[*Id.*] Stacy made the second payment to Spencer on January 30, 2008, and Spencer deposited that payment to his account on February 1, 2008. [*Id.*, SX 94, 98C.] That payment posted to Spencer's bank account on February 4, 2008. [*Id.*] On February 5, 2008, Spencer sent an email to Wooten indicating that Sandoval "cannot match our resources," even though Wooten had raised only $3,620 for her campaign at that time. [4 RR 94-95, SX 14, 4 RR 98.] On February 14, 2008, Stacy made her third payment to Spencer. [7 RR 186.] On that day, Spencer exchanged text messages by phone with David between 5:12 p.m. and 5:23 p.m. [ 7 RR 187, SX 98C.] Between 5:34 p.m. and 5:46 p.m., Spencer then communicated in succession with Wooten, Clements, and David. [7 RR 188.] Stacy's third payment to Spencer posted to his account on February 15, 2008. [*Id.*, 7 RR 188-89.] On February 26, 2008, Stacy made her fourth payment to Spencer. [*Id.*] At 4:41 a.m. on that day, Spencer's assistant confirmed to Spencer by email that radio advertising time had been purchased for Wooten's campaign. At 5:24 a.m. and 6:59 a.m., David received text messages from Spencer. At 9:17 a.m., Stacy sent instructions to Tolleson Private Bank to wire $25,000 to Spencer. [*Id.*] At 2:14 p.m., the wire transfer was posted to Spencer's account. [*Id.*] At 2:37 p.m. and 2:53 p.m., Spencer's wife, Kipling Spencer, purchased cashier's checks for payment of Wooten campaign expenses from the funds wired to Spencer's account by Stacy. [*Id.*, 7 RR 191.]

On March 4, 2008, Wooten won the Republican primary. On March 7, 2008, Stacy made the fifth payment to Spencer. [7 RR 192-93.] On March 7, 2008, between 7:07 a.m. and 8:29 a.m., Spencer text-messaged four times with David. [7 RR 193-94, SX 98C.] Clements text-messaged Spencer at 8:17 a.m. [*Id.*] David and Stacy had three phone conversations between 8:45 a.m. and 9:10 a.m. Between 9:23 a.m. and 10:02 a.m., Spencer and David exchanged thirteen text messages. [*Id.*] At 10:47 a.m., Stacy attempted to reach David by telephone. [*Id.*] At 10:58 a.m., Stacy sent instructions to Tolleson Private Bank to wire $10,000 to Spencer. [*Id.*] At 11:40 a.m., David text-messaged Spencer. At 2:51 p.m., the wire transfer of $10,000 posted to Spencer's bank account. [*Id.*] Between 3:21 p.m. and 3:52 p.m., Spencer and David exchanged eleven text messages. [*Id.*] At 3:59 p.m., Kipling Spencer purchased a cashier's check made payable to Clements in the amount of $10,000. [7 RR 194.] Between 6:24 p.m. and 6:31 p.m. on March 13, 2008, the day of the sixth payment from Stacy to Spencer, Spencer text messaged David six times. [7 RR 195, SX 98C.] At 9:41 p.m., Stacy sent instructions by email to Tolleson Private Bank to wire Spencer $15,000. [*Id.*] On March 14, 2008, the sixth payment from Stacy to Spencer in the amount of $15,000 was posted to Spencer's bank account. [*Id.*]

Spencer testified he kept [the Carys] removed from his work on Wooten's campaign. However, evidence of the consulting agreement between Spencer and Stacy and a summary of invoices purportedly related to the agreement were introduced in evidence. The consulting agreement is dated prior to Spencer's meeting with David and Stacy where his consulting services were first purportedly discussed. [3 RR 230, 237-38.] The consulting agreement, dated October 1, 2007, was strikingly similar to Spencer's October 15, 2009 engagement letter with TDI. [4 RR 115-22.] Both agreements include an identical phrase relating solely to TDI: "[a]ny additional time spent on TDI's behalf is part and parcel to, and inclusive of this

engagement." [4 RR 120-21, 5 RR 94-95.] Spencer admitted [that he had testified at a previous hearing] that when he left the October 2, 2007 meeting with David and Stacy, he did not know the name of David's employer. [5 RR 95-96.]

The August 1, 2008 "summary" invoice for purported consulting services rendered by Spencer did not apply a credit for the $50,000 wire transfer from Stacy to Spencer on January 4, 2008, and the $25,000 transfer on February 26, 2008 from Stacy to Spencer did not appear as a credit on the invoice, but was handwritten on Stacy's copy of the invoice. [3 RR 241-52, 5 RR 115-16.] The work product purportedly produced by Spencer pursuant to the consulting agreement was insubstantial, especially in light of the generous compensation of $25,000 for each of the four "projects" outlined in the consulting agreement. [3 RR 248-50, 264-68, 5 RR 12-17, 4 RR 20-22.] Further, the evidence indicated that Stacy purportedly paid Spencer for "projects" at times when she had not been invoiced for the work and Spencer had not provided any work product. Stacy transferred $150,000 to Spencer between January 4, 2008 and March 14, 2008, although Spencer testified he was to be paid $25,000 for each of four "projects," which would total only $100,000 under the consulting agreement. [3 RR 243-48, 4 RR 41-43, 65.]

From the evidence relating to Spencer's consulting agreement with Stacy, the jury could have reasonably inferred the agreement was a subterfuge, fabricated several years after the purported effective date to provide a false explanation for the transfers of money from Stacy to Spencer that were used to finance Wooten's campaign. . . .
. . .
The jury also heard evidence concerning a June 2009 email exchange between Spencer and David regarding an opinion of the United States Supreme Court concerning judge recusal. *See Caperton*, 556 U.S. 868[; 4 RR 133.] The email included a

statement from an article discussing *Caperton*, stating that "judges who receive campaign contributions large enough to create the appearance of bias should recuse themselves. . . ." I[4 RR 133-36.] n the email, Spencer stated to David that he thought David would understand why he was interested in the subject matter of that case, although Spencer denied that he and David were interested in *Caperton* because Stacy's money was used to finance Wooten's campaign. [*Id.*]

> After Wooten became the judge presiding over David's SAPCR, David's motion to modify was set to be heard by Wooten. [3 RR 76, 97-98.] However, shortly before the hearing on the SAPCR, Benavides appeared in the case on behalf of Jennifer. [*Id.*] This appearance as counsel would result in Wooten's recusal because Wooten had indicated an intent to recuse herself for a period of nine months after January 2009 from cases in which Benavides appeared. [3 RR 74.] The evidence showed David contacted Spencer regarding Benavides appearing in the SAPCR, and Spencer, in turn, contacted Benavides and Basinger and told them to [withdraw] despite not being able to provide a satisfactory reason. [3 RR 99-101.] The evidence showed numerous other contacts between Spencer and David shortly after Benavides's appearance in the SAPCR. [7 RR 198-200, SX 98C.] Further, the evidence showed that shortly after Benavides appeared in the SAPCR, Spencer contacted the office of Judge Oldner, the administrative judge. . . . [*Id.*] Further, the evidence showed that despite Benavides and Basinger appearing in the suit brought by Stacy against Jennifer and Suster that had been transferred to Wooten's court, Wooten did not voluntarily recuse herself in that lawsuit. [SX 7A.]

*See* n.15, *supra*. The State also presented testimony from Jay Valentine,

Appellant's former colleague at TDI, who stated that both Spencer and

Appellant "said several times" that "Spencer was hired to fix [Appellant]'s divorce case." 8 RR 173.

When a court's charge authorizes the jury to convict on more than one theory, the verdict of guilty will be upheld if the evidence is sufficient on any one of the theories. *Guevara*, 152 S.W.3d at 49. And circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor, and alone is sufficient to establish guilt. *Id.* Here, with the cumulative effects of the facts presented by the State at trial, a rational juror to have found that Appellant, intentionally or knowingly, either as the primary actor or a party, offered, conferred, or agreed to confer a benefit to Wooten in consideration for Wooten filing paperwork to run for Judge; proceeding and continuing with a campaign to unseat Judge Sandoval, the incumbent elected judge of the 380th Judicial District Court; and/or issue favorable rulings in cases in which Appellant or his wife was a party. *See* Tex. Penal Code Ann. §§ 7.01(a), 7.02(a)(2) (law of parties); *see also Hayes*, 265 S.W.3d at 678, n.4 (a party may be criminally responsible under law of the parties in several ways); *Patterson*, 950 S.W.2d at 202 (at the time of the offense, the parties acted together and contributed to a common purpose); *see also Trenor*, 333 S.W.3d at 806 (State must show conduct constituting an offense, plus an act by the defendant "done with the intent to promote or assist such conduct").

Furthermore, the State did not need to prove Appellant was well-versed in election law, or knew specifically how his wife's money was being spent or that Spencer was acting improperly in regards to Wooten's campaign finances or reporting. Brief at 26-30. To require such detailed knowledge would lead to the absurd result of the acquittal of every financier who deliberately chose to remain ignorant of the process by which his intended recipient executed the particular "decision, opinion, recommendation, vote, or other exercise of discretion" desired by the financier. Here, based upon the evidence described above, a rational trier of fact could have reasonably found the State proved beyond a reasonable doubt Appellant's guilt of six counts of bribery.

### E. The evidence sufficiently supports Appellant's convictions for bribery as charged under § 36.02(a)(1), (2).

Appellant argues that, because the State's evidence showed that the monies paid by Appellant's wife under his direction were functionally campaign contributions, the evidence is necessarily insufficient to support his convictions for bribery as he was charged. Brief at 19-23. But based on the evidence presented at trial, a rational trier of fact could have reasonably found that Appellant did not specifically direct the money to be used to fund Wooten's campaign. Indeed, as this Court has already determined on a materially identical record, *see Cary v. State*, 2014 WL

4261233 at *33-34,[18] a rational trier of fact, instead, could have reasonably found that Appellant intended the money-without regard for specific execution-be used to obtain, by any means necessary, (1) a person who would challenge the incumbent judge of the 380th Judicial District Court, despite the odds stacked against succeeding in such a challenge, and/or (2) a judge who would rule favorably in Appellant's custody and visitation proceedings, and/or rule in favor of his wife Stacy.

Where a criminal statute expressly includes a provision beginning with, "It is an exception to the application of," the State "must negate the existence of [that] exception in the accusation charging commission of the offense and prove beyond a reasonable doubt that the defendant or defendant's conduct does not fall within the exception." Tex. Penal Code Ann. § 2.02(a), (b) (Vernon 2013). Here, the offense of bribery has one statutory exception:

> (3) of Subdivision (a) that the benefit is a political contribution as defined by Title 15, Election Code, or an expenditure made and reported in accordance with Chapter 305, Government Code.

Tex. Penal Code Ann. § 36.02(d). Also, as relevant to the instant case,

> 2) "Contribution" means a direct or indirect transfer of money, goods, services, or any other thing of value and includes an agreement made or other obligation incurred, whether legally enforceable or not, to make a transfer[.]

---

[18] In an abundance of caution, the State again notes that this opinion was unpublished.

(5) "Political contribution" means a campaign contribution[.]

(3) "Campaign contribution" means a contribution to a candidate or political committee that is offered or given with the intent that it be used in connection with a campaign for elective office or on a measure. Whether a contribution is made before, during, or after an election does not affect its status as a campaign contribution.

Tex. Elec. Code § 251.001 (West 2008).

In the instant case, both parties agree that two of the three requirements set out in §§ 2.02(a) and 36.02(d) of the Penal Code were met: sufficient language in the indictment negated the § 36.02(d) exception, and the benefits conferred were not lobbyist expenditures. *See* 1 CR 159-64 (indictment alleging Counts II through VII: "other than a political contribution as defined by Title 15, Election Code, or an expenditure made and reported in accordance with Chapter 305 of the Government Code"); *see also* Appellant's Brief at 19-23 (Appellant's complaint solely related to "political contribution").

But under Appellant's theory regarding the remaining portion of the statutory exception, § 36.02(d) would indicate that a political contribution is not an illegal benefit to offer, confer, or agree to confer upon a public servant, party official, voter, or an authority figure in a judicial or administrative proceeding, in exchange for that individual's action in his/her official capacity. See § 36.02(a)(1), (2), and (3). Rather, a political contribution offered, conferred, or in agreement to be conferred to such

70

individuals described above would comprise an illegal action only if there exists:

- an express agreement to take or withhold a specific exercise of official discretion if such exercise of official discretion would not have been taken or withheld but for the political contribution, and

- direct evidence of the express agreement.

§ 36.02(a)(4). Simply stated, as long as no such evidence of express agreement exists, no crime has been committed.

But such an absurd result could not have been intended by the legislature. The commentary accompanying the 1975 amendment which established the foundation for § 36.02 notes:

> "This section was completely rewritten based upon Model P.C. Sec. 240.1. The term 'with intent to influence' was completely omitted, and the term 'as consideration for' was used to emphasize the bargaining aspect of bribery. This concept includes both express and implied or tacit agreements. Any benefit will suffice to convict for bribery, if it is consideration for the recipient's exercise of official discretion in a judicial or administrative proceeding . . . (Emphasis supplied.).

*McCallum*, 686 S.W.3d at 134 (quoting BRANCH'S ANN. P.C., 3RD ED., VOL. III, § 36.02). As further noted by the *McCallum* Court, the amendment served to prevent the criminalization of "situations where gifts are given in mere hope of influence, without any agreement by the donee." *Id.* at 135 (quoting A.L.I. MODEL PENAL CODE, REPRINT-PROPOSED OFFICIAL DRAFT, § 240.1 at 197 (May 4, 1962)). As discussed above, the

71

evidence shows that the actions of Appellant and his wife were not motivated by a "mere hope of influence."

Regardless, Appellant ignores the evidence and reasonable inferences from the evidence, from which a rational trier of fact could have found that the State negated the § 36.02(d) exception beyond a reasonable doubt.

While State-Appellee could not locate any controlling authority on negating the exception to bribery as alleged in this case, guidance can be found in *McElroy v. State*, 720 S.W.2d 490 (Tex. Crim. App. 1986), in which the Court of Criminal Appeals affirmed this Court's decision regarding sufficiency of the evidence to negate an exception to a different offense[19] —"a trust type statute enacted to regulate a specific type of conduct on the part of contractors and subcontractors[.]" *Id.* at 491 (referring to former Tex. Ann. Civ. Stat. Art. 5472e). In affirming this Court's holding that the State failed to properly negate the exception to the charged offense, the *McElroy* Court provided the following explanation:

> The reason that we find the evidence is insufficient to establish that the State did not prove that [McElroy] did not [meet the statutory exception of] us[ing] the allegedly misapplied trust funds for reasonable overhead expenses is because it did not trace the application of three checks payable

[19] One of the issues presented in McElroy which is absent in this case is whether a statutory exception was provided within former Article 5742e of the Civil Statutes; since the Court of Criminal Appeals upheld this Court's finding of a statutory exception and analyzed the sufficiency of the evidence under such finding, the same underlying principles in *McElroy* should apply in the instant case. *Id.* at 492-93.

to the telephone company, an apartment complex, and a liquor store, which could have easily shown that they either did or did not have anything to do with reasonable overhead expenses. In sum, the State did not show that the proceeds from the checks were not used for what the law permits the funds to be used, reasonable overhead expenses. The evidence is thus insufficient to establish that [McElroy] did not use the trust funds that he allegedly misapplied for reasonable overhead expenses, which the law permitted him to use the trust funds for.

*McElroy*, 720 S.W.2d at 495 (emphasis added).

Appellant points out that the definition of "contributions" specifically includes direct or indirect transfers, and argues the State proved such transfers occurred between Appellant and Wooten. Brief at 20. But both direct and indirect transfers inherently encompass a traceable source of the transfer of value. In this case, the evidence demonstrates Appellant deliberately engaged several deceptive tactics to prevent the funds from being traced to him:

1. All payments were made from Appellant's wife's accounts.

2. All payments were made to and accepted by Spencer.

3. Spencer testified at length that the payments made by Appellant's wife were for services he rendered pursuant to a contract, back-dated to October 1, 2007, and engaging him until December 2009.

4. Spencer testified that he did his best to keep his Stacy Cary business separate from Wooten's campaign business.

73

5. Spencer testified that Wooten did not know the Carys, and sub-contracted-campaign consultant Clements stated he had not heard mention of the Carys.

6. No acknowledgment of the Carys as donors or lenders was ever made in Wooten's campaign finance or personal finance reports.

7. The payments issued by the Carys were in gross excess of $2,500.00, the legal political contribution limit for an individual towards a judicial campaign within Collin County. 6 RR 37.

Applying *McElroy*, the State's precise tracing of the funds demonstrated that Appellant clearly removed himself from being a publicly identifiable source of funding-either direct or indirect-for Wooten's campaign.

Furthermore, Appellant's assertion that Spencer worked for Wooten under a "turnkey" arrangement-when read in conjunction with Appellant's argument that the payments to Wooten were political contributions-would allow an individual to make unlimited "campaign contributions" to a "consultant" employed under the same "turnkey" arrangement described by Spencer. Such an outcome defeats the purpose of the statutorily-imposed limits placed upon individual political contributions.

Lastly, as the Court in the Stacy Cary appeal held, the jury could have reasonably inferred that Appellant had no specific intent for the payments issued by his wife were to be used exclusively "in connection with a campaign for elective office or on a measure," as the definition of

74

"campaign contribution" requires. Jay Valentine, Appellant's former colleague at TDI, testified that he had heard "several times" that "Spencer was hired to fix [Appellant]'s divorce case," and that Spencer "said he owned [Wooten] several times, and that she was going to help in their endeavor for making some changes," namely reversing "some adverse rulings" in Appellant's divorce and child-custody proceedings. 8 RR 173, 158-59. Additionally, Wooten's campaign reports reflect she reported $102,000.00 in expenditures, but Spencer paid $118,000.00 on campaign expenditures. 7 RR 156. The jury thus could have inferred that Appellant's description of Spencer as a "fixer," coupled with the discrepancy of between $32,000.00 and $48,000.00 between Spencer's invoices and Wooten's reports, demonstrate that Appellant had no specific intent that every payment made by his wife be used specifically in connection with the campaign.

When viewed in the light most favorable to the verdict, the evidence and the reasonable inferences from the evidence of the great lengths taken by Appellant to make any payments untraceable to him, coupled with the lack of transparency within Wooten's campaign, could allow a rational trier of fact to have found beyond a reasonable doubt that the State negated the exception that such payments were political contributions. *Jackson*, 443 U.S. at 319; *Gear*, 340 S.W.3d at 746. Thus, Appellant's complaint of insufficient evidence alleged on this ground should be denied.

**F. The evidence is sufficient to establish that a "public servant" was bribed by Appellant in exchange for the public servant's exercise of discretion, and thus sufficient to sustain Appellant's convictions for bribery.**

Appellant argues that Wooten, the intended recipient of Appellant's bribes, was not a "public servant" when she made the decision to run for judicial office. Brief at 23-24. Appellant also argues that there is no evidence to support a finding that Wooten was considering a decision to withdraw from the judicial race. Brief at 25-26. But Appellant's misconstruction of the record fails to demonstrate Appellant's conviction is not supported by the evidence presented at trial.

As relevant to Appellant's point of error, in Counts Two through Seven of the Superceding Indictment charging Appellant with bribery; Wooten is alleged to have received or was offered benefits from Appellant as consideration for her "decision, opinion, recommendation, vote, and other exercise of discretion as a public servant, . . . to wit: filing paperwork to run for Judge, [and] proceeding and continuing with a campaign to unseat the incumbent elected Judge of the 380th Judicial District Court[.]"[20] 1 CR 159-64.

---

[20] *See Gahl v. State*, 721 S.W.2d 888, 893-96 (Tex. App.–Dallas 1986) ("the phrase 'decision, recommendation and exercise of discretion" are simply different manners and means of committing the offense of bribery"), citing *Bates v. State*, 587 S.W.2d 121, 129 (Tex. Crim. App. 1979) ("intentionally and knowingly solicit, accept, and agree to accept . . . a pecuniary benefit" is an allegation of several means of committing the offense of bribery).

Included in the statutory definition of "public servant" is a "candidate for nomination or election to public office," and the provision that a person may be a public servant "even if [she] has not yet qualified for office or assumed [her] duties." Tex. Penal Code § 1.07(4)(E). "Candidate" is further defined within the Election Code as "a person who knowingly and willingly takes affirmative action for the purpose of gaining nomination or election to public office," including filing an application for a place on a ballot or filing a campaign treasurer appointment. § 251.001(1)(B), (A). Thus, Wooten's action in filing paperwork to run for office squarely falls within the statutory definition of "candidate" and "affirmative action" taken by candidates, and is thus an "exercise of discretion as a public servant."

Additionally, Appellant mischaracterizes Wooten's actions as a "decision" made as a public servant. A variation of Appellant's argument has already been rejected by the Ninth Court, where the appellant in that case alleged, "the state has utterly blurred the distinction between making decisions as a public servant and *deciding to be a public servant*." *Kaisner v. State*, 772 S.W.2d 528, 529 (Tex. App.–Beaumont 1989, pet. ref'd.) (quoting appellant Kaisner's brief) (emphasis in original). In rejecting this claim, the Ninth Court of Appeals found that Kaisner's opponent's "decision to withdraw from the runoff would have been the exercise of discretion as a public servant." *Id.* The Court of Criminal Appeals also implicitly rejected this argument when it refused Kaisner's petition for

discretionary review. *See Kaisner v. State*, 780 S.W.2d 226, 227-28 (Tex. Crim. App. 1989) (Miller, J., dissenting, supporting Kaisner's argument). Likewise-and because Wooten's actions fall within the statutory definition of affirmative action taken by a candidate-this Court should reject Appellant's argument that Wooten, as a private citizen, "decided" to run for the 380th Judicial District Court bench.

Appellant also complains the State failed to prove that Wooten ever considered withdrawing from the race. Brief at 25-26. But Appellant cites no authority in support of his argument that the State must prove the converse of its allegations that Appellant was charged with bribing for Wooten to "proceed[ ]and continu[e ]" with her campaign. Additionally, where the Kaisner courts considered the opponent's decision to withdraw as an exercise of discretion of a public servant, the implicit converse must also be true-that, as in this case, a candidate's decision to stay or "proceed[ ]and continu[e]" in the race is an exercise of discretion of a public servant.

Because Appellant's arguments present no merit, this Court should overrule Appellant's challenge to the sufficiency of the evidence on these grounds.

## II. STATE'S REPLY TO APPELLANT'S POINT OF ERROR THREE

### A. Applicable law to establish money laundering

Under section 34.02(a)(4) of the Penal Code (Vernon 2008), a person commits money laundering if he finances or invests or intends to finance

or invest funds that the person believes are intended to further the commission of criminal activity. "Criminal activity" is defined within the Penal Code as "any offense, including any preparatory offense, that is classified as a felony under the laws of this state." *Id.* at § 34.01(1)(A). Knowledge of the specific nature of the criminal activity giving rise to the proceeds is not required to establish a culpable mental state under this section. *Id.* at § 34.02(1). As related to Appellant, "criminal activity" is the offense of bribery, defined in Part I(B), *supra*. 1 CR 164 (Superceding Indictment: Count Eight). The jury was instructed that Appellant may be found criminally responsible for money laundering, either as a principal actor or under the law of parties. 2 CR 649; *see* Part I(C).

## B. The evidence was sufficient to support Appellant's conviction for money laundering.

Appellant argues that the evidence was insufficient to sustain his conviction for money laundering because there was insufficient evidence of the only predicate offense alleged, i.e., bribery. Brief at 36-37; *see* 1 CR 164. Since this is Appellant's only point of error with respect to his conviction for money laundering, the State incorporates all arguments urged in Part I, and asserts the evidence thus demonstrates that a rational trier of fact could have found Appellant guilty of money laundering beyond a reasonable doubt.

## III. STATE'S REPLY TO APPELLANT'S POINT OF ERROR TWO

Appellant claims that there is insufficient evidence to sustain his conviction for engaging in organized criminal activity ("EOCA"). Brief at 31-36.

### A. Standard of review for a challenge to the sufficiency of the evidence.

Again, on review, all evidence and any reasonable inferences from the evidence is viewed in the light most favorable to the verdict and it is determined whether any rational trier of fact could have found the elements of the offense beyond a reasonable doubt. *Jackson*, 443 U.S. at 319; *Gear*, 340 S.W.3d at 746.

The jury is the exclusive judge of witness credibility and the weight of the evidence. *Isassi*, 330 S.W.3d at 638. The jury also resolves or reconciles conflicts in the evidence in favor of the verdict. *Id.*; *Jackson*, 443 U.S. at 326. "An appellate court determines whether the necessary inferences are reasonable based upon the combined and cumulative force of all the evidence when viewed in the light most favorable to the verdict." *Ervin*, 331 S.W.3d at 55. The appellate court must view both direct and circumstantial evidence equally when reviewing the record based on a sufficiency of the evidence claim. *Jackson*, 443 U.S. at 326; *Hooper*, 214 S.W.3d at 16-17. The reviewing court does not resolve any conflict of fact,

rough the evidence, or evaluate the credibility of the witnesses. *Garza*, 841 S.W.2d at 21.

### B. Applicable law to establish EOCA

Section 71.02(a) of the Penal Code (Vernon 2008) provides that a person commits the offense of EOCA if, with the intent to establish, maintain, or participate in a combination, he commits or conspires to commit one or more of several enumerated offenses, including bribery, money laundering, and tampering with a governmental record. Additionally, § 71.01(b) defines "conspires to commit" as when "a person agrees with one or more persons that they or one or more of them engage in conduct that would constitute the offense and that person and one or more of them perform an overt act in pursuance of the agreement. An agreement constituting conspiring to commit may be inferred from the acts of the parties."

"Combination" is defined as "three or more persons who collaborate in carrying on criminal activities." Tex. Penal Code § 71.01(a). The participants need not know each other's identity, and the combination's membership may change from time to time. *Id.* In proving the existence of a combination, the State need not demonstrate the participation of all alleged members of the combination; the State need only prove the participation of at least three of the named members of the combination, including the defendant. *See Crum v. State*, 946 S.W.2d 349, 356 (Tex.

App.-Houston [14th Dist.] 1997, pet. ref'd). Generally, this requires more than the intent to commit the predicate offense; the State must prove the defendant's intent to establish, maintain, or participate in a combination. *Hart v. State*, 89 S.W.3d 61, 63 (Tex. Crim. App. 2002). Further, in order to prove the defendant's intent to participate in a combination, the State must prove not only that the defendant knew of the existence of the combination, but also that the defendant knew of the criminal activity of the group. *See McGee v. State*, 909 S.W.2d 516, 518 (Tex. App.-Tyler 1995, pet. ref'd).

### 1. Applicable law to underlying criminal activities of bribery and money laundering.

Two of the predicate offenses alleged against Appellant in the charge of EOCA within the Superceding Indictment are bribery and money laundering. 1 CR 157-58. Penal Code sections 36.02(a)(1), (2) and 34.02(a)(4) define bribery and money laundering, respectively, as discussed above in Parts I(B) and II(A), *supra.*

### 2. Applicable law to underlying criminal activities of bribery and money laundering.

A person commits the offense of tampering with a governmental record if she makes, presents, or uses a governmental record with knowledge of its falsity. Tex. Penal Code § 37.10(a)(5) (Vernon 2008). A governmental record is defined as anything "belonging to, received by, or kept by government for information," or anything required by law to be

kept by others for information of government. *Id.* at § 37.01(2)(A), (B). Additionally, a "partisan or independent candidate for an office as an elected officer" is required to file a financial statement that contains an account of the financial activity of the candidate, including:

(5) identification of each guarantor of a loan and identification of each person or financial institution to whom a personal note or notes or lease agreement for a total financial liability in excess of $1,000 existed at any time during the year and the category of the amount of the liability; . . .

(7) identification of a person or other organization from which the individual or the individual's spouse or dependent children received a gift of anything of value in excess of $250 and a description of each gift, except:

(A) a gift received from an individual related to the individual at any time within the second degree by consanguinity or affinity, as determined under Subchapter B, Chapter 573; [and]

(B) a political contribution that was reported as required by Chapter 254, Election Code.

Tex. Gov't Code §§ 572.021, 572.023(a), (b)(5), (b)(7) (Vernon 2008).

## C. Sufficient evidence supports Appellant's conviction for EOCA in committing or conspiring to commit bribery and/or money laundering.

Appellant argues that there is insufficient evidence to sustain his conviction for EOCA because there is insufficient evidence that demonstrates he committed or conspired to commit the underlying

criminal activities of bribery and/or money laundering. Brief at 31-32. Appellant incorporates his arguments as stated in his Points of Errors One and Three in support of his insufficiency claims. *Id.* Likewise, the State has demonstrated in Parts I and II, *supra*, that sufficient evidence supports Appellant's commission, either as a primary actor or as a party, of bribery and money laundering. Because a general verdict was returned, the verdict will be upheld if the evidence is sufficient to support a finding of guilt under any allegation. *See Fuller v. State*, 827 S.W.2d 919, 931 (Tex. Crim. App. 1992); *Kitchens v. State*, 823 S.W.2d 256, 258 (Tex. Crim. App. 1991); *Aguirre v. State*, 732 S.W.2d 320, 326 (Tex. Crim. App. 1982). Accordingly, sufficient evidence supports the jury's finding of guilt in the charge of EOCA against Appellant for the criminal activities of bribery or money laundering.

### D. Sufficient evidence supports Appellant's conviction for EOCA in the commission or conspiracy to commit tampering with a governmental record.

Appellant argues that there is insufficient evidence to support his conviction for EOCA for committing or conspiring to commit tampering with a government record, where the Superceding Indictment alleged Wooten knowingly prepared and affirmed her Personal Financial Statement with false information, and Appellant provided funding in the furtherance of that activity. Brief at 33-36. Namely, Appellant alleges that he had no knowledge or involvement with Wooten's election filings,

including her Personal Financial Statement (Tex. Gov't Code § 572.023), or the statutory requirements of election filings. Brief at 26-27.

Again, because a general verdict was returned, the verdict will be upheld if the evidence is sufficient to support a finding of guilt under any allegation of EOCA, whether-as applied here-that be pursuit of bribery, money laundering, or tampering with a governmental record. *See Fuller*, 827 S.W.2d at 931; *Kitchens*, 823 S.W.2d at 258; *Aguirre*, 732 S.W.2d at 326. Regardless, sufficient evidence supports the jury's finding of Appellant's guilt of EOCA, predicated upon Wooten's tampering with a government record.

Although no direct evidence of Appellant's knowledge of Wooten's campaign records or record filing requirements was presented, circumstantial evidence may be used to prove the state of mind required to support Appellant's conviction. *See Munoz v. State*, 29 S.W.3d 205, 209 (Tex. App.–Amarillo 2000, no pet.). Such circumstantial evidence may also be used to prove the existence of an agreement to work together in continuing criminal activities. *See id.*; *Hart*, 89 S.W.3d at 64.

Looking at the evidence described above in Part I(F), *supra*, a rational trier of fact could have found the cumulative effect of that evidence was proof beyond a reasonable doubt that Appellant, with intent to establish, maintain, or participate in a combination, conspired for Wooten to commit tampering with a governmental record. Namely, a

rational juror could reasonably infer that-where Appellant's wife provided funds that were ultimately used to finance Wooten's campaign; and the phone records reflect communications occurred primarily between Appellant and Spencer, Appellant and his wife, or Spencer and Wooten; and Wooten's campaign reports do not reflect monies received from or loaned by the Carys-Appellant was committing or conspiring to commit tampering with a governmental record, in combination with his wife and/or Spencer, and/or Wooten.

Again, members of the combination need not know each other's identity. Tex. Penal Code § 71.01(a). Thus, contrary to Appellant's assertion, Wooten did not need to know that Appellant was directing his wife to provide $150,000.00 to Spencer, who provided invoices to Wooten and jointly approved campaign expenses with Wooten. However, as a candidate, Wooten was responsible for knowing where her campaign's funding came from, particularly given the restrictions on the allowable amounts of gifts and loans from individuals to a judicial campaign. *See* Tex. Gov't Code § 572.023. A rational trier of fact could have inferred from the evidence presented at trial that Wooten deliberately chose to remain ignorant of where her novice campaign manager obtained a six-figure sum to pay for her campaign expenses.

In order to prove the defendant's intent to participate in a combination, the State must prove not only that the defendant knew of the

existence of the combination, but also that the defendant knew of the criminal activity of the group. *See McGee*, 909 S.W.2d at 518. Although Appellant argues he did not know the reporting requirements for judicial candidates, his ignorance of the law is no excuse. *See Tovar v. State*, 978 S.W.2d 584, 588, 589 (Tex. Crim. App. 1998) (Baird, J., concurring), (Price. J., concurring) (citation omitted). For the same reason, Appellant cannot successfully argue that he was unaware of the statutory limits placed on individual political contributions or loans. Accordingly, the jury could have inferred that-given Appellant's blatant disregard for complying with any such restrictions-Appellant must have intended for Wooten to omit him, his wife, and/or Spencer from her Personal Finance Statement as the bulk of her campaign resources. *See Crum*, 946 S.W.2d at 356 (the State need not demonstrate the participation of all alleged members of the combination; the State need only prove the participation of at least three of the named members of the combination, including the defendant); *see also Hart*, 89 S.W.3d at 63 (the State must prove the defendant's intent to establish, maintain, or participate in a combination).

Accordingly, when viewed in the light most favorable to the verdict, sufficient evidence supports Appellant's conviction for EOCA.

## IV. STATE'S REPLY TO POINT OF ERROR FOUR

### A. Ineffective Assistance of Counsel Standards

Both federal and State constitutions guarantee a defendant the right to counsel. *See* U.S. Const. Amend. VI; Tex. Const. Art I, sec. 10; Tex. Code Crim. Proc. Ann. art. 1.05 (West 2011). The right to counsel means the right to effective counsel. *See Strickland v. Washington*, 466 U.S. 668 (1984); *Ex parte Gonzalez*, 945 S.W.2d 830, 835 (Tex. Crim. App. 1997). When a defendant challenges his conviction or sentence based upon the ineffective assistance of trial counsel, his challenge is subject to the two-prong *Strickland* test: (1) whether counsel's performance fell below an objective standard of reasonableness; and, if so, (2) whether there is a reasonable probability that, but for counsel's error, the outcome would have been different. *Strickland*, 466 U.S. at 669; *Thomas v. State*, 9 S.W.3d 808, 812 (Tex. Crim. App. 1999); *Hernandez v. State*, 988 S.W.2d 770, 770 (Tex. Crim. App. 1999). Effective assistance of counsel, however, does not mean a right to errorless counsel, but rather to objectively reasonable representation. *See Strickland*, 466 U.S. at 686; *Robertson v. State*, 187 S.W.3d 475, 483 (Tex. Crim. App. 2006). In determining whether counsel was ineffective, we consider the totality of the circumstances of the particular case. *Thompson v. State,* 9 S.W.3d 808, 813 (Tex. Crim. App. 1999). It is the defendant's burden to prove ineffective assistance of counsel by a preponderance of the evidence. *Id.*

In reviewing the first prong of an ineffectiveness of counsel challenge to a conviction, there is a strong presumption an attorney's performance is encapsulated within a wide range of reasonable professional assistance. *Hernandez*, 988 S.W.2d at 772. Appellant must: (1) rebut this presumption that trial counsel is competent by identifying the acts and/or omissions of counsel that are alleged as ineffective assistance; and (2) affirmatively prove that such acts and/or omissions fell below the professional norm of reasonableness by a preponderance of the evidence. *McFarland v. State*, 928 S.W.2d 482, 500 (Tex. Crim. App. 1996), *overruled on other grounds by Mosley v. State*, 983 S.W.2d 249 (Tex. Crim. App. 2001). Such proof must be made on the record, affirmatively demonstrating the alleged ineffectiveness. *See McFarland*, 928 S.W.2d at 500. An ineffective assistance claim with a record silent as to trial counsel's motivations will generally fail, as the presumption that the attorney's conduct was reasonable has not been overcome. *Mallett v. State*, 65 S.W.3d 59, 63 (Tex. Crim. App. 2001) (denying ineffective assistance claim where record is silent as to why counsel did not request guilty plea withdrawn). When, however, a motion for new trial is conducted, at which the testimony of the trial counsel is recorded, such evidence may serve as the basis for determining ineffectiveness of counsel. *Gibbs v. State*, 7 S.W.3d 175, 179 (Tex. App.–Houston [1st Dist.] 1999, pet. ref'd) (noting that, in the absence

of a proper evidentiary record developed at a hearing on a motion for new trial, it is extremely difficult to show trial counsel was ineffective).

To determine *Strickland* prejudice during sentencing, Appellant must show that, as a result of the purported constitutionally deficient performance of trial counsel, the punishment assessed would have been less severe. *Hernandez*, 988 S.W.2d at 772-74 (extending the test for *Strickland* prejudice to non-capital sentencing); *but see Mendoza v. State*, 2008 WL 2403769, *4, 11 (Tex. App.–Houston [14 Dist.[, Jun 12, 2008) (Nos. 14-06-01015-CR, 14-06-01016-CR) (citing *Miller v. Dretke*, 420 F.3d 356, 365 (5th Cir. 2005) (Courts determine if the sentence given was significantly more harsh than the one that might have been given in the absence of counsel's deficient performance.).[21] Here as elsewhere, reasonable probability means "a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 669; *Thomas v. State*, 9 S.W.3d at 812.

Finally, it is not necessary to conduct the *Strickland* analysis in any particular order; if an appellant cannot demonstrate sufficient prejudice, a court may dispose of the claim on that ground. *Strickland*, 466 U.S. 697; *Hagens v. State*, 979 S.W.2d 788, 793–94 (Tex. App.–Houston [14th Dist.]

---

[21] Although *Mendoza* is an unpublished opinion–and, hence, does not bind the panel Court under principles of *stare decisis*–the State merely cites this case as persuasive authority.

90

1998, pet. ref'd); *Gamboa v. State*, 822 S.W.2d 328, 330 (Tex. App.-Beaumont 1992, pet. ref'd).

## B. Appellant was not Prejudice by Counsel's Performance at the Punishment Phase of Trial.

Appellant claims that trial counsel, Lawson Pedigo, was ineffective because he mistakenly failed to make a timely election of punishment by the court. Trial counsel tried to make that election after the State rested, but by then, it was too late without the State's consent, and the State did not consent. Appellant asserts that this error by trial counsel resulted in a substantially longer sentence than his co-conspirators, Suzanne Wooten and Stacy Cary. Brief, at 37. Appellant's claim, however, is without merit.

On July 22, 2011, and before commencement of the voir dire examination of the jury panel, Appellant's previous attorney, Keith Gore, filed an Election for Jury to Assess Punishment in Event of Conviction pursuant to Tex. Code Crim. Pro. Art. 37.07,[22] along with a motion for

---

[22] Article 37.07 of the Texas Code of Criminal Procedure provides to every defendant a statutory right to elect the judge or the jury to assess punishment. Article 37.07 provides as follows:

> [I]f a finding of guilty is returned, it shall then be the responsibility of the judge to assess the punishment applicable to the offense; provided, however, that (1) in any criminal action where the jury may recommend probation and the defendant filed his sworn motion for probation before the trial began, and (2) in other cases where the defendant so elects in writing before the commencement of the voir dire examination of the jury panel, the punishment shall be assessed by the same jury,.... If a finding of guilty is returned, the defendant may, with the

91

community supervision. 1 CR 15, 119, 257; *see* MNT RR 10-11. Lawson Pedigo was retained by Appellant in August or September 2012 to represent him at trial. 1 CR 199; MNT RR 10. On April 24, 2013, before the jury returned a guilty verdict, Mr. Pedigo filed an Amended Election for Judge to Assess Punishment in Event of Conviction, along with a follow-up brief in support of his amendment per the trial court's request. 9 RR 119-20; MNT RR 15-17.

After the jury returned a guilty verdict and prior to the hearing on punishment, the State objected to Appellant's amended motion for the judge to assess punishment as untimely and submitted that the jury must set the punishment. 10 RR 5-10. The trial court denied Appellant's amended motion citing Tex. Code Crim. Proc. Ann. art. 37.07, section 2(b), and the court's understanding that since the prosecutor refused to consent to the amendment which is necessary for the change, Appellant's original election filed before commencement of the voir dire examination of the jury panel must stand. 10 RR 10-11.

At the hearing on Appellant's motion for new trial, Appellant argued that Mr. Pedigo was ineffective for failing to realize that he had to file an amended punishment election before voir dire in order to make sure that his client could be sentenced by the judge which resulted in the jury

consent of the attorney for the state, change his election of one who assesses the punishment.
Tex. Code Crim. Proc. Ann. art. 37.07, § 2(b) (West 2010).

92

assessing a substantially longer sentence than his co-conspirators, Suzanne Wooten and Stacy Cary. 2 CR 757; MNT RR 5-21. The overwhelming amount of testimony at the motion for new trial dealt with Mr. Pedigo's argument that he failed to "appreciate" or "realize" the significance of the finality of the election. He thought he would have the ability to go before the judge for sentencing as did the two co-defendants, Wooten and Stacy. MNT RR 13-15. Mr. Pedigo acknowledged he made a mistake with the election and should have discussed it with the defendant, and amended it prior to voir dire. *Id.* at 20-21. Pedigo believed that if he had gone before the trial judge for sentencing, Appellant would have received probation, as with his co-conspirators, rather than the fourteen year sentence. *Id.* at 20-21. In support of his claim, Appellant cites to Suzanne Wooten and Stacy Cary's sentences. Brief at 38. On November 28, 2011, Wooten received an agreed sentence of probation from the State. 2 CR 796-807. On October 11, 2012, Appellant's wife Stacy, received a sentence of probation plus thirty days in jail from a trial judge. 2 CR 1004-1005.

In spite of his obvious propensity for falling on his sword at every available opportunity, Mr. Pedigo cannot be held ineffective for failing to timely file an amended election. Appellant argues that the sentences received by Wooten and Stacy Cary for their participation in the offenses were relevant to Appellant's sentencing. *See* Brief at 39-40. Appellant,

93

however, is mistaken. In *Joubert v. State*, the Texas Court of Criminal Appeals considered whether the trial court erred by excluding, at the punishment phase, evidence that the appellant's co-defendant received a thirty-year sentence as part of a plea bargain. 235 S.W.3d 729, 734 (Tex. Crim. App. 2007). The Court concluded that "[a] co-defendant's conviction and punishment have no bearing on a defendant's own personal moral culpability." *Id.* (citing *Morris v. State*, 940 S.W.2d 610, 613 (Tex. Crim. App. 1996) ("[E]vidence of a co-defendant's conviction and punishment is not included among the mitigating circumstances which a defendant has a right to present.")); *see Evans v. State*, 656 S.W.2d 65, 67 (Tex. Crim. App. 1983) ("We do not see how the conviction and punishment of a co-defendant could mitigate appellant's culpability in the crime. Each defendant should be judged by his own conduct and participation and by his own circumstances."). The Court stated that "such punishments 'relate[ ] neither to appellant's character, nor to his record, nor to the circumstances of the offense.'" *Joubert*, 235 S.W.3d at 735 (quoting *Morris*, 940 S.W.2d at 613); *see Walker v. State*, 530 S.W.2d 572, 573 (Tex. Crim. App. 1975) (holding that "upon the trial of one charged with crime it is not permissible to show that another jointly or separately indicted for the same offense has been convicted or acquitted."); *see also Eichelberger v. State*, 232 S.W.3d 225, 227 (Tex. App.-Fort Worth 2007, pet. ref'd) ("[O]nly a defendant's own circumstances are relevant in determining an appropriate

94

punishment for that defendant."); *Torres v. State,* 92 S.W.3d 911, 918 (Tex. App.–Houston [14th Dist.] 2002, pet. ref'd) ("The disposition of a co-defendant's case is generally not admissible in the trial of another co-defendant."); *Montoya v. State,* 65 S.W.3d 111, 114–15 (Tex. App.–Amarillo 2000, no pet.) ("Generally, the disposition of a case against a co-defendant is inadmissible at trial against another co-defendant."); *Beasley v. State,* 838 S.W.2d 695, 703 (Tex. App.–Dallas 1992, pet. ref'd) ("Ordinarily, the disposition of a case against co-defendants never becomes admissible in the trial of another co-defendant."). In light of this authority, even if Appellant had been sentenced by the judge, evidence of Wooten's and Stacy's sentences would have been inadmissible. *Id.* Thus, Appellant cannot prove prejudice. *Strickland*, 466 U.S. at 689. Because the record contains no other evidence of how Appellant would have benefitted from the timely election, Appellant fails to meet his burden to show that trial counsel was ineffective. *See Ex parte Martinez*, 330 S.W.3d at 901.

Moreover, in the non-capital context, the sentencing process consists of weighing mitigating and aggravating factors, and making adjustments in the severity of the sentence consistent with this calculus. *Milburn v. State*, 15 S.W.3d 267, 270 (Tex. App.–Houston [14th Dist.] 2000) (citing *Vela v. Estelle*, 708 F.2d 954, 965 (5th Cir. 1983)). But unlike the appellant in *Milburn*, Appellant is not presently claiming that trial counsel failed to present evidence of mitigating factors for the jury to balance against the

aggravating factors presented by the State. Rather, Appellant's only contention in support of prejudice assertion is that the trial court would have sentenced Appellant to less than fourteen years, on precisely the same evidence.

The preceding point bears repeating, Appellant is attempting to establish *Strickand* prejudice resulting from trial counsel's purported deficiency, for a non-capital sentencing regime that possess non-determinate, unconstrained sentencing discretion. But Appellant's only contention in support of his claim, is his rank speculation that the trial judge may have sentenced Appellant to less than fourteen years, in a non-determinate sentencing range of five years to *life*.

Turning to the relevant aggravating factors considered by the jury, the aggravating evidence showed that Eric Roberson's testimony clearly supported the fourteen-year sentence. 10 RR 15-30. Despite Appellant's total silence as to any aggravating factors admitted at punishment, *see* Brief at 37-40, a particularly aggravating factor was Mr. Roberson's testimony where upon meeting with David Cary in January 2008, Appellant said to Roberson that, "he could make certain that [Cary's] organization provided no less that fifty [50] thousand dollars to [Roberson's] campaign *if in exchange* [Roberson] would agree, once [Roberson] was a member of Congress, that [Roberson] would sponsor the

bill that they wanted." 10 RR 24 (emphasis added).[23]  Roberson testified that, in running for Congress, he knew ". . . you cannot accept a campaign contribution *in exchange for* a promise to do a specific official act or an exchange to refrain from doing a specific official act.  *Id.* at 25 (emphasis added). This evidence alone–that Appellant attempted to bribe a candidate for Congress–which was unique to Appellant's trial, means that he can never establish a sufficient similarity between his trial and the others to prove prejudice.

Lastly, the State observes that Cary's fourteen year sentence for the Engaging in Organized Criminal Activity fell far short of the maximum of life, indicating that the jury afforded him a considerable measure of clemency.  *See* 2 CR 659; 2 CR 666-75.  Applying *Hernandez* here, Cary cannot meet his burden of proof and is unable to show that his sentence would have been significantly less harsh than the one that might have been given in the absence of counsel's alleged deficient performance.

---

[23]  During their meeting, Appellant told Roberson he believed that the way family law in Texas was written, "it was impossible for men to win in a divorce type hearing." 10 RR 24. Appellant wanted Roberson to sign "a bill that would redefine certain family law terms so that men and women would be equalized in divorce cases and so we wouldn't have this societal ability for women to have an incentive to file for divorce." *Id.* at 24-25.

## V.   STATE'S REPLY TO POINTS OF ERRORS FIVE AND SIX

### A.   Appellant Waived Challenges to the Constitutionality of Texas Penal Code Section 36.02.

Appellant claims the Texas bribery statute Section 36.02(a)(1),(4) is unconstitutional as applied for impermissibly burdening his first amendment right to exercise political speech, and is unconstitutional on its face for vagueness and overbreadth. Brief at 41-47. Appellant, however, failed to preserve this issue for appeal.

### A.   Forfeiture of Complaint

To preserve error for appellate review, the record must show that a defendant raised his complaint by a timely and specific objection. *See* Tex . R. App. Proc. 33.1(a)(1)(A); *Haley v. State*, 1 73 S.W.3d 510, 516 (Tex. Crim. App. 2005). Without proper preservation, even constitutional error may be waived. *Wright v. State*, 28 S.W.3d 526, 536 (Tex. Crim. App. 2000); *Draughon v. State*, 831 S.W.2d 331, 336 (Tex. Crim. App. 1992). The only complaints that are exempt from the requirements of rule 33.1 are those involving systematic or absolute requirements, or rights that are waiveable only. *See Neal v. State*, 150 S.W.3d 169, 175 (Tex. Crim. App. 2004); *Marin v. State*, 851 S.W.2d 275, 279-280 (Tex. Crim. App. 1993). All other complaints, whether constitutional or statutory, are forfeited by the failure to comply with rule 33.1. *See Neal*, 150 S. W.3d at 175.

The Court of Criminal Appeals recently held that a defendant may not raise for the first time on appeal a facial challenge to the constitutionality of a statute. *See Karenev v. State*, 261 S.W.3d 428, 434 (Tex. Crim. App. 2009) (a facial challenge to the constitutionality of statute falls within the category of rights that can be forfeited). In so holding, the CCA explained that statutes are presumed to be constitutional until it is determined otherwise and "[t]he State and the trial court should not be required to anticipate that a statute may later be held to be unconstitutional." *Id.* Here, Appellant filed a Motion to Quash Superseding Indictment for Failure to Provide Sufficient Notice of Crimes Charged. 1 CR 206-19. Appellant's motion only challenged deficiencies in the indictment, not a constitutional facial challenge to the bribery statute itself. *Id.* This holding, which intermediate courts are bound to apply, prevents the Court from considering Appellant's fifth and sixth claims. Accordingly, because Appellant did not present a challenge to the facial constitutionality of Texas Penal Code Section 36.02(a)(1),(4) in the trial court, he may not do so now on appeal, and has thus waived these claims. *See* Tex. R. App. P. 33.1(a)(1)(A); *Karenev*, 281 S.W.3d at 434; *see also Holmes v. State*, 380 S.W.3d 307, 308-309 (Tex. App.—Fort Worth 2012, pet. ref'd) (constitutionality of a statute as applied to the defendant must be raised in the trial court to preserve error). Even if preserved, however,

99

this court should reject appellant's arguments that the bribery statute is unconstitutional.

## B.   Standard of Review for Claim Five

Where First Amendment freedoms are implicated, the law must be sufficiently definite to avoid chilling protected expression. *Long v. State*, 931 S.W.2d 285, 287 (Tex. Crim. App. 1996) (citing *Grayned v. Rockford*, 408 U.S. 104 (1972)).  When the constitutionality of a statute is at issue, we presume the statute is valid and that the legislature did not act unreasonably or arbitrarily in enacting the statute. *Weyandt v. State*, 35 S.W.3d 144, 155 (Tex. App.–Houston [14th Dist.] 2000, no pet.). The burden rests on the moving party to establish its unconstitutionality. *Id.*. Furthermore, courts will uphold the statute if a reasonable construction of it can be determined which will render it constitutional and carry out the legislative intent. *Weyandt*, 35 S.W.3d at 155.

## C.   The Benefit Given by Appellant to Ms. Wooten Did Not Constitute Protected First Amendment Speech.

In his fifth issue, Appellant claims that Section 36.02 violates the United States Constitution by infringing upon his right to free speech. According to Appellant, Cary's conduct of "providing indirect financing to Wooten's judicial campaign" and "criminalizing such conduct as a bribe without any evidence of a *quid pro quo* agreement impermissibly restricts Appellant's right to exercise political speech in violation of the First

Amendment." Brief at 41. Appellant, however, is estopped from raising this claim. The CCA has recognized that a party may be estopped from asserting a claim that is inconsistent with that party's prior conduct. *See Arroyo v. State*, 117 S.W.3d 795, 798 (Tex. Crim. App. 2003) (discussing *State v. Yount*, 853 S.W.2d 6, (Tex. Crim. App. 1993) and *Prystash v. State*, 3 S.W.3d 522 (Tex. Crim. App.1 999)). In the instant case, Appellant argued in his Motion to Quash Superseding Indictment that any monies paid from Stacy Cary to Judge Wooten were *not* "campaign contributions," and most importantly, Appellant had no connection to these payments to Wooten as they were connected to Stacy Cary. *See e.g.*, 1 CR 203-18; 9 RR 61-62. Moreover, the position Appellant now takes on appeal, that monies paid to Wooten are now campaign contributions from David Cary, Brief at 41-47, is contrary to his defense at trial. Appellant, however, cannot have it both ways. In light of the trial record, Appellant should be estopped from now asserting on appeal that monies paid to Wooten by Spencer are "campaign contributions." *See Arroyo,* 117 S.W. 3d at 798 (explaining that party may be estopped from asserting claim that is inconsistent with his prior conduct); *see also Jones v. State*, 119 S.W.3d 766, 784 (Tex. Crim. App. 2003) (defendant was estopped from raising issue on appeal that trial court's discharge of juror was inappropriate where defendant himself proposed discharge as alternative to mistrial) *Davidson v. State,* 737 S.W.2d 942, 948 (Tex. App.-Amarillo 1987, pet. ref'd) (stating that

101

defendant could not argue that evidence was insufficient to show cause of death after admitting victim's cause of death).

Regardless, Appellant is incorrect because Texas courts have already found that, "[b]ribery and extortion, while involving 'speech,' are not protected by the First Amendment." *Sanchez v. State*, 995 S.W.2d 677, 688 (Tex. Crim. App. 1999).

First, the Supreme Court has not revisited the constitutionality of individual campaign contribution limitations since it upheld those limitations in *Buckley v. Valeo*, 424 U.S. 1 (1976). As support for his argument, Appellant cites to *McCutcheon v. Fed. Election Comm'n*, 134 S.Ct. 1434, 1442 (2014), where the Court held that "aggregate limits," which "restrict[ ] how much money a donor may contribute in total to all candidates or committees" in a given election cycle violated the First Amendment. *Id*. *McCutcheon*, however, did "not involve any challenge to the base limits" and "restrict how much money a donor may contribute to any particular candidate or committee" and which *Buckley* "previously upheld as serving the permissible objective of combating corruption." *Id*. The Supreme Court has made clear that *only certain* contribution limits comport with the First Amendment. Since contributing money is a form of speech, preventing *quid pro quo* corruption or its appearance is the only governmental interest strong enough to justify restrictions on political speech. *Citizens United v. FEC*, 558 U.S. 310, 357–61 (2010). In

*McCutcheon*, the Court concluded that "the possibility that an individual who spends large sums may garner influence over or access to elected officials or political parties ... does not give rise to such *quid pro quo* corruption." 134 S.Ct. at 1438. In effect, it is only direct bribery, that has been violated in this case—not influence—that the Court views as crossing the line into *quid pro quo* corruption. *See* Part I, *supra*. Thus, *McCutcheon* is inapplicable to this instant case.

Essentially, Appellant complains that under the State's theory of the case, Cary's monies given to Spencer for Wooten were "campaign contributions" and therefore acts protected by the First Amendment. Brief at 41-43. But, the State pursued prosecution regarding the Appellant's benefits–namely monetary exchanges–which were explicitly alleged within the indictment not to be campaign contributions.[24] *See* 1 CR 156-65. The payments do not meet the definition of legal campaign contributions. Accordingly, Appellant fails to present a meritorious claim for relief.

Moreover, to the extent Appellant argues that the payments to Spencer were campaign contributions, thus invoking § 36.02(a)(4) of the Texas Penal Code, his argument still fails. First, under the Penal Code, "[i]t is an exception to the application of Subdivisions (1), (2), and (3) of Subsection (a) that the benefit is a political contribution as defined by Title

---

[24] The State does not concede that Cary's payments were campaign contributions, but will proceed to show that the claims that they are would not allow Appellant relief.

103

15, Election Code." § 36.02(d). Evidence presented to the jury that the payments made to Spencer for the benefit of Suzanne Wooten were (a) not reported on Suzanne Wooten's campaign finance reports in any form; (b) not reported as a loan on Wooten's personal financial statements, and (c) were over the limit of an allowable contribution to a judge. Tex. Elec. Code §§ 254.031, 253.155(b). Since the evidence demonstrated that the payments made by David Cary do not meet the criteria for a proper legal contribution, Appellant's conduct is not encompassed within § 36.02(a)(4).

The Legislature has charged Courts with reading statutes to give "a just and reasonable result," and that the statute be interpreted in "compliance with the constitutions of the state and the United States." Tex. Gov't Code § 311.021(3), (1). And that "(t)he rule that a penal statute is to be strictly construed does not apply to this code. The provisions of this code shall be construed according to the fair import of their terms, to promote justice and effect the objectives of the code." Tex. Penal Code §1.05(a).

The Court of Criminal Appeals has stated that a court should ordinarily interpret a criminal statute according to the text because that shows the Legislature's and Governor's intent. *Boykin v. State*, 818 S.W.2d 782,785 (Tex. Crim. App. 1991). The Court recognized that this form of statutory interpretation should not be followed "where application of a statute's plain language would lead to absurd consequences that the

104

Legislature could not possibly have intended." *Id.* (italics in original); *see Moore v. Avoyelles Corr. Ctr.*, 253 F.3d 870, 872 (5th Cir. 2001) (Legislative intent determined by looking at the plain language of the statute and if the intent is apparent on the face of the statute no further inquiry is needed.). "When used in the proper manner, this narrow exception to the plain meaning rule does not intrude on the lawmaking powers of the legislative branch, but rather demonstrates respect for that branch, which we assume would not act in and absurd way." *Boykin*, 818 S.W.2d at 785.

In interpreting the bribery statutes, the Legislature's intent is clear. The preamble to the Senate Bill 1, 72nd Legislature, Regular Session, 1991[25] shows how this law is to be interpreted:

BE IT ENACTED BY THE LEGISLATURE OF THE STATE OF TEXAS:

ARTICLE 1

SECTION 1.01. PURPOSE. It is the policy of the Legislature of the State of Texas to protect the constitutional privilege of free suffrage by regulating elections and prohibiting undue influence, while also protecting the constitutional right of the governed to apply to their government for

---

[25] S.B. No. I modified the existing bribery statutes creating § 36.02(a)(4) along with the Ethics Commission and strengthened reporting requirements for certain elected officials and appointees. *See* 2 CR 469-89.

the redress of grievances. To these ends, the provisions of this Act are intended, and shall be construed, to achieve the following objectives:

1) to control and reduce the cost of elections;

(2) to eliminate opportunities for undue influence over elections and government action;

(3) to fully disclose information related to expenditures and contributions for elections and for petitioning the government;

(4) to enhance the potential for individual participation in electoral and governmental processes; and

(5) to ensure the public's confidence and trust in its government.

S.B. No. 1 72nd Regular Session, Texas Legislature.

Appellant is asking this court to grant him First Amendment rights that do not exist. Appellant claims that Stacy Cary's payments, at the direction of Appellant, have some Constitutional protection, yet provides no valid legal arguments or case law support. In fact, the United States Supreme Court has consistently upheld laws regulating the amount of campaign donations, finding that these laws do pass First Amendment muster. *See Federal Elections Commission v. Beaumont*, 539 U.S. 146, 161 (2003); *McConnell v. Federal Elections Commission*, 540 U.S. 93, 138 (2003). In *McConnell*, the Court stated,

> Our treatment of contribution restrictions reflects more than the limited burdens they impose on First Amendment freedoms. It also reflects the importance of the interests that underlie contribution limits-interests in preventing both the actual corruption threatened by large financial contributions and the eroding of public confidence in the electoral process through the appearance of corruption.

*McConnell*, at 136, at 656. *See also Buckley v. Valeo*, 424 U.S. at 27. The Supreme Court has also upheld that requirements of disclosure of campaign contributions do not violate the First Amendment. *Citizens United v. Federal Election Commission*, 130 S.Ct. 876, 913-914 (2010).

Appellant asks the court to read the entirety of § 36.02 in an unreasonable and unprecedented manner. What Appellant suggests the court do is to read into the bribery statute First Amendment protection to a person—who, in league with his accomplices, has gone out of his way to violate numerous campaign finance laws regarding contribution limits and reporting requirements.

To require the State to prosecute a person who gives a politician money under § 36.02(a)(4), after every effort has been made to conceal the source and destination of the money by (1) making the payment to a third party, (2) failing to ever deposit the money into the judicial candidate's account, and (3) failing to report this money in any public document is an outcome contrary to legislative intent, precedent and the facts, and is absurd.

Logically, bribery as defined under § 36.04(a)(4) is found only when the contribution is made in a manner that is open to public scrutiny. Politicians cannot be prosecuted for bribery for a legal and properly reported campaign contribution unless there is direct evidence of the *quid pro quo*. But as we have here, with all the monies hidden, there is no basis in law or logic reason to grant relief on this claim.

### D. Standard of Review for Claim Six

The burden rests upon the person who challenges a statute to establish its unconstitutionality. *Kfouri v. State*, 312 S.W.3d 89, 92 (Tex. App.-Houston [14th Dist.] 2010, no pet.). In determining whether a law is vague and overbroad, the elementary principle of statutory construction requires us to interpret a statute in accordance with the plain meaning of its language unless the language is ambiguous or the plain meaning leads to absurd results. *Sanchez*, 995 S.W.2d at 683; *Duncantell v. State*, 230 S.W.3d 835, 842-43 (Tex. App.–Houston [14th Dist.] 2007, pet. ref'd). In determining a statute's plain language, words and phrases shall be read in context and construed according to the rules of grammar and usage. *Sanchez*, at 683; *Duncantell*, at 843. Courts begin the review of the constitutionality of a statute with the presumption that the statute is valid and that the legislature did not act arbitrarily and unreasonably in enacting the statute. *Duncantell*, 230 S.W.3d at 843. Courts must uphold a statute if it can determine a reasonable construction that will render it

constitutional. *Id.* When an appellant challenges a statute as both unconstitutionally overbroad and vague, courts address the overbreadth challenge first. *Id.*

"A facial challenge to a legislative act is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the act would be valid." *Briggs v. State*, 789 S.W.2d 918, 923 (Tex. Crim. App. 1990); *State v. Garcia*, 823 S.W.2d 793, 796–97 (Tex. App.-San Antonio 1992, pet. ref'd). In a facial challenge to the overbreadth and vagueness of a law, a court's first task is to determine whether the enactment reaches a substantial amount of constitutionally protected conduct. *Garcia*, 823 S.W.2d at 797 (citing *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 494–95 (1982)). If it does not, then the overbreadth challenge must fail. *Id.* The court should then examine the facial vagueness challenge and, assuming the enactment implicates no constitutionally protected conduct, should uphold the challenge only if the enactment is impermissibly vague in all of its applications. *Id.*

Here, Appellant alleges that he Texas Bribery Statute is unconstitutional on its face for vagueness and overbreadth. Brief at 44-47. For the following reasons, Appellants' arguments fail.

## E. Section 36.02 is Not Unconstitutionally Overbroad.

A statute is impermissibly overbroad if, in addition to proscribing activities that may be constitutionally prohibited, it sweeps within its coverage speech or conduct protected by the First Amendment. *Duncantell v. State*, 230 S.W.3d at 843. Section 36.02(a)(1), (4) provides that a person commits bribery if:

> (a)  he intentionally or knowingly offers, confers, or agrees to confer on another, or solicits, accepts, or agrees to accept from another:
>
> (1) any benefit as consideration for the recipient's decision, opinion, recommendation, vote, or other exercise of discretion as a public servant, party official, or voter;
>
> or
>
> (4) any benefit that is a political contribution as defined by Title 15, Election Code, or that is an expenditure made and reported in accordance with Chapter 305, Government Code, if the benefit was offered, conferred, solicited, accepted, or agreed to pursuant to an express agreement to take or withhold a specific exercise of official discretion if such exercise of official discretion would not have been taken or withheld but for the benefit; notwithstanding any rule of evidence or jury instruction allowing factual inferences in the absence of certain evidence, direct evidence of the express agreement shall be required in any prosecution under this subdivision.

Tex. Pen. Code Ann. §§ 36. 02(a)(1), (4) (West 2007). The offense proscribed in the instant case is in many ways similar to extortion. *See Sanchez*, 995 S.W.2d at 687. Bribery, while involving "speech," is not protected by the First Amendment. *Id*. Bribes are not protected simply because they are written or spoken; extortion is a crime although it is verbal. *Id*. (citing *United States v. Marchetti*, 466 F.2d 1309, 1314 (4th Cir. 1972)). Accordingly, the type of speech prohibited by section 36.02 is not within the nature of speech protected by the First Amendment; therefore, Section 36.02 is not overbroad in violation of any constitutional provisions. *See Colten v. Kentucky*, 407 U.S. 104 (1972); *McMorris v. State*, 516 S.W.2d 927, 929-30 (Tex. Cr. App.1974).

F.   Section 36.02 is Not Unconstitutionally Vague.

A statute will be declared unconstitutionally vague if its prohibitions are not clearly defined. *Duncantell*, 230 S.W.3d at 844; *see Papachristou v. City of Jacksonville*, 405 U.S. 156 (1972) (statute void for vagueness if it fails to give a person of ordinary intelligence fair notice that his contemplated conduct is forbidden by the statute.). The vagueness doctrine is not, however, designed to convert into a constitutional dilemma the practical difficulties in drawing criminal statutes general enough to take into account a variety of human conduct and sufficiently specific to provide fair warning that certain kinds of conduct are prohibited. *Id*. A two-part inquiry is applied in examining a criminal statute for vagueness.

*Id.* First, courts review the statute to determine whether an ordinary law-abiding person receives sufficient information from the statute that his conduct risks violating the criminal law. *Id.* A criminal statute need not be mathematically precise; it need only give fair warning, in light of common understanding and practices. *Id.* at 845. A statute is unconstitutionally vague when no core of prohibited activity is defined. *Id.* Second, courts determine whether the statute provides sufficient notice to law enforcement personnel to prevent arbitrary or discriminatory enforcement. *Id.* A statute must be sufficiently definite to avoid the possibility of arbitrary and erratic arrests and convictions. *Id.*

Here, Appellant gives no support of his claim that the "bribery statute is void for vagueness because it fails to give a person of ordinary intelligence a reasonable opportunity to know that indirect campaign financing by way of an interest-free loan to a candidate from a third-party would be prohibited as a 'bribe.' " Brief at 45. He just states that "the statute is indefinite and susceptible to arbitrary enforcement. . .", without any evidentiary support and no application of law. *Id.* Nor does he provide a clear and concise argument for the contentions he makes with appropriate citation to the record. *See* Tex. R. App. Proc. 38.1(I); *Swearingen v. State*, 101 S.W.3d 89, 100 (Tex. Crim. App. 2003) (concluding appellant failed to adequately brief issue when he failed to apply law to facts of case as required under appellate rules). Because

112

Appellant has failed to adequately brief this issue, this court need not reach the merits of his complaint.[26]

Regardless, Appellant's claim lacks merit. As previously cited in Part V.D, *supra*, this same offense, Section 36.02, was similarly attacked as being void for vagueness in *Mutscher v. State*, 514 S.W.2d 905 (Tex. Crim. App. 1974). The court concluded in *Mutscher* that the relevant bribery statutes of the then applicable penal code "clearly furnish(ed) adequate warning to anyone of ordinary intelligence that the kind of conduct embarked on by appellants would constitute an offense." The present penal code section making bribery an offense is an amendment of the 1974 codification of the various provisions previously set forth in Title V, Chapter 1, of the state's former penal code. It is readily apparent, from a review of the current statute, what conduct is prohibited by the statute and that the statute's application is appropriately restricted so as not to result in arbitrary and erratic convictions. Therefore Section 36.02 is not unconstitutionally vague. *See Connally v. General Construction Company*,

---

[26] The State notes that Appellant did not provide the court with any relevant citations to the record regarding these points. If a party does not refer the appellate court to the precise pages in the record where the error allegedly occurred, the appellate court may properly overrule the point(s) as inadequately briefed. *Lawton v. State*, 913 S.W.2d 542, 554 (Tex. Crim. App. 1995), disavowed on other grounds by *Mosley v. State*, 983 S.W.2d 249, 263, n.18 (Tex. Crim. App. 1998) (op. on reh'g); *Alvarado v. State*, 912 S.W.2d 199, 210 (Tex. Crim. App. 1995).

269 U.S. 385 (1925); *McMorris v. State*, 516 S.W.2d 927 (Tex. Crim. App. 1974).

## PRAYER FOR RELIEF

FOR ALL THESE REASONS, the State respectfully requests that this Honorable Court overrule Appellant's points of error and affirm his convictions and sentences.

Respectfully submitted,

GREG ABBOTT
Attorney General of Texas

DANIEL T. HODGE
First Assistant Attorney General

DON CLEMMER
Deputy Attorney General
  for Criminal Justice

HARRY E. WHITE
Assistant Attorney General
Criminal Prosecutions Division

EDWARD L. MARSHALL
Chief, Criminal Appeals Division

 /s/  Gretchen B. Merenda

*Lead Counsel          GRETCHEN B. MERENDA*
Assistant Attorney General
State Bar No. 24010233

P.O. Box 12548, Capitol Station
Austin, Texas  78711-2548
Telephone: (512) 936-1400
Facsimile: (512) 936-1280

ATTORNEYS FOR THE STATE

## CERTIFICATE OF COMPLIANCE WITH
## TEXAS RULE OF APPELLATE PROCEDURE 9.4

This brief does not comply with Tex. R. App. Proc. 9.4 in that it contains 28,842 words, in Microsoft WordPerfect 12, Century, 14 points. The State has, however, filed a "Motion to Exceed Word Count Limit for Appellee Brief," in compliance with Rule 9.4(i)(4) of the Texas Rules of Appellate Procedure.

 /s/  Gretchen B. Merenda
GRETCHEN B. MERENDA*
Assistant Attorney General

115

## CERTIFICATE OF SERVICE

Pursuant to Rule 9.5(b)(1) of the Texas Rules of Appellate Procedure, I do hereby certify that, if the email address for counsel of record for appellant is on file with the electronic filing manager, then a true and correct copy of the foregoing pleading was served electronically through the electronic filing manager. In addition, I do hereby certify that on September 10, 2014, a true and correct copy of the foregoing pleading was served on the following attorneys via electronic mail:

John M. Helms
jhelms@fhsulaw.com

/s/ Gretchen B. Merenda
GRETCHEN B. MERENDA*
Assistant Attorney General